```
 1              UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2                    1:16-cv-01038
                                    )
 3   ARIANA QAYUMI                  )
                                    )
 4                                  )
        Plaintiff,                  )
 5                                  )
     VS.                            )
 6                                  )
                                    )
 7   DUKE UNIVERSITY,               )
                                    )
 8                                  )
        Defendant.                  )
 9                                  )

10

11

12

13

14

15

16

17

18

19

20   DEPOSITION OF ELI KOZIN

21

22   At Durham, North Carolina
     June 19, 2017
23   9:36 a.m.
     Reported by: Leslie Christian
24

25
```

Case 1:16-cv-01038-CCE-JLW   Document 81-3   Filed 02/02/18   Page 1 of 49

Page 2

```
1        A P P E A R A N C E S :
2  FOR THE PLAINTIFF:
3  Robert C. Ekstrand, Esquire
   EKSTRAND & EKSTRAND, LLP
4  110 Swift Avenue, Second Floor
   Durham, North Carolina 27705
5  (919)416-4590
   rce@ninthstreetlaw.com
6
   FOR THE DEFENDANT:
7
   Christopher W. Jackson, Esquire
8  ELLIS & WINTERS, LLP
   300 North Greene Street, Suite 800
9  Greensboro, North Carolina 27401
   (336)389-5686
10 chris.jackson@elliswinters.com
11 FOR ELI KOZIN:
12 Glen D. Bachman, Esquire
   BACHMAN & SWANSON, PLLC
13 1402 Broad Street
   Durham, North Carolina 27705
14 (919)286-1061
   gdb@bachmanswanson.com
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1        T A B L E   O F   C O N T E N T S
2  EXAMINATIONS - ATTORNEY              PAGE
```
```
3  Direct - Mr. Jackson                   4
4  Cross - Mr. Bachman                   91
5  Recross - Mr. Ekstrand                91
6  Redirect - Mr. Jackson               113
7
8        E X H I B I T S
9  NO.        DESCRIPTION               PAGE
10 Exhibit 19   Subpoena                 14
11 Exhibit 20   Text messages            39
12 Exhibit 21   Declaration of Eli Kozin 65
13 Exhibit 22   E-mail exchanges         71
```
```
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1        S T I P U L A T I O N S
2        I, Leslie Christian, being a court reporter
3  and a Notary Public in and for the state of North
4  Carolina, was appointed commissioner by consent to
5  record the deposition of ELI KOZIN, on June 19, 2017
6  beginning at 9:36 a.m., at the offices of Bachman &
7  Swanson, PLLC, located at 1402 Broad Street, Durham,
8  North Carolina.
9        P R O C E E D I N G S
10 Whereupon,
11        ELI KOZIN,
12 having been duly sworn by the Notary Public, was
13 examined and testified as follows:
14 DIRECT EXAMINATION BY
15 MR. JACKSON:
16    Q.   Good morning, Mr. Kozin.
17    A.   Good morning.
18    Q.   My name is Chris Jackson.  I'm a lawyer.  I
19 represent Duke University in a case that's been filed
20 by a young woman named Ariana Qayumi who's kind of
21 represented by Mr. Ekstrand.  You understand you're
22 here today to give sworn testimony in this case?
23    A.   Yes, sir.
24    Q.   Have you ever had your deposition taken
25 before?
```

Page 5

```
1    A.   No, sir.
2    Q.   For that reason I just want to remind you
3  of a couple of ground rules so we understand each
4  other.  You understand that everything we're saying
5  here today is being taken down by this court reporter?
6    A.   Yes, sir.
7    Q.   And for that reason it's important that you
8  give verbal responses as opposed to shaking your head
9  or saying uh-huh or uh-uh.  So if I ask you is that a
10 yes or a no or if I ask for verbal responses, that's
11 why.  Is that fair?
12    A.   Yes, sir.
13    Q.   For the same reason, it's important that we
14 not talk over one another.  So I would ask that you try
15 and wait for me to finish my question before you start
16 speaking.  I'll do the same.  I'll wait for you to
17 finish your answer before I start asking the next
18 question.  It'll just make the court reporter here, her
19 job much easier.  Understood?
20    A.   Yes, sir.
21    Q.   Finally, if at any point I ask a question
22 that you don't understand or you feel like it assumes
23 something maybe you don't think is fair to assume, will
24 you please let me know so that I can rephrase the
25 question?
```

Page 6

1    A.  Of course.
2    Q.  If you have questions or if you don't
3 understand, let me know and I'll do my best to
4 rephrase.  Okay?
5    A.  Yes, sir.
6    Q.  And the final thing is if you need a break
7 at any point -- I don't expect we'll be here terribly
8 long, but if you need a break please just let me know.
9 I'll ask that you finish answering whatever question
10 has been posed to you.  Fair?
11    A.  You got it.
12    Q.  So how did you first come to meet -- if you
13 have, how did you first come to meet Ariana Qayumi?
14    A.  She was living in my dorm freshman year.
15    Q.  And are you currently a student at Duke?
16    A.  I am not.
17    Q.  Did you graduate from Duke?
18    A.  I did not.
19    Q.  Are you currently a student at any other
20 school?
21    A.  I am not.
22    Q.  How many credits did you -- strike that.
23 Do you intend to return to Duke?
24    A.  Not to Duke.
25    Q.  Do you intend to finish your degree at

Page 7

1 another university?
2    A.  At some point.
3    Q.  How would you describe your relationship
4 with Ms. Qayumi?
5    A.  We were casual acquaintances.  We had lived
6 in the same dorm freshman year.  We obviously knew each
7 other.  And that's about it.  I haven't seen her or
8 spoken to her or heard from her in the probably close
9 to six years now.
10    Q.  Did you ever spend any time with her in a
11 one-on-one setting?
12    A.  To the extent that we would be on the quad
13 and run into each other, yes.  If you're talking about
14 the two of us privately in a room, not really.
15    Q.  Did you see her in Israel while you both
16 happened to be in the country?
17    A.  I wouldn't know when she was in the
18 country.
19    Q.  So that would be a -- you don't recall
20 seeing her in Israel?
21    A.  I did not see her.
22    Q.  And you said you last spoke with Ms. Qayumi
23 probably upwards of six years ago?
24    A.  To the best of my recall, yes.
25    Q.  Did you ever exchange e-mails with her?

Page 8

1    A.  To the best of my recall, no.
2    Q.  Do you have her phone number?
3    A.  May I check?
4    Q.  Of course.
5        (Witness looks at phone.)
6    A.  I have a phone number.  I don't know if
7 it's her.
8    Q.  Okay.  Have you ever exchanged text
9 messages with her?
10    A.  No.  At least not on this phone that I have
11 saved.
12    Q.  Have you ever exchanged social media
13 messages with her?
14    A.  I have not.
15    Q.  And did you just check your social media
16 accounts?
17    A.  I just checked Facebook Messenger, which I
18 believe I had and I wanted to double check.
19    Q.  Sure.  Understood.  Have you ever
20 communicated with any members of Ms. Qayumi's family?
21    A.  To the best of my knowledge, no, unless
22 they were unknown to me members of the family.
23    Q.  Of course.  And I won't hold you to
24 something -- if you happened to speak with a cousin of
25 hers, I wouldn't hold you to that.  You're represented

Page 9

1 by counsel here today?
2    A.  That's correct.
3    Q.  And you were previously represented by
4 Kevin Ginsberg; is that right?
5    A.  Yes.
6    Q.  I don't want to know about the substance of
7 communications with any person you believe has
8 represented you, but I want to ask when did you first
9 retain Mr. Ginsberg?
10    A.  In 2014.
11    Q.  Was that in connection with your role as a
12 witness to the matters underlying Ms. Qayumi's
13 complaint?
14    A.  It was.
15    Q.  Had you retained any other lawyer prior to
16 Mr. Ginsberg?
17    A.  I had not.
18    Q.  Did you have a prior relationship with
19 Mr. Ginsberg before hiring him?
20    A.  I had not.
21    Q.  How did you come to learn of Mr. Ginsberg's
22 name or come to hire him?
23    A.  The rabbi recommended him to me.
24    Q.  Why did you decide to retain a lawyer in
25 connection with your role as a witness in this case?

Page 10

1    A. I knew that this had the possibility of
2 being a somewhat larger affair, and I knew that there
3 would be plenty of lawyers and I just wanted somebody
4 to, one, kind of handle all the communications for me
5 and, two, just sort of be there representing my
6 interests.
7    Q. Understood. So I asked you if you retained
8 anyone -- anyone else. Is there any other lawyer who
9 you felt like has given you legal advice throughout
10 this process other than Mr. Ginsberg and Mr. Bachman?
11    MR. BACHMAN: Just answer as best you
12 can.
13        THE WITNESS: I had spoken with
14 Mr. Ekstrand on a couple of different occasions, but I
15 didn't receive advice from him.
16 (BY MR. JACKSON)
17    Q. Have you ever operated under -- I'm just
18 asking for your subjective belief. And I understand
19 you're not a trained lawyer. Have you ever felt like
20 Mr. Ekstrand was working as your attorney?
21    A. As my personal attorney, no.
22    Q. Is there -- you qualified that as your
23 "personal attorney." Do you feel like he was working
24 as your attorney in any capacity?
25    A. No.

Page 11

1    Q. Have you signed any sort of declaration in
2 connection with this case?
3    A. I have a declaration that I need to make --
4 I did not.
5    Q. So you've got a declaration there in front
6 of you but you've not signed it?
7    A. That is correct.
8    Q. Have you offered any form of sworn
9 testimony in connection with the incidents giving rise
10 to this lawsuit?
11    A. Can you explain what you mean.
12    Q. Yeah. I understand you haven't given a
13 deposition before, but have you offered any sort of --
14 well, let me back up.
15        At the beginning of this deposition you
16 were asked to swear or affirm that the testimony you
17 were about to give was true to the best of your
18 knowledge. Have you offered any other sort or oral
19 statement that was offered under penalty of perjury?
20    A. I don't believe so.
21    Q. Have you signed anything other than a
22 declaration -- say, an affidavit or anything else --
23 that you felt like was binding you to a particular
24 narrative in connection with this case?
25    A. I have not.

Page 12

1    Q. You received a copy of the amended
2 complaint in connection with the documents subpoenaed
3 in this case. Do you recall receiving that?
4    A. I do.
5    Q. Did you review that amended complaint?
6    A. Yes, I did.
7    Q. And, in particular, the paragraphs that
8 were referenced in the document subpoena?
9    A. Referenced --
10    Q. I believe it's paragraphs 20 through 23 of
11 the complaint.
12    A. Yes. I just reviewed them one more time.
13    Q. Of course.
14    A. Yes, I did.
15    Q. And before receiving that amended complaint
16 with the document subpoena, had you ever reviewed the
17 complaint before?
18    A. When I believe some news coverage was
19 received in August of 2016 the original complaint was
20 filed and available online. I did review that.
21    Q. How did you come to learn about the filing
22 of the lawsuit -- original filing of the lawsuit?
23    A. In 2016?
24    Q. Yes, sir.
25    A. Through the news media.

Page 13

1    Q. Did you have any sort of Google alert or
2 other notifications set up?
3    A. I did not.
4    Q. How did you come to learn of the news
5 coverage of the case?
6    A. I don't recall. It was either kind of just
7 moving through -- I do read the news -- or a family
8 member alerted me.
9    Q. When you learned about that did that prompt
10 you to take any action or to contact anyone in
11 particular?
12    A. I believe I did follow up with Kevin at
13 that point. And that's when I learned that he had
14 switched firms.
15    Q. Had you been in contact with Mr. Ekstrand
16 before the original complaint was filed?
17    A. I had.
18    Q. Are you able to tell me how many times you
19 had spoken with Mr. Ekstrand before the original
20 complaint was filed?
21    A. Less than five.
22    Q. Had you met in person?
23    A. Yes.
24    Q. Had you also spoken on the phone?
25    A. Yes.

Page 14

1    Q.  And you had exchanged text messages?
2    **A.  Yes.**
3    Q.  Any other form of communication?
4    **A.  E-mail.**
5    Q.  I want to hand you -- so part of this
6 process is going to be -- we're going to introduce
7 certain exhibits as part of the records.  We can
8 identify them later.  And so this is going to be marked
9 as Exhibit 19 in this case.
10        (Deposition Exhibit 19 was marked for
11 identification as of this date.)
12    Q.  And this goes for all exhibits.  Please
13 take as much time as you feel like you need to review
14 any document that's handed to you.  I'll represent to
15 you this is the document subpoena without the amended
16 complaint attached to it just for the sake of saving
17 paper.
18    **A.  Yes.**
19    Q.  Does this document look familiar to you?
20    **A.  It does.**
21    Q.  Is this an accurate copy of the document
22 subpoena that you received with a caveat that the
23 amended complaint is not attached?
24    **A.  Without going through it letter for letter,**
25 **it does seem so.**

Page 15

1    Q.  What, if anything, did you -- strike that.
2 Have you ever exchanged written communications with
3 Colby Leachman about the subject matter of this case?
4    **A.  About the subject matter, I have not.**
5    Q.  When is the last time that you have
6 communicated with Mr. Leachman in any capacity?
7    **A.  Probably sometime towards the end of spring**
8 **of 2011.**
9    Q.  So that would be the end of your freshman
10 year?
11    **A.  That is correct.**
12    Q.  When is the last time that you have
13 communicated with Brian Self in any capacity?
14    **A.  Right around the same time.**
15    Q.  Have you ever communicated with Mr. Self in
16 written form about the subject matter of this case?
17    **A.  I have not.**
18    Q.  Have you ever spoken with Mr. Self in any
19 form about the subject matter or the incidents
20 underlying this case?
21    **A.  I have not.**
22    Q.  And when I say the "subject matter and the
23 incidents underlying this case," you understand me to
24 mean the allegations that Mr. Self and Mr. Leachman
25 engaged -- the allegation that they engaged in a

Page 16

1 nonconsensual sexual encounter with Ms. Qayumi?
2    **A.  I have not engaged in any conversation with**
3 **either one.**
4    Q.  Same question for Frank Jones.  In terms of
5 oral communications have you ever spoken with Mr. Jones
6 about the subject matter of this case?
7    **A.  I have not.**
8    Q.  And so you've never exchanged written
9 communications with him on that subject?
10    **A.  That is correct.**
11    Q.  You received this document subpoena.  It's
12 got a list of documents that are requested.  What did
13 you do to look for communications that were responsive
14 to these requests?
15    **A.  I searched through my e-mails, my text**
16 **messages.  And this phone I believe I got in 2014 so**
17 **sometimes Apple carries things over and sometimes they**
18 **don't.  So anything that was on my phone as well as**
19 **Facebook Messenger.**
20    Q.  Did you find any Facebook messages that you
21 felt were responsive to this request?
22    **A.  I did not.**
23    Q.  Did you search for voicemails?
24    **A.  I did not.**
25    Q.  Do you know if you have any voicemails

Page 17

1 from, for example, anyone from Mr. Ekstrand's firm?
2    **A.  I don't believe I do.  I can search if you**
3 **would like, but I don't believe that I do.**
4    Q.  You don't need to do it right now.  We'll
5 probably take a short break and I may ask.  Actually,
6 if during the break we could just look and see if there
7 are any oral communications between Ms. Qayumi's
8 representatives and you.
9        There are certain individuals listed on
10 this document subpoena -- communications between
11 yourself and another person.  Have you communicated
12 with anyone else whose name is not on this document
13 subpoena about the subject matter of this case?
14    **A.  Define "communicated."**
15    Q.  Let's start with written communication.
16 Have you exchanged e-mails, text messages, Facebook
17 messages, anything of that nature with anyone other
18 than Mr. Bachman about this -- or Mr. Ginsberg about
19 the subject matter of this case?
20    **A.  Does that include immediate family?**
21    Q.  Yes.
22    **A.  Okay.  I believe my mother and I probably**
23 **sent e-mails just with news articles on the case back**
24 **and forth.**
25    Q.  Have you commented about the events

Case 1:16-cv-01038-CCE-JLW   Document 81-3   Filed 02/02/18   Page 5 of 49

Page 18

1 underlying this complaint to your mother?
2    A.   I can't speak to that.  Have I commented in
3 written form?
4    Q.   Yes.
5    A.   I don't have those e-mails in front of me.
6    Q.   When you say you can't speak to it, do you
7 mean you don't care to speak to it or you don't know?
8    A.   I don't know whether or not I attached
9 comments to anything that was sent.
10    Q.   Okay.  Anyone else other than members of
11 your immediate family?
12    A.   To the best of my knowledge, no.
13    Q.   I'm not asking you to reveal these
14 communications, but have you spoken with your rabbi or
15 any other person within your religious institution
16 about --
17    A.   Orally.
18    Q.   What?
19    A.   Only orally.
20    Q.   Okay.  And you asked me to define
21 "communications" earlier, and I said we'll start with
22 written communications.  What about oral communications
23 with other persons about the subject matter of this
24 lawsuit?
25    A.   It's come up in casual conversation but

Page 19

1 nothing --
2    Q.   Okay.  How did you first learn -- so I'm
3 going to be referring to the Ariana Qayumi incident,
4 the incident underlying this complaint.  If I use that
5 phrase or that general phraseology can you understand
6 me to mean the alleged sexual encounter that occurred
7 in March of 2011 involving Ms. Qayumi, Mr. Leachman,
8 and Mr. Self?
9    A.   Yes, sir.
10    Q.   How did you first learn about that incident
11 involving Ms. Qayumi, Mr. Leachman, and Mr. Self?
12    A.   Shortly after it occurred I would imagine
13 sometime in March of 2011 there was a rumor mill, if
14 you would, on campus about it.  And so it was very much
15 hearsay, but I was aware of the possibility that it
16 might have occurred at the time.
17    Q.   Do you recall who you heard about it from?
18    A.   Other members of the dorm.  The discussion
19 -- other members of the dorm.
20    Q.   So you think it was in March of 2011.  So
21 it was within a few weeks of the incident; would that
22 be fair?
23    A.   Yes, sir.
24    Q.   Do you remember specifically what you heard
25 in the form of those rumors?

Page 20

1    A.   In the form of rumors we had heard that a
2 sexual encounter had happened at the provost's house
3 off campus on Marco Street.  There was a video of it.
4 And I remember the exact phrase that was being used and
5 used many times between members of the dorm was Eiffel
6 tout.  That's kind of etched into my mind a little bit.
7    Q.   And you understood that to be a crude
8 reference to a form of multiple-party sexual encounter;
9 is that fair?
10    A.   Yes.  But I would prefer to not draw a
11 picture.
12    Q.   Right.  And so when you first heard this
13 rumor, your understanding of the rumor was that the
14 encounter had occurred at the provost's house?
15    A.   That was my understanding.
16    Q.   As you sit here today is that still your
17 understanding?
18    A.   I wasn't there.
19    Q.   Did you hear anything else about the
20 incident during this initial rumor phase?
21    A.   Not that -- I'm sure I did, but nothing
22 that I recall specifically.
23    Q.   Did you ever see the video?
24    A.   I did not.
25    Q.   During this initial phase did you hear any

Page 21

1 rumors to the effect that there may have been
2 impairment on the part of any of the participants in
3 this encounter?
4    A.   Define "impairment."
5    Q.   Yeah.  And let's break it down.  Let me
6 back up further.  At this point did you know the
7 identity of the female participant in this encounter?
8    A.   Specifically the one involving Ariana?
9    Q.   Yes.
10    A.   Yes.
11    Q.   Okay.  And so when these rumors are going
12 around, you understood that Ariana Qayumi was the
13 female participant in the alleged act; is that right?
14    A.   Yes.
15    Q.   At this initial stage did you have an
16 understanding as to whether Ms. Qayumi was impaired?
17    A.   I cannot speculate.
18    Q.   So at least in terms of what you were
19 hearing, you didn't hear one way or the other whether
20 she was under the influence of what are commonly known
21 as a date rape drug?
22    A.   What I can say -- oh, a date rape drug.  I
23 have no knowledge.
24    Q.   And, as you sit here today, you still have
25 no knowledge one way or the other whether she was under

1 the influence of any sort of drug that's commonly known
2 as the date rape drug?
3    A.   Firsthand, I have no knowledge.
4    Q.   Do you have any secondhand or knowledge
5 from any other source on that subject?
6    A.   I've heard rumors.  That's not my
7 knowledge.
8    Q.   At the time of this initial rumor phase did
9 you gain any understanding as to whether Ms. Qayumi was
10 under the influence of alcohol during this encounter?
11    A.   I was not.  Can you repeat the question.
12    Q.   Yeah.  So you're hearing things about this
13 encounter.
14    A.   That's correct.
15    Q.   Did you hear one way or the other whether
16 Ms. Qayumi was under the influence of alcohol?
17    A.   I did not.
18    Q.   So is it correct to say that during this
19 initial phase the extent of your knowledge is there's a
20 rumor going around that Ms. Qayumi was involved in a
21 sexual encounter with more than one male at the
22 provost's house?
23    A.   That was my -- that was the extent -- well,
24 that was not the full extent of the rumor but I did
25 understand that, yes.

1    Q.   And that this encounter was video recorded?
2    A.   Yes.
3    Q.   Are there any other facts that were part of
4 the rumor that you heard during this initial phase?
5    A.   That it was not consensual.
6    Q.   What did you hear about that?
7    A.   Simply it was not consensual.
8    Q.   Did you hear anything about use of force
9 versus not consensual due to impairment or anything of
10 that nature?
11    A.   Define "force."
12    Q.   Well, why don't you just tell me what you
13 heard about the lack of consent.
14    A.   In 2011 on freshman year campus, unless
15 people were in a long-term committed relationship, my
16 recollection of the general happenings that very few
17 sexual encounters happened completely sober.  That
18 being said, it seemed that there was -- the rumors were
19 that there was some form of coercion that was used.  I
20 don't know if it was physical force.  I don't know if
21 it was intimidation.  I don't know if it was some sort
22 of accelerant or other drug.  But my recall of the
23 rumors was that there was coercion in some form used.
24    Q.   And I want to --
25    A.   But this is all secondhand.

1    Q.   You spoke to a set of circumstances
2 existing in 2011 on Duke's campus and the circumstances
3 under which individuals would engage in sexual
4 activity.  What was that based on -- that understanding
5 about whether people would engage in sexual activity?
6    A.   Having been a part of that culture.
7    Q.   So when you said that you -- this was your
8 understanding, when you heard those rumors did you
9 infer that Ms. Qayumi must have been impaired to have
10 engaged in this type of activity or to have been
11 engaged in this type of activity?
12    A.   It did not seem like herself, yes.
13    Q.   But that was not -- that was based on your
14 perception of what was happening on campus and being a
15 part of that environment?
16    A.   And based on the fact it wasn't the first
17 time rumors had circulated regarding these three
18 gentlemen.
19    Q.   And, at this point, these three gentlemen
20 you're referring to --
21    A.   Colby, Brian, and Frank.
22    Q.   Have you ever spoken about this incident
23 with Ariana Qayumi?
24    A.   I recall one encounter on the quad after
25 this had happened, and there was something along the

1 lines of -- I don't think it was discussed directly,
2 but I do somewhere in the reaches of my mind recall her
3 referring to it.  It was a very brief encounter on the
4 quad in between classes or something of that nature.
5    Q.   Was it just the two of you?
6    A.   Yeah.  I mean, other people were walking
7 by, but it was just the two of us in conversation.  And
8 it wasn't any sort of elaborate conversation.
9    Q.   At that point you would not have called
10 yourself a friend of Ariana Qayumi; is that right?
11    A.   Casual acquaintance.  We lived in the same
12 dorm.
13    Q.   You said you crossed paths on campus, and
14 your recollection is that there was some reference to
15 this underlying incident.
16    A.   That's correct.
17    Q.   Initiated by whom?
18    A.   I believe by her.
19    Q.   Are you able to tell me any other details
20 about that?
21    A.   It was very much brief and in passing.  It
22 probably wasn't longer than 45 seconds.
23    Q.   Did you ask her if she was all right?
24    A.   I don't recall.
25    Q.   So you're not able -- as you sit here

Case 1:16-cv-01038-CCE-JLW   Document 81-3   Filed 02/02/18   Page 7 of 49

1 today, you're not able to provide any additional
2 details about that communication beyond what you've
3 told me?

**4      A.   It was a passing conversation in 2011.  I
5 cannot.**

6      Q.   Did you ever reach out to Ms. Qayumi after
7 that conversation to check on her?

**8      A.   I did not.  I had informed her counsel that
9 should she wish to discuss it or something, she was
10 more than welcome to give me a call but that I would
11 not reach to her.  If she wanted to do that, that
12 was up to her.**

13      Q.   What was the -- let me back up.  How did
14 you come to learn that Ms. Qayumi was represented by
15 counsel?

**16      A.   I learned about it in 2014 through a
17 conversation with the dean on campus.**

18      Q.   What dean?

**19      A.   Dean Blackshear.**

20      Q.   Sorry?

**21      A.   Dean Blackshear.**

22      Q.   So Dean Blackshear informed you that
23 Ms. Qayumi had hired a lawyer?

**24      A.   That's correct.**

25      Q.   What lawyer?

**1      A.   Mr. Ekstrand.**

2      Q.   So there was a point where Mr. Ekstrand is
3 involved.  What did Dean Blackshear tell you?

**4      A.   He told me that one of the women who had
5 accused the three gentlemen of unwanted sexual contact
6 or sexual assault had retained counsel and was pushing
7 things forward.  And from my conversation with him, I
8 was able to deduce which woman and I said, oh, my God.
9 And that's when I called my rabbi.  He said I needed to
10 -- I explained the situation to him, and he said I
11 needed to speak with her counsel.**

12      Q.   Did that --

**13      A.   And let me -- just to be clear for the
14 record -- I'm sorry to talk over you -- that
15 conversation was with my rabbi in New York.  The
16 conversation where I found -- Mr. Ginsberg was with the
17 rabbi here.**

18      Q.   What else can you tell me about that
19 conversation with Dean Blackshear?

**20      A.   It was a long conversation.  I recall we
21 were discussing just different happenings with the
22 University.  We were discussing different
23 administrators at the University.  We were discussing,
24 I believe, the provost.  And I stopped and said, "Do
25 you know who my freshman year roommate was."  And he**

1 said, "No."  I said, "Colby Leachman."  He went, "He
2 was a monster."  It was Dr. Blackshear's response.  And
3 I said, "I know.  I filed a report."  His eyes sort of
4 lit up and he said, "You filed a report."

**5           And that's -- I don't -- that was what I
6 recall more or less verbatim.  The conversation kind of
7 had us put the dots together after that, that one of
8 the women who had alleged the assault had come forward
9 and that I had filed a report.  And those dots had not
10 been connected as far as we know to that point.**

11      Q.   What was the nature of your relationship
12 with Dean Blackshear at that point?

**13      A.   He was an informal advisor.**

14      Q.   Were you an enrolled student at the time of
15 this conversation?

**16      A.   I was.**

17      Q.   So I had asked you earlier if you had ever
18 reached out to Ms. Qayumi and you said not directly,
19 but you had informed her counsel that you were happy to
20 speak with him -- with Mr. Ekstrand; is that right?

**21      A.   That's correct.**

22      Q.   So did you initiate the conversation with
23 Mr. Ekstrand?

**24      A.   I did.**

25      Q.   And during that conversation you said that

1 you would be willing to speak with Ms. Qayumi but you
2 would not pursue it unless she wanted you to; is that
3 fair?

**4      A.   Yes.  And my offer in that was not as much
5 as far as talking about the facts of the case or
6 anything of that nature, more so to just provide
7 support for her as a person.**

8      Q.   And the two of you have never since spoken
9 directly in any form whether through written or oral
10 communication?

**11      A.   Who are the two of us?**

12      Q.   You and Ms. Qayumi.

**13      A.   That's correct.**

14      Q.   Did you have any firsthand knowledge about
15 Ms. Qayumi's communications with anyone who was working
16 on behalf of Duke in the course of this investigation?

**17      A.   You said firsthand knowledge?**

18      Q.   Yes.

**19      A.   I did not.**

20      Q.   Do you have any knowledge of any form about
21 Ms. Qayumi's communications with Duke about Duke's
22 investigation into this matter?

**23      A.   Rumor and speculation and things I picked
24 up through conversation?**

25      Q.   Sure.  Are you able to give me a synopsis

1 of what your understanding is?

2     A.   My understanding is that within days of the
3 report that I filed, she had gone to -- I believe it
4 was the Women's Center, and filed a report there.  I
5 don't know if there was a previous call to the police
6 or anything else.  But that was within several -- a
7 couple of days of my report being filed in the same
8 week that she had filed a report as well.  And they
9 went through whatever process that they do.

10     Q.   And what's the basis -- I know you said
11 that this is a product of rumors and other matters.
12 What is the specific basis if you're able to tell me?

13     A.   Conversations with Dean Blackshear and
14 Mr. Ekstrand -- Mr. Ginsberg, excuse me, and other
15 people connected to the case.

16     Q.   What did Dean Blackshear tell you about
17 that subject of Duke's investigation and Duke's
18 communications with Ms. Qayumi?

19     A.   He did not identify her to me.  I was able
20 to just through the conversation.  I don't recall how
21 -- if a video had been mentioned that would have likely
22 been the reason I was able to deduce that she was the
23 woman that he was describing since there were -- this
24 was all secondhand anyway, but there were rumors about
25 this happening on multiple occasions.  I know I had

1 witnessed one.  This was alleging a different occasion,
2 and there had been rumors about many, many other
3 occasions where this exact sort of incident occurred.
4 I was able to deduce it was Ariana.

5     Q.   Did Dean Blackshear ever explain to you
6 whether Duke had an obligation to preserve the privacy
7 of any individual involved in disciplinary proceedings?

8     A.   He did not reveal.

9     Q.   Okay.  But did he explain to you that I
10 cannot reveal the identity of other students who were
11 the subject of disciplinary investigations?

12     A.   There was no specific mention of that.

13     Q.   And that goes for -- my question is not
14 specific to an alleged victim and something like this,
15 but also an accused.  But did Dean Blackshear ever explain
16 to you any of Duke's obligations to preserve the
17 privacy of any of the accused students?

18         MR. EKSTRAND:  Objection.  Assumes a
19 legal proposition that they have that obligation with
20 respect to criminal activity.

21 (BY MR. JACKSON)

22     Q.   Do you understand my question?

23     A.   I sort of lost it.

24     Q.   Did Dean Blackshear ever explain to you
25 that Duke had an obligation to preserve the privacy of

1 the identity of any individuals?

2     A.   For activity that happened off campus?

3     Q.   On or off.

4     A.   We had -- no, we did not have that
5 conversation.  But I, again, was the one to identify
6 the gentlemen firsthand.

7     Q.   And you asked the question about for
8 activities that happened off campus.  Does that change
9 the answer to your question?

10     A.   I'm not a lawyer.

11     Q.   Right.

12     A.   What I do know is -- I'll let the lawyers
13 figure that one out.

14     Q.   No.  My question is, you had brought up the
15 subject of activities happening on campus.  My question
16 is whether the premise of off campus versus on campus,
17 whether that changes the answer to your question about
18 --

19     A.   Oh, it does not change the answer.

20     Q.   Okay.  Thank you.  Do you have any
21 firsthand knowledge about Duke's investigation into
22 Ms. Qayumi's report of an incident with Mr. Leachman
23 and Mr. Self?

24     A.   I do not.

25     Q.   Do you have any firsthand knowledge about

1 the student conduct panel hearing that was held for
2 Mr. Leachman and Mr. Self?

3     A.   I do not.

4     Q.   Do you have any firsthand knowledge about
5 an investigation performed by Celia Irvine who was
6 retained by Duke to investigate this matter?

7     A.   I do not.  I was never contacted concerning
8 this investigation.

9     Q.   Do you have any information as to any
10 impact that Peter Lange -- strike that.  Do you have
11 any information about any influence that Peter Lange
12 did or did not exert over the investigation in this
13 matter?

14     A.   Is this a question as to firsthand?

15     Q.   I'll break it down.  Do you have any
16 firsthand knowledge about any influence that Peter
17 Lange exerted over the investigation in this matter?

18     A.   I do not.

19     Q.   Do you have any firsthand knowledge about
20 any influence that Lori Leachman has exerted over this
21 process?

22     A.   I do not.

23     Q.   Knowledge returning to -- do you have any
24 knowledge that you would not qualify as firsthand
25 knowledge about influence that Peter Lange did nor did

Page 34

1 not exert over this process?
**2    A. I've heard rumors.**
3    Q. What are those rumors?
**4    A. The rumors were that he did, in fact, exert**
**5 influence.**
6    Q. Did in fact?
**7    A. Did in fact. He did exert influence in**
**8 order to have as light of a penalty imposed.**
9    Q. What's the -- who or what is the source of
10 those rumors?
**11    A. General conversation.**
12    Q. Can you give any more detail about those
13 rumors?
**14    A. I cannot.**
15    Q. So do you have any basis for those rumors?
**16    A. Completely unsubstantiated except -- I**
**17 mean, that sort of rumor generally is.**
18    Q. Same question as to Lori Leachman. Do you
19 have any information that you would not classify as --
20 that you would not qualify as firsthand knowledge about
21 Lori Leachman exerting influence over this process?
**22    A. I do not.**
23    Q. Do you have any firsthand knowledge about
24 anyone else exerting undue influence over this process?
**25    A. I do not.**

Page 35

1    Q. Any non-firsthand knowledge about anyone
2 else exerting influence over this process?
**3    A. The same rumor mill that had named Provost**
**4 Lange had also named Dean Sue, Larry Netta, Steven**
**5 Brian.**
6    Q. What did you hear about Dean Sue?
**7    A. About all three I heard the same thing that**
**8 all three were aware of the case and were attempting to**
**9 have as light a penalty imposed as possible.**
10    Q. Do you remember speaking with anyone in
11 particular about that subject and hearing that rumor
12 from anyone in particular?
**13    A. Can you rephrase the question.**
14    Q. Yeah, that was two questions. Thank you.
15 Do you remember hearing that rumor from anyone in
16 particular?
**17    A. There was -- no, I do not.**
18    Q. As you sit here today, you don't know
19 whether that's true one way or the other; is that
20 right?
**21    A. It's not my place to speculate.**
22    Q. So is it fair to say Mr. Ekstrand was the
23 first representative of Ms. Qayumi who you spoke with
24 about this incident?
**25    A. To my knowledge, yes.**

Page 36

1    Q. Tell me about that first contact.
**2    A. After speaking with my rabbi who noted that**
**3 I had a moral obligation to the victim of the alleged**
**4 assault, I went over to Mr. Ekstrand's office and**
**5 presented myself and said that I had filed a report in**
**6 conjunction with the same defendants and very similar**
**7 circumstances and similar situation. And we sat down**
**8 and took some notes that day.**
9    Q. The determination that if this was a
10 similar incident and similar circumstances, what was
11 that determination based on?
**12    A. It was the same three people, and it was**
**13 what I can only qualify as a gang rape.**
14    Q. The statement about the gang rape, that was
15 a product of rumors that you had heard?
**16    A. Can you rephrase the question.**
17    Q. Yeah. When you're referring to an incident
18 as a gang rape, are you -- is it your understanding
19 that Ms. Qayumi was subjected to a gang rape at the
20 hands of Colby Leachman, Brian Self, and Frank Jones?
**21    A. I have no firsthand way to substantiate it.**
**22 That was my understanding.**
23    Q. Do you have an understanding one way or
24 another as to whether Ms. Qayumi is contending that she
25 had a sexual encounter with Frank Jones whether

Page 37

1 consensual or non-consensual?
**2    A. I'm sorry. Can you repeat that.**
3    Q. Yeah. Do you know whether Ms. Qayumi is
4 contending that she had any form of sexual encounter
5 with Frank Jones?
**6    A. I believe that's the basis of the -- I'm a**
**7 little confused as to what the question is asking.**
8    Q. Do you know whether Ms. Qayumi is
9 contending that she had a sexual encounter with Frank
10 Jones?
11          MR. BACHMAN: So you're asking him if
12 he knows what Ariana Qayumi is contending?
13          MR. JACKSON: Yeah.
**14          THE WITNESS: Yes, that there was a**
**15 sexual encounter.**
16 (BY MR. JACKSON)
17    Q. So, as you sit here today, your
18 understanding is that Ms. Qayumi had some form of
19 sexual encounter with Frank Jones?
**20    A. Are we just repeating the same questions?**
21    Q. You sort of qualified your answer. I asked
22 you a yes or no question. You said, yes, that there
23 was a sexual encounter. I'm trying to clarify the
24 nature of that incident. As you sit here today, do you
25 have an understanding as to whether Ms. Qayumi is

Page 38

1 contending that she had a sexual encounter with Frank
2 Jones?

3    **A.   With -- I'm sorry.  With Frank Jones**
4 **specifically?**

5    Q.   Yes.

6    **A.   I'm unaware if Frank -- for some reason**
7 **every time this comes up, Frank is in a different**
8 **category from Brian and Colby.  To the best -- I don't**
9 **know exactly what they're contending.  That's honestly**
10 **not my business.  As far as I'm concerned, my business**
11 **is to state what I know about the case from firsthand**
12 **knowledge.**

13    Q.   Right.  And I'm trying to get an
14 understanding as to what that is.  I'll move on from
15 that.  Did you know Mr. Ekstrand before you reached out
16 to him on that first occasion?

17    **A.   I did not.**

18    Q.   And by "that first occasion," I mean that
19 occasion after you spoke with your rabbi.  You didn't
20 know him before that?

21    **A.   That is correct.**

22    Q.   And you came to learn of his involvement
23 through Dean Blackshear?

24    **A.   That is correct.**

25    Q.   You produced some text messages in this

Page 39

1 case.

2        (Deposition Exhibit 20 was marked for
3 identification as of this date.)

4    Q.   Are you familiar with this document?

5    **A.   I am.**

6    Q.   Did you review it?

7    **A.   No.**

8    Q.   The first text messages in the -- first
9 text message in this exchange appears to be dated
10 January 3, 2016.  Do you know when your first contact
11 with Mr. Ekstrand was relative to this text?  You say
12 it was in 2014?

13    **A.   That is correct.  It would have, I believe,**
14 **been in April of 2014.  I'm not sure I have the exact**
15 **dates on that.**

16    Q.   Why is the date April 2014 or that range of
17 time --

18    **A.   It seems like this case always bubbles back**
19 **up in April -- at least my involvement in it.**

20    Q.   But what about April 2014 is causing you to
21 think of that timeframe?

22    **A.   I remember it being three years after I**
23 **filed the report.**

24    Q.   And were you -- I'm sorry.  You said you
25 spoke with your rabbi in New York?

Page 40

1    **A.   That's correct.**

2    Q.   Were you in New York for any particular
3 reason?

4    **A.   No, I was here.**

5    Q.   You spoke with your rabbi on the phone?

6    **A.   That's correct.**

7    Q.   Did you exchange any text messages with
8 Mr. Ekstrand before January 3, 2016?

9    **A.   To the best of my knowledge, no.**

10    Q.   What did you discuss with Mr. Ekstrand in
11 April of 2014 when you first spoke with him?

12    **A.   We discussed the report that I had filed**
13 **with Dean Pesetski as well as my secondhand knowledge**
14 **to the assault that had occurred allegedly.**

15    Q.   Let's start with the Ms. Qayumi part of it.
16 What did you discuss specifically with Mr. Ekstrand
17 during that initial meeting in relation to Ms. Qayumi?

18    **A.   I believe that we discussed that I was**
19 **aware that she had made allegations and that critical**
20 **mass -- that in the three years before that meeting, a**
21 **critical mass had been reached in the rumor mill and I**
22 **had perceived them to have some basis to them.  And I**
23 **was aware at that point that something was potential.**

24    Q.   What do you mean by the phrase "a critical
25 mass had reached the rumor mill"?

Page 41

1    **A.   I was studying sociolinguistics at Duke.**
2 **If perception is reality in a sociolinguistic world and**
3 **languages are a basis of forming that reality, we can't**
4 **perceive anything to necessarily be 100 percent true,**
5 **but when we have enough direct evidence of that and we**
6 **form our assumptions about the world and that**
7 **eventually something is discussed on such a level that**
8 **it becomes what is close to be perceived as fact**
9 **regardless of circumstances.**

10        **There was enough rumor going around about**
11 **the other incident -- the Ms. Qayumi incident -- that**
12 **it had become perceived to be true by pretty much**
13 **everybody at that point that I recall.**

14    Q.   At what point did you reach the conclusion
15 that the rumor mill had reached the critical mass?

16    **A.   Probably just before I filed my report.**

17    Q.   So this was 2011?

18    **A.   That's correct.**

19    Q.   You were a freshman at the time?

20    **A.   That's correct.**

21    Q.   Had you declared a major at that point?

22    **A.   I had not.**

23    Q.   How many courses had you taken in the arena
24 of sociolinguistics?

25    **A.   I'm not here to testify as an expert in**

1 sociolinguistics.

2   Q.   So the --

3   **A.   I'm just telling you what I was hearing.**

4   Q.   So the statement about sociolinguistics and
5 the perception of reality, that's your lay view of the
6 meaning of language, but it's not -- you're not
7 offering that as any form of expert opinion; is that
8 right?

9   **A.   That's correct.**

10   Q.   You also mentioned -- so you spoke with
11 Mr. Ekstrand about Ariana Qayumi.  You also mentioned
12 another incident.  What did you speak with Mr. Ekstrand
13 in relation to that other incident?

14   **A.   I told him what I witnessed and the report
15 I filed.**

16   Q.   As to what you witnessed, what did you tell
17 Mr. Ekstrand?

18   **A.   I believe I laid out to him exactly the
19 same thing I laid out to Ms. Pesetski and everybody
20 else.**

21   Q.   And that is?

22   **A.   Do you want a whole recount of the
23 incident?**

24   Q.   Sure.

25   **A.   Let me make sure I get the dates correct.**

1 So it was a Saturday night.  It was April 9th, 2011.

2   Q.   And are you referring to a document right
3 now?

4   **A.   I'm just referring to the dates here
5 because I have previously verified them.  I don't have
6 them.  I don't -- this is not relevant except that I
7 wanted to double check.**

8   Q.   No, I understand.  I just want to make
9 sure.

10   **A.   So it was April 9th, 2011.  It was Saturday
11 night.  I was hosting a pregame in my dorm room as was
12 Colby separately.  The relationship between Colby and I
13 had deteriorated extraordinary, I would say, by that
14 point.  The two of us barely ever spoke other than
15 dealing with kind of the logistics of being roommates,
16 going out of town, cleaning things up.  It was very
17 much basically just being in the room.  We were clearly
18 not seeing eye to eye on much else besides that at that
19 point.**

20   I was hosting a small pregame in my room
21 that night, as was he.  He was on one side of the room
22 with his folks.  It's not that the dorm rooms are very
23 large.  I was on the other side.  And of course it
24 wasn't -- we weren't that far apart so it wasn't two
25 close circles.  It was just kind of two groups of

1 people.  But we were talking to each other.  One of the
2 women at that pregame was, I believe, a friend from
3 high school of another student -- a female student who
4 was living in the dorm.  She was a female student.  She
5 was a freshman and she was visiting from one of the
6 universities in Virginia.  I don't recall which
7 university she was visiting from.  I don't recall how
8 long she was there for.  But she was invited to the
9 pregame with Colby and his friends, and she was
10 drinking with them.  She and Colby had appeared to be
11 getting along fairly well.

12   We went to our event that night.  Colby
13 went to his event with the girl.  I came back before
14 him.  I was in the room with two of my friends and we
15 were kind of handing out a little bit.  Colby texted me
16 -- from what I remember, he texted me asking if he
17 could have the room.  I was actually about to go to bed
18 at that point.  My friends were about to leave.  I
19 said, "Yeah, that's fine.  Just make it quick.  I would
20 like to go to bed."

21   He came into the room as I was leaving with
22 my two friends.  He came into the room with the girl
23 and kind of walking down the hallway and coming into
24 the room.  I didn't think too much of it at that time
25 because, like I said, they had been together earlier in

1 the night and seemed to be getting along with each
2 other.  I went downstairs to the common room with my
3 two friends.  I believe that I had asked him to finish
4 it up within half an hour to 45 minutes or something
5 along those lines.  It was about roughly an hour later
6 the three of us went back upstairs and kind of went,
7 "Hey, it's getting late.  I want to go to bed."  They
8 had kind of stayed with me downstairs.

9   That's when as we were coming up the stairs
10 and we turned the corner into the hallway, that's when
11 we saw Frank and Brian entering the room.  We saw them
12 knock, knock.  The door was unlocked.  They just
13 entered the room, closed it behind them.  By that point
14 we were close enough to hear the door lock.  And then
15 the two of them pressed their ear to the door and, just
16 for my having lack of words for it, I do want to refer
17 to this -- I believe it was unmistakable sounds of
18 sexual interaction.

19   Q.   Can I interrupt you.  You said the two of
20 them had pressed their --

21   **A.   My two friends I was with at the time, they
22 had pressed their ear to the door.  I could hear well
23 enough that I didn't have to and didn't really care to
24 at that point.  That's when we -- it had gone from this
25 girl who was clearly impaired in some way coming back**

1 to the room with Colby, which they had been hanging
2 out. We found that to be a somewhat normal course of
3 action, to having two other gentlemen enter the room
4 where at that point none of us were in the room, none
5 of us know what had been agreed to or what happened.
6 But it clearly wasn't a normal event.
7         I went back downstairs. The two of them
8 went back to their dorms. They were not in the same
9 dorm. They left. I was kind of -- I took a nap in the
10 common room. I got a text saying I could go back up to
11 the room. I went back up to the room. I remember
12 specifically having made my bed that day because I was
13 having friends over for a pregame. And so I do
14 remember specifically having made my bed. I noticed
15 that my sheets and my bed were all disheveled and
16 thrown out of place.
17         That was, on another level, disturbing to
18 me just because that's the place where I sleep and my
19 DNA is obviously there, and I didn't know who would say
20 what. And, again, we had this very strong suspicion
21 that things were not as they seemed. The next day --
22 and that was late Saturday night or early Sunday
23 morning. Later on that Sunday we had the e-mail
24 exchange.
25     Q. Can we stop the story there and let me ask

1 you some questions, and then we'll pick up on the next
2 morning.
3     A. Sure.
4     Q. Too many things. I understand. Sorry to
5 interrupt you like that. It's just a lot of ground
6 covered. So this is a Saturday night. You mentioned
7 that you and Mr. Leachman were both hosting people in
8 your dorm room. You mentioned the term "pregame."
9     A. That's correct.
10     Q. Do I understand you to be saying that you
11 were drinking alcohol in your room?
12     A. That's correct.
13     Q. And you went to an event after this
14 pregame. Where did you go?
15     A. I don't recall that night exactly where we
16 went.
17     Q. Did you go to an event where alcohol was
18 served?
19     A. We did.
20     Q. Did you go to -- and did you consume
21 alcohol at that event?
22     A. Not a lot.
23     Q. How much did you have to drink at the
24 pregame, if you can remember?
25     A. Probably just a beer or two. The night

1 before, we had hosted a larger party and so we had been
2 drinking a lot more so that Saturday was kind of like a
3 night off.
4     Q. A night off --
5     A. From heavy drinking.
6     Q. So you drank less than you had the previous
7 night?
8     A. Yes.
9     Q. And you and Mr. Leachman did not have a
10 good relationship at this time?
11     A. That's correct.
12     Q. What had led to the two of you having a
13 relationship that had deteriorated?
14     A. We didn't see eye to eye on pretty much
15 anything. His group of friends were completely
16 different from my group of friends. I had my
17 suspicions of him after all the rumors I had heard.
18 And I just didn't interpret him to be a nice person.
19 He didn't seem to want to get along. He had his group
20 of friends and that was fine, but he didn't seem to --
21     Q. During your freshman year at Duke did you
22 apply to or rush any fraternities?
23     A. I did.
24     Q. Did you ultimately end up participating in
25 a fraternity?

1     A. I did.
2     Q. Did you apply to or rush the Delta Sig
3 fraternity that Mr. Leachman was involved in?
4     A. Delta Sig, to the best of my knowledge,
5 during rush I kind of walked in for ten seconds, looked
6 around, and walked out from their first event.
7     Q. You said you did participate in a
8 fraternity at Duke?
9     A. That's correct.
10     Q. What fraternity?
11     A. Sigma Phi.
12     Q. Do you know if you went to a Sigma Phi
13 event on the night in question?
14     A. I did not. Oh, the night of --
15     Q. Let me back up. Did you go to a Sigma Phi
16 event the night before -- the night of heavier
17 drinking?
18     A. To the best of my knowledge, it was when I
19 went, yes.
20     Q. What about the night in which you hosted
21 the pregame in your dorm room and then went out to some
22 other event? Was that your fraternity event?
23     A. There were several -- from what I remember
24 of that event, there were several members of the
25 fraternity there, but it was not a fraternity event.

Page 50

1    Q.   So you did not like Mr. Leachman at this
2 point?
3    **A.   I didn't have anything against him.**
4    Q.   The Duke student who was hosting this young
5 woman who was visiting from another school, do you know
6 that Duke student's name?
7    **A.   I don't recall.**
8    Q.   Were you friends with that person at this
9 time?
10    **A.   She was an acquaintance from the dorm.**
11    Q.   You said Mr. Leachman texted you and said
12 that he needed the room.  Did you change phones
13 subsequent to that text exchange?
14    **A.   After the text exchange?**
15    Q.   Yes.
16    **A.   Yes, that was 2011.**
17    Q.   Do you have any text messages from
18 Mr. Leachman in your current phone?
19    **A.   I don't believe I do.  I can triple check.**
20          (Witness looks at phone.)
21    **A.   I do not.**
22    Q.   During this pregame event in your dorm you
23 said it appeared that Mr. Leachman and this student
24 were getting along well.
25    **A.   That's right.**

Page 51

1    Q.   And so when he and this visiting student
2 returned from the room, while you suspected they might
3 have been impaired, you were not alarmed by the fact
4 that they appeared to be heading back to the room in
5 private; is that fair?
6    **A.   It's not something I would have done, but**
7 **it's something I had seen at that point and it wasn't**
8 **my place to judge.**
9    Q.   And so at that point you didn't suspect
10 that there was non-consensual sexual activity occurring
11 in your dorm room?
12    **A.   At that exact point, no.**
13    Q.   The two friends who you were spending time
14 with, is one of those gentlemen Dillan Gamerut?
15    **A.   No.**
16    Q.   Who were the friends that you were spending
17 time with?
18    **A.   Alex Buben and Jonathan Igne.  I believe**
19 **his mother's maiden name is Bianchi which is sometimes**
20 **appended.**
21    Q.   Which is sometimes --
22    **A.   Appended.**
23    Q.   Thank you.  And so were these gentlemen in
24 your room with you at the time when Mr. Leachman asked
25 you if he could have the room?

Page 52

1    **A.   They were.**
2    Q.   And they stayed with you up until the point
3 when you took a nap in the common room?
4    **A.   Yes.**
5    Q.   Do you know who Dillan Gamerut is?
6    **A.   I do.**
7    Q.   During your freshman year at Duke were you
8 a friend of Dillan Gamerut?
9    **A.   I would say I was.**
10    Q.   At any point did you spend time with him
11 during that evening?
12    **A.   I don't recall.**
13    Q.   You said you came back to the hallway and
14 you observed Mr. Jones and Mr. Self entering your dorm
15 room?
16    **A.   That's correct.**
17    Q.   You don't know the nature of any
18 communications between Mr. Self and this young woman;
19 is that fair?
20    **A.   Obviously, no.**
21    Q.   You don't know the nature of any
22 communication between Frank Jones and this young woman,
23 correct?
24    **A.   That's correct.**
25    Q.   You don't know whether this encounter that

Page 53

1 you described was consensual or not, correct?
2    **A.   I was not in the room.  I have no way of**
3 **knowing.**
4    Q.   Earlier you used the term "gang rape" when
5 you described what you had discussed with Mr. Ekstrand.
6 And I understand you were using that term to refer to
7 the encounter involving Ms. Qayumi.  As you sit here
8 today, would you classify the encounter between the
9 visiting Duke student and the gentlemen we've been
10 speaking about as a gang rape?
11    **A.   It's not my place to define those things.**
12    Q.   When you spoke with Mr. Ekstrand were you
13 defining any of these encounters as a gang rape?
14    **A.   I believe I would have mostly used the word**
15 **"assault."**
16    Q.   As you sit here today, do you believe that
17 the encounter between this visiting student and the
18 male students that we've been discussing, would you
19 characterize that as an assault?
20    **A.   I would.**
21    Q.   On what basis?
22    **A.   On the basis that -- the basis that it was**
23 **not a normal set of circumstances for any student other**
24 **than these three engaging in, and these three students**
25 **were suspected of having engaged in this on a fairly**

Page 54

**1 regular basis and that this was not -- Ariana was not**
**2 the only woman who was suspected to not get consent.**
**3 And it was not a normal course of activity for two men**
**4 to walk into another dorm room unannounced while two**
**5 people are already having sex.**
6     Q.   You said "unannounced."  Do you know if
7 there was any interactions between the persons who were
8 in the room on the one hand and Mr. Self and Mr. Jones
9 on the other hand?
**10     A.   I know that physically when they walked**
**11 into the room it's not like the door was open for them.**
**12 The door had been unlocked, they walked in, and the**
**13 door was locked behind them.**
14     Q.   Do you know anything else about that --
15 about whether there was communications?
**16     A.  I do not.**
17     Q.   And I asked you about the --
**18     A.   And I did not -- just to be clear, I did**
**19 not allege that in my report.  I did not allege that I**
**20 was in the room.  I did not allege that I knew exactly**
**21 the --**
22     Q.   Understood.  I asked you about the phrase
23 "gang rape" and you said you would characterize it as
24 an assault.  And I asked you if you would define what
25 happened on the -- in the incident involving the

Page 55

1 visiting student as an assault, and you referenced
2 Ms. Qayumi.  I want to make sure that we're clear that
3 we're only talking about the visiting student incident
4 right now.
5          Is there any basis besides what you've told
6 me that wouldn't be normal?  Is there any other basis
7 for you to characterize that visiting student encounter
8 as an assault?
**9     A.   Could you rephrase that question.**
10     Q.   Yeah, sure.  Let's stick with what's the
11 basis for your characterizing this incident involving
12 the visiting student as an assault without referring to
13 Ms. Qayumi?
**14     A.   I never alleged -- I don't know whether**
**15 consent was or was not given on a firsthand basis.  It**
**16 would seem to me to be an extremely extenuating set of**
**17 circumstances that consent was given because this was**
**18 in the normal course of behavior for Duke students at**
**19 the time, not something that would fit within any**
**20 number of standard deviations of normal behavior.**
21     Q.   Anything else?
**22     A.   The fact that two men had -- again, I**
**23 didn't see any text messages -- walked into the room**
**24 and just commenced sexual activity.**
25     Q.   As this was happening during the evening

Page 56

1 when this visiting student was involved, did you at
2 that time suspect that a non-consensual sexual
3 encounter was happening?
**4     A.   When the two men walked into the room, I**
**5 did.**
6     Q.   Did you do anything to intervene?
**7     A.  I did not.**
8     Q.   At any point did the young woman come out
9 of the room?
**10     A.   She did not.  We had gone back downstairs**
**11 after being up there.**
12     Q.   Did you make any report to an RA while this
13 was happening?
**14     A.   I did not.**
15     Q.   Did you ask any questions of anyone to
16 determine whether the woman was impaired?
**17     A.   Of whom would I have asked the questions?**
18     Q.   I don't know.
**19     A.   I mean, obviously I discussed it with the**
**20 two friends that I was with.  But other than that, no.**
21     Q.   Did you and your two friends discuss
22 contacting Duke police?
**23     A.   We did.**
24     Q.   Did you contact Duke police?
**25     A.   We did not.**

Page 57

1     Q.   Why not?
**2     A.   We were 18 -- or at least I was 18.  I**
**3 don't know how old they were at the time.  And my**
**4 judgment was not as good at 18 as I believe it is**
**5 today.**
6     Q.   Was the fact that you had been drinking,
7 did that play into account?
**8     A.   I don't believe so.**
9     Q.   So you believe that a non-consensual sexual
10 encounter was occurring.  Did you do anything else
11 after reaching that conclusion to try and prevent or
12 stop the situation?
**13     A.   We did not.**
14     Q.   Did you ever speak with Mr. Leachman about
15 this incident after it occurred?
**16     A.  I did not.**
17     Q.   Did you ever speak with Mr. Self about this
18 incident after it occurred?
**19     A.  I did not.**
20     Q.   Same question for Mr. Jones.
**21     A.  I did not.**
22     Q.   Let me know if you need a break.  I'm happy
23 to keep trudging along.  On January 3rd, 2016 when you
24 first exchanged text messages or received a text
25 message from Mr. Ekstrand, had you hired a lawyer at

Case 1:16-cv-01038-CCE-JLW   Document 81-3   Filed 02/02/18   Page 15 of 49

Page 58

1 this point?
2   A.   I retained Mr. Ginsberg.
3   Q.   And that's what that first text message
4 refers to is your counsel, correct?
5   A.   That's correct.
6   Q.   And you were not a Duke student at this
7 time; is that right?
8   A.   In 2016 I was not a -- no.  I was still a
9 Duke student at that time.
10   Q.   Had you left and then come back?
11   A.   I did, and then I left again.
12   Q.   What were the circumstances of your first
13 departure from Duke?
14   A.   Academic.
15   Q.   What were the circumstances of your second
16 departure from Duke?
17   A.   Academic and health.
18   Q.   Back in 2014 when you first met with
19 Mr. Ekstrand, did he share with you any draft legal
20 documents, any complaints, proposed pleadings or
21 anything of that nature?
22   A.   Not that I recall.
23   Q.   Did he show you any documents?
24   A.   Not that I recall.
25   Q.   Did he play you any recordings or present

Page 59

1 you with any other materials?
2   A.   Not that I recall.
3   Q.   Did he share with you any information about
4 potential claims that Ms. Qayumi was considering filing
5 against Duke?
6   A.   I believe so.
7   Q.   What do you remember about them?
8   A.   I believe he mentioned that she would be
9 pushing forward with the charges of some nature against
10 Duke.
11   Q.   Do you remember any discussion of Title IX?
12   A.   Vaguely.
13   Q.   What do you remember about that?
14   A.   That Title IX was mentioned as a basis for
15 the complaint.
16   Q.   Do you remember any other potential
17 theories being discussed at that point?
18   A.   Theories as to?
19   Q.   Theories as to legal claims to pursue
20 against Duke University.
21   A.   That's not my business.  I don't recall
22 that.  There may have been.  I wasn't pursued in
23 letting him know that I filed a report.
24   Q.   Right.  And I just want to know if you
25 discussed any additional claims that Ms. Qayumi made

Page 60

1 against Duke during that meeting.
2   A.   It's possible.
3   Q.   Are you able to recall any?
4   A.   I do not.
5   Q.   Did you all discuss Peter Lange during
6 those meetings?
7   A.   We may have.  I don't recall speaking about
8 him.
9   Q.   On April 3rd, 2016, you responded to or you
10 texted Mr. Ekstrand, "Hey, Bob, I'm running a couple of
11 minutes late but should be there shortly."  Did you
12 meet with Mr. Ekstrand on April 3rd, 2016?
13   A.   By the looks of that text message I did.
14   Q.   Was Mr. Ginsberg present for that meeting?
15   A.   I don't believe he was.
16   Q.   Were you a Duke student in April of 2016?
17   A.   I was.
18   Q.   Are you able to recall any specific details
19 about that meeting with Mr. Ekstrand?
20   A.   I believe we may have gone over what he had
21 in mind for the deposition.  I believe that
22 Mr. Ginsberg had advised me that it was fine to just
23 meet with him to go over the details of the deposition.
24   Q.   I just want to make sure you don't disclose
25 what you and Kevin talked about.

Page 61

1   A.   Okay.  And I believe that meeting was for
2 the purpose of going over the declaration -- the
3 affidavit.
4   Q.   Earlier you said you -- you said during
5 that meeting you discussed what he had in mind for the
6 deposition.  You meant declaration?
7   A.   Exactly.
8   Q.   Did he share with you a proposed
9 declaration during that meeting?
10   A.   I don't remember if it was a proposal or a
11 sketch at some point, but there was some sort of
12 structure.
13   Q.   Did you all discuss the purpose that, that
14 declaration served in this case?
15   A.   Yes.
16   Q.   What was that purpose?
17   A.   The purpose was to be submitted as part of
18 the evidence or the filing.
19   Q.   Did you ultimately -- strike that.  Did you
20 express any reservations during this April 2016 meeting
21 about signing a declaration?
22   A.   About the general notion of signing one, I
23 did not without making sure that it was meticulously
24 worded to be exactly true, yes.
25   Q.   And you left that meeting without signing

Page 62

1 the declaration?

2     A.  I don't recall if it had been completely
3 put together or if there were just some slight edits
4 that needed to be made.  It wasn't ready for me to sign
5 it.

6     Q.  Did you communicate with Mr. Ekstrand or
7 anyone from his office between April 3rd, 2016, and
8 November 4th, 2016?

9     A.  It's very possible.

10     Q.  Is this text exchange that you've got in
11 front of you, is that the entirety of your text
12 communications with Mr. Ekstrand?

13     A.  It is.

14     Q.  Do you recall specifically speaking on the
15 phone with Mr. Ekstrand or anyone from his office
16 between these two text exchanges?

17     A.  I would imagine I probably spoke on the
18 phone with Mr. Ekstrand.

19     Q.  Do you recall the nature of any of those
20 communications?

21     A.  Usually just updates to the declaration and
22 things he needed from me.

23     Q.  Did you exchange drafts of any
24 declarations?

25     A.  I have the draft of the declaration there.

Page 63

1 By the time I went to go sit down with Mr. Ginsberg to
2 just discuss the edits that needed to be made, he had
3 moved firms.

4     Q.  Mr. Ginsberg had moved firms?

5     A.  That's correct.

6     Q.  So edits were being made to an original
7 document -- to a prior version of a declaration during
8 this time?

9     A.  Yes.  I believe the declaration very much
10 resembled what was submitted.

11     Q.  Did you receive multiple drafts of the
12 declaration during this process?

13     A.  Just the one.

14     Q.  Do you know if Mr. Ginsberg received
15 multiple drafts of the declaration?

16     A.  I do not know.

17     Q.  Then there's a November or a -- strike
18 that.  There's a May 5, 2017, text message from
19 Mr. Ekstrand to you.  Do you see that?

20     A.  I do.

21     Q.  What was the nature of your voicemail to
22 Mr. Ekstrand on this day?

23     A.  The nature of the voicemail was that I was
24 getting the cost service from this place of business,
25 and that after discussing it with Mr. Ginsberg, his

Page 64

1 firm was representing another party in the case.  One
2 of his partners, I believe, was representing another
3 party in the case so he would no longer be able to
4 represent me, and the representation he had referred me
5 to I could not afford.

6     Q.  The representation --

7     A.  Mr. Ginsberg had referred me to I could not
8 afford.

9     Q.  Did you ask Mr. Ekstrand for
10 recommendations for a new lawyer who you could retain?

11     A.  That is correct.

12     Q.  And Mr. Ekstrand provided you Mr. Bachman's
13 name?

14     A.  Mr. Bachman contacted me first.

15     Q.  So I just want to make sure that's clear.
16 Yes or no, did Mr. Ekstrand provide you with
17 Mr. Bachman's name?

18     A.  He may have.  I don't -- he never said call
19 this gentleman specifically.

20     Q.  Did he provide you with a few options?

21     A.  He said he was speaking to a couple of
22 different people.  And I don't remember which names
23 were or were not specifically mentioned.

24     Q.  Okay.  Do you remember anything else about
25 the conversation with Mr. Ekstrand in May of 2017?

Page 65

1     A.  I do not.  We discussed the fact I was at
2 some point going to be deposed, and clearly I was being
3 asked for documents.  We were at a point of discovery
4 in the case.

5         (Deposition Exhibit 21 was marked for
6 identification as of this date.)

7     A.  Can we take three minutes?

8     Q.  That's fine.

9         (Whereupon a break was taken from
10 10:47 a.m. to 10:53 a.m.)

11 (BY MR. JACKSON)

12     Q.  Before we went off the record I handed you
13 an exhibit that was a cover e-mail with an attached
14 declaration at the top.  Before we get to that I just
15 want to ask you one quick question about the text
16 message exchange.

17     A.  Yes, sir.

18     Q.  The November 4, 2016, text from
19 Mr. Ekstrand to you has a document -- it appears to
20 have a document attached to a declaration.  Do you see
21 that?

22     A.  I do.

23     Q.  Is that the same version of the document
24 that Mr. Ekstrand sent to you by e-mail?

25     A.  I believe it to be.

Page 66

1    Q.   Excuse me.  Previously had sent to you via
2 e-mail on September 2nd, 2016.  Is that the same draft?
3    **A.   I believe it to be.**
4    Q.   The e-mail document that I had handed to
5 you indicates that you had called Mr. Ekstrand on
6 September 2nd, 2016.  Do you see that?  "Eli, thanks so
7 much for your call today."
8    **A.   Yes.**
9    Q.   Do you recall the nature of that
10 conversation?
11    **A.   It would have been to review the**
12 **declaration or to receive the declaration from him via**
13 **e-mail.**
14    Q.   And then there is a draft declaration
15 attached to this e-mail; is that right?
16    **A.   That's correct.**
17    Q.   And, as you sit here today, you've not
18 signed this declaration, right?
19    **A.   No.  There were minor edits I wanted to**
20 **make.**
21    Q.   Are there still edits?
22    **A.   Very minor in nature that don't change most**
23 **of the substantive.**
24    Q.   Did you call Mr. Ekstrand after receiving
25 the declaration that was attached to this e-mail?

Page 67

1    **A.   Can you restate the question.**
2    Q.   Did you call Mr. Ekstrand close in time to
3 the time when you received this draft statement?
4    **A.   In reference to --**
5    Q.   In reference to the declaration.
6    **A.   I don't believe so.  Next time I'll keep a**
7 **call log.**
8    Q.   This visiting student incident that we were
9 discussing earlier, do you have an understanding as to
10 whether that was before or after the encounter
11 involving Ms. Qayumi?
12    **A.   Now or the time when it happened?**
13    Q.   As you sit here today.
14    **A.   As I sit here today, my understanding is**
15 **that the incident occurred afterwards.**
16    Q.   And, as you sit here today, you don't know
17 the identity of that visiting student?
18    **A.   I do not.**
19    Q.   And you don't know the identity of the Duke
20 student -- this visiting student -- who was on campus;
21 is that right?
22    **A.   I do not.  You can narrow it down to about**
23 **however many females were in the dorm.**
24    Q.   After learning about the incident involving
25 Ms. Qayumi, did you make any efforts to determine the

Page 68

1 identity of the visiting student?
2    **A.   I did not.**
3    Q.   Did you reach out to the Duke student who
4 the visiting student was seeing?
5    **A.   I did not.**
6    Q.   Did you take any steps to determine the
7 identity of the visiting student?
8    **A.   I did not.  It's not my place to come**
9 **forward for her.**
10    Q.   As you sit here today, do you believe that
11 the visiting student was under the influence of any
12 drugs that are commonly referred to as date rape drugs
13 on the night in question?
14    **A.   It's not my place to speculate.**
15    Q.   As you sit here today, do you believe that
16 Ms. Qayumi was under the influence of any drugs that is
17 commonly referred to as the date rape drug on the night
18 of her incident?
19    **A.   It's not my place to speculate.**
20    Q.   Do you know if anyone -- any other Duke
21 student made any attempt to intervene on the night of
22 the encounter involving the visiting student?
23    **A.   To the extent to my knowledge, no.**
24    Q.   Have you ever spoken with the gentleman I
25 mentioned earlier Dillan Gamerut about the night of the

Page 69

1 incident involving the visiting student?
2    **A.   I don't believe I have.  He was a friend of**
3 **mine at the time.  I've seen him several times since**
4 **then.  But until today, as you mentioned his name, I**
5 **have no further reason he was involved in this case**
6 **whatsoever.**
7    Q.   How did you first meet Dean Christine
8 Pesetski?
9    **A.   I had met her a week earlier for a**
10 **completely unrelated exchange.**
11    Q.   Was that unrelated exchange in relation to
12 a disciplinary incident?
13         MR. BACHMAN:  You can answer.
14         THE WITNESS:  It was.
15 (BY MR. JACKSON)
16    Q.   Was that incident involving you personally?
17    **A.   It was.**
18    Q.   Were you found responsible for any
19 violation of Duke's student conduct policy?
20    **A.   I don't remember if it was considered a**
21 **violation of policy.**
22    Q.   There was a report that you had struck
23 another student; is that right?
24    **A.   "Struck" is a harsh term for it.**
25    Q.   There was a report that you had made

Page 70

1 non-consensual contact using your fist to another male
2 student; is that right?

3    A.   Yes, sure.

4    Q.   Was that at a Friends of Israel meeting?

5    A.   Yes, it was.

6    Q.   And describe for me the nature of your
7 first interaction with Christine Pesetski.

8    A.   It was very cordial.  I seemed somewhat
9 shocked that somebody had filed a report.  If you've
10 never kind of lightly jabbed a friend in the top of the
11 arm I would be very surprised by that, and it wasn't
12 meant anything by it.  It wasn't done particularly
13 forcefully, and I wasn't a particularly strong
14 gentleman at the time.

15        So that's why I was kind of -- thought it
16 was a little farcical that I was being called in on it.
17 I believe it was cordial.  I don't know if she
18 approached it being farcical, but she could have
19 realized that there was not any sort of gravity to it
20 whatsoever.  We had a short meeting.  That was that.

21    Q.   And that meeting was before the visiting
22 student incident, correct?

23    A.   By roughly a week, yes.

24    Q.   And you went to see Dean Pesetski the day
25 after or later depending on if we're in the early

Page 71

1 morning hours.  But this exchange with the visiting
2 student began on April 9th.  You saw Dean Pesetski on
3 April 10th?

4    A.   I saw her on April 11th, which would have
5 been that Monday.

6    Q.   So it was a day removed from the --

7    A.   So the incident happened early Sunday
8 morning which would have been Sunday the 10th, and then
9 I saw her on Monday afternoon the 11th.

10    Q.   Understood.

11    A.   The fact that, that meeting with Dean
12 Pesetski I called fortuitous that I had that
13 extraordinarily minor incident the week before because
14 it meant that I knew exactly who to speak to about
15 this.

16    Q.   Was the last document that I gave you 22?

17    A.   Twenty-one, I believe.

18        (Deposition Exhibit 22 was marked for
19 identification as of this date.)

20    Q.   I'll hand you what I'm marking as
21 Exhibit 22.  Do you recognize this e-mail exchange?

22    A.   I do.

23    Q.   If you turn to the second page of this
24 document at the top e-mail there, do you see where it
25 says on April 10th, 2011, at 5:56 p.m., Eli Kozin

Page 72

1 wrote?

2    A.   Yes.

3    Q.   Is that an e-mail from you to Dean
4 Pesetski?

5    A.   It is.

6    Q.   And so you e-mailed Dean Pesetski in the
7 evening of Sunday, April 10th; is that right?

8    A.   That's correct.

9    Q.   And the purpose of this -- your
10 requesting the meeting was what?

11    A.   Was to discuss the incident that had
12 happened early that Sunday morning.

13    Q.   And you did, in fact, meet with Dean
14 Pesetski the next day on Monday, correct?

15    A.   That's correct.

16    Q.   You didn't provide a victim name at that
17 time, correct?

18    A.   I did not.  If I may, my purpose in having
19 that meeting was twofold.  It was, one, as I had
20 mentioned, when I reentered my room that the sheets had
21 been messed up.  It was -- you know, covered my basis
22 situation as well as -- like I had spoken earlier about
23 the critical mass of rumors and now having seen a very
24 similar incident firsthand, to say that I didn't want
25 to continue pretending that it seemed like everything

Page 73

1 was okay.  It had reached a point where I didn't think
2 something right was happening.

3        I saw some things that were wrong were
4 happening, but, as I stated, I was not in the room at
5 the time where any of these situations took place.
6 There was a pattern of events.  It was distressing.  It
7 was disturbing.  It continues to be distressing and
8 disturbing -- this pattern of events.  And I didn't
9 want to pretend that everything was right.

10    Q.   So to the first purpose, you were concerned
11 that -- well, strike that.  Why don't you just tell me
12 what your specific concern was in relation to -- let me
13 back up.  You wanted to speak with Dean Pesetski to
14 memorialize with her the fact that you were not in the
15 room when this sexual encounter occurred; is that
16 right?

17    A.   I wouldn't use more -- yes, to establish
18 that.

19    Q.   You wanted to speak with someone at Duke
20 involving the conduct process to establish that, yes,
21 my DNA would be on my bed because I sleep there but I
22 had nothing to do with this?

23    A.   While I was of the very strong feeling that
24 improper conduct was occurring, like I said, I wasn't
25 in the room.  I would not be able to directly accuse --

Page 74

1 cannot directly accuse any of the gentlemen who are
2 being alleged to have perpetuated the assaults. And I
3 believe I alluded to this earlier, that to me was -- if
4 one of the women were to come forward, that's their
5 place. It's not my place to come forward for them.
6         But, yes, as far as it refers to my bed,
7 should that woman have come forward and should an
8 investigation have ensued, it was, yes, to protect my
9 whereabouts at the time and to explain any DNA that
10 would have come off of my bed is obviously including my
11 DNA.
12    Q.   So as of April 2011, you didn't have a
13 basis for accusing Colby Leachman, Brian Self, or Frank
14 Jones of a crime having occurred on the weekend of
15 April 9th, and April 10th, correct?
16         MR. EKSTRAND: Objection. It calls
17 for a legal conclusion about what crimes entailed in
18 the way of proof and facts.
19         THE WITNESS: I can answer?
20         MR. BACHMAN: You can answer.
21         THE WITNESS: I had a basis for
22 suspecting. I did not have a basis for accusing.
23 That's why my meeting was not to accuse them.
24 (BY MR. JACKSON)
25    Q.   And during that meeting with Dean Pesetski

Page 75

1 you did not accuse those three men of any crimes,
2 correct?
3    A.   Directly I did not accuse them of any
4 crimes.
5    Q.   And you didn't tell Dean Pesetski that any
6 of these three men had engaged in a non-consensual
7 sexual encounter with this visiting student, correct?
8    A.   I suspected that they had, but I let her
9 know that. I'm unaware of how Duke either at the time
10 or in present day handles sexual assault claims. I'm
11 unaware of what the laws are. I do know that once
12 something is reported, there are theoretically certain
13 requirements. I wasn't sure what met the threshold.
14 All I wanted to do was, again, say this doesn't all
15 seem proper.
16    Q.   So I just want to make sure I understand
17 your answer. You said that you told Dean Pesetski that
18 you were concerned or suspected. What did you tell her
19 that you -- as close as you can, tell me what your
20 words were to Dean Pesetski.
21    A.   That I had -- the meeting was actually
22 conducted -- a lot of hypotheticals. Again, I didn't
23 know -- I was somewhat fearful at the time, again,
24 because of the whole -- my bed and my DNA. So we made
25 a lot of hypotheticals. Hypothetically if I witnessed

Page 76

1 this, hypothetically if I witnessed that. It was
2 conducted under the very, very implicit assumption that
3 she very clearly understood that based on her responses
4 that we were discussing actual events.
5         And based on her responses we were very
6 clearly both discussing actual events that had occurred
7 with specific times, places, and people. And she was
8 aware of those times, places, and people. She
9 understood where I was coming from as wanting to make
10 sure that I was not going to be held responsible for
11 any of my roommates' actions that had -- and that the
12 suspicion that this was going from something within the
13 bounds of normality to something outside the bounds of
14 normality happened after I had already been removed
15 from the room when the other two gentlemen entered and
16 that this was part of a pattern of behavior.
17         She was made aware at the time that this
18 was part of a pattern of behavior. Had she not been
19 made aware of that already, I had informed her.
20    Q.   So you relayed specifically to Dean
21 Pesetski that you had left the room and hadn't
22 witnessed any portion of the encounter that was --
23    A.   We had heard.
24    Q.   I'm sorry?
25    A.   We had heard portions of the encounter.

Page 77

1    Q.   I want to make sure we're not speaking over
2 each other and I get a full question asked. Did you
3 relay to Dean Pesetski that you did not witness
4 visually any portion of this encounter that you were
5 concerned about?
6    A.   That's correct.
7    Q.   Did you relay to Dean Pesetski that you
8 heard any portion of the encounter that you felt was
9 concerning?
10    A.   I did.
11    Q.   What did you tell her about that?
12    A.   I told her that I had heard those three
13 gentlemen in the room and sounds of sexual interaction.
14    Q.   Did you use these three men's names?
15    A.   I do not recall.
16    Q.   Do you recall whether you used these three
17 men's names at any point during this conversation?
18    A.   I do not recall.
19    Q.   So you went to Dean Pesetski and you told
20 her that you were concerned -- strike that. You
21 mentioned discussion in terms of hypotheticals. Can
22 you tell me how that was conducted, how did you present
23 this set of facts to Dean Pesetski?
24    A.   It was essentially the same story I told
25 that it was very much hypothetically Saturday night

Page 78

1 this happened and this happened and this happened to
2 the point where, again, it was extraordinarily implicit
3 that we weren't discussing hypotheticals. Again, I was
4 a freshman and somewhat fearful at the time.
5     Q.   But you didn't provide her a victim name
6 because you didn't have a victim name?
7     A.   No, I did not.
8     Q.   And you can't recall whether you provided
9 her with any accused student name?
10     A.   She was clearly aware of the student. I
11 don't remember if I had provided their relationship to
12 administrators at the school or their names, but she
13 was clearly aware -- we were clearly talking about the
14 same students who she was clearly aware of which
15 student I was referring to.
16     Q.   And your basis for saying that she was
17 clearly aware is what?
18     A.   Was an exchange we had at the end of the
19 meeting.
20     Q.   Which is?
21     A.   And this is going to be not quite verbatim
22 but fairly close. After telling her everything I knew,
23 she said here's what we're going to do. We're going to
24 open a case and close it immediately, and if anything
25 corroborates we're going to give you a call. And my

Page 79

1 response to her was if you give me a call, we've got
2 much bigger problems because of who the accused
3 students were or one of the accused students was.
4     Q.   Did you explain what you meant by --
5     A.   By that point she was aware of what I
6 meant.
7     Q.   Did you explain to her what you meant by if
8 we -- we'll have much bigger problems because of the
9 identity?
10     A.   I didn't give an explanation. At the time
11 she understood that it meant that one of the women had
12 come forward -- would have come forward should she have
13 given me a call. Again, we were discussing a pattern
14 of behavior. And I had framed my description to her
15 the events of that early Sunday morning within that
16 pattern of behavior.
17     Q.   Did you explain to Dean Pesetski what you
18 meant by if another woman comes forward we're going to
19 have much bigger problems?
20     A.   I didn't say that. I said if you give me a
21 call, we have much bigger problems.
22     Q.   Did you explain explicitly what you meant
23 by that statement?
24     A.   I did not.
25     Q.   Did you mention Peter Lange during this

Page 80

1 conversation?
2     A.   I may have. I don't recall explicitly
3 mentioning his name. I may have also referred to him
4 as the provost if I referred to him.
5     Q.   Do you recall one way or another whether
6 you referred to the provost in this conversation?
7     A.   I remember that we had established at least
8 Colby's identity.
9     Q.   How?
10     A.   I don't recall if it was either through use
11 of his name, through use of the provost, through the
12 use of Peter Lange, the stepson of the provost, the
13 stepson of Peter Lange. I do remember that we had
14 explicitly established his identity.
15     Q.   And the way that you did that was?
16     A.   I don't recall how, but by the end of the
17 exchange of the end of the conversation I knew that we
18 were talking about the same person. I cannot recall
19 exactly how I established it, but it had been
20 established during the course of the meeting.
21     Q.   Your belief and recollection is that Dean
22 Pesetski said words to the effect of, "I will open a
23 case and then immediately close it"?
24     A.   That's correct.
25     Q.   Is it your recollection whether -- or do

Page 81

1 you recall whether she told you how she was going to go
2 about opening the case?
3     A.   No.
4     Q.   Do you have any understanding as to how a
5 case would be opened without a victim name, for
6 example?
7     A.   I do not.
8     Q.   Do you have any understanding as to how a
9 case might be opened without an accused student's name?
10     A.   I do not.
11     Q.   Do you have any understanding as to Duke's
12 internal reporting policies?
13     A.   I do not.
14     Q.   Have you ever investigated that subject?
15     A.   Occasionally perhaps, but never in any
16 depth.
17     Q.   Based on that casual investigation do you
18 have any understanding as to the -- did you reach any
19 conclusions of your own?
20     A.   I did not. There's not much information
21 available on their internal -- or at least at the time
22 there was not.
23     Q.   Did you tell Dean Pesetski during this
24 meeting that you believed that fellow students had
25 engaged in a non-consensual sexual act with a visiting

Page 82

1 student?
2     A.   I'm sorry?
3     Q.   Did you tell Dean Pesetski during this
4 meeting that certain Duke male students had subjected a
5 female -- a young woman to a non-consensual sexual act?
6     A.   I told her that I suspected that.  Exactly.
7     Q.   Was that in the form of a hypothetical or
8 was that in the form of an actual thing that you told
9 her happened?
10     A.   I don't recall.
11     Q.   Do you have the e-mail with the draft
12 declaration attached to it?
13     A.   I do.  21?
14     Q.   Yes.  Actually, before we get to that, have
15 you spoken to Dean Pesetski since that one -- or since
16 that last meeting?
17     A.   I believe we have.  I know I was on at
18 least one committee with her at some point, but nothing
19 else relating to this case.
20     Q.   Had your personal -- whatever we call it,
21 your personal matter arising from the Friends of Israel
22 meeting, had it concluded by the time you went to speak
23 with Dean Pesetski about this incident?
24     A.   I don't recall if there was an essay that
25 was required to be submitted.  I don't recall if that

Page 83

1 was before or after.  I would venture to guess after,
2 but I don't recall.
3     Q.   If you go to paragraph ten in this
4 declaration, it reads, "I was also concerned that what
5 I observed was consistent with reports of a pattern of
6 sexual misconduct involving Leachman, Self, and Jones."
7 Do you see that?
8     A.   I do.
9     Q.   The reports there, who are those reports
10 made by?
11     A.   By reports I think we're alluding to the
12 rumor mill.  And by rumor mill, don't mistake me for
13 thinking this was one or two.  This was a constant
14 source of conversation for many months at that point
15 among students in the dorm and other students on
16 campus.
17     Q.   Not what you had firsthand knowledge of,
18 correct?
19     A.   Usually in sexual activities, only the
20 people involved in that would have firsthand knowledge
21 of it.  I saw what I saw the night outside the room,
22 and until then I had only heard things.  And the night
23 that I actually saw something with my own eyes is the
24 day I came forward.  I still didn't have enough
25 evidence to make an accusation, but I had enough to

Page 84

1 know that things didn't seem right to me.
2     Q.   Paragraph 12 -- and I'm asking these
3 questions about this declaration understanding that you
4 haven't signed this.  You haven't sworn to this under
5 penalty of perjury.  I'm asking about the current draft
6 of the declaration.
7     A.   Okay.
8     Q.   In paragraph 12 there's a reference to
9 questions from Dean Pesetski, the final clause, and "I
10 answered all of her questions."  Do you remember what
11 questions Dean Pesetski asked you?
12     A.   I don't.  That was one of the parts that I
13 wanted to clarify in that draft.  Had she required any
14 clarification from me, I would have provided it and
15 been cooperative at the time.
16     Q.   In that same paragraph above, it reads, "I
17 reported my knowledge of reports of similar events
18 involving Leachman, Self, and Jones."  Did you report
19 knowledge of reports of similar events involving
20 Leachman, Self, and Jones to Dean Pesetski?
21     A.   Yes.  This incident would have been framed
22 as that pattern of behavior.
23     Q.   Was that framing provided in the form of a
24 hypothetical?
25     A.   I do not recall.  I do not recall.

Page 85

1     Q.   You don't know one way or another?
2     A.   I do not.
3     Q.   You said earlier that you don't recall
4 whether you used the name Colby Leachman or whether you
5 said Peter Lange's stepson or the provost's stepson.
6 Was there any way during this meeting with Dean
7 Pesetski that you identified Brian Self?
8     A.   I do not recall.
9     Q.   You don't know whether you ever used Brian
10 Self's name with Dean Pesetski?
11     A.   That is correct.
12     Q.   And because Brian Self is not identifiable
13 through relationship to any faculty or administrator at
14 Duke, there was no way for you to identify him that
15 way, correct?
16     A.   That's correct.
17     Q.   So you don't know -- and what about Frank
18 Jones?  Did you ever identify Frank Jones by name?
19     A.   I do not recall.
20     Q.   Do you know if you ever identified Frank
21 Jones through any other identifying information?
22     A.   I do not recall other than the two -- their
23 relationship to Colby within this pattern of events.
24     Q.   Which is?
25     A.   Which is that the rumor had been -- it's

Case 1:16-cv-01038-CCE-JLW   Document 81-3   Filed 02/02/18   Page 22 of 49

Page 86

1 very possible -- I don't want to swear under penalty of
2 perjury that I did identify the two of them, but if we
3 were discussing three students in a pattern of events,
4 I would imagine at some point I did. But, again, under
5 penalty of perjury I can't swear to it as far as
6 recalling that I did use their names other than Colby
7 who in some way, shape, or form I will swear that I did
8 identify him.
9      Q.  Paragraph 15 in this declaration says, "I
10 told Dean Pesetski that I could have easily found out
11 her name at the time I made my report." You said
12 earlier you presented this scenario in terms of a
13 hypothetical. How did you -- in light of that framing,
14 how would you have presented this statement to Dean
15 Pesetski if you did make this statement?
16      A.  That was a major edit that I wished to make
17 to the draft.
18      Q.  What is -- as you read it, what's not
19 factually correct about paragraph 15?
20      A.  I don't recall having told her I could have
21 easily found out the student's name. At this time and
22 place I don't recall which student was hosting the
23 visiting student. Two days after or a day after the
24 incident I likely still did recall, but I don't
25 remember having provided that willingness to provide a

Page 87

1 name.
2          Dean Pesetski, from what I do recall,
3 didn't seem to want too much information. She didn't
4 want to know too many names of the other people who had
5 witnessed it or were hosting the student.
6      Q.  Did that concern you at the time?
7      A.  Should have more.
8      Q.  Did it concern you at the time?
9      A.  Possibly vaguely. Not in any
10 substantative at all.
11      Q.  Paragraph 16 -- is there anything that you
12 would change about that paragraph 16?
13      A.  I don't know if I explicitly told Dean
14 Pesetski I was willing to participate. Clearly, by
15 coming forward I was willing to share what I knew as
16 far as the pattern of events.
17          So that first sentence is more or less
18 fine. Dean Pesetski assured me that I could be -- I
19 know Leachman was identified having six years after the
20 fact not wanting to swear under oath if I ever called
21 Jones or Self. Leachman or associates might be a more
22 fitting way for me to swear that or something of that
23 nature.
24      Q.  You said, as you sit here today, it's your
25 understanding that Ms. Qayumi's incident occurred

Page 88

1 before the visiting student incident, correct?
2      A.  As I sit here today.
3      Q.  And so do you agree that -- well, strike
4 that. As you sit here today, do you believe that Dean
5 Pesetski should have taken some further action in
6 connection with the conversation that you had with her
7 on April 11th?
8      A.  Yes.
9      Q.  What action do you believe that Dean
10 Pesetski should have taken?
11      A.  Seeing this was a report that had an
12 extremely similar set of circumstances to a firsthand
13 accusation from a victim and involving the same
14 students, I believe that at some point when that report
15 was filed, additional details should have been asked
16 and they should have been contacted in some way, shape,
17 or form.
18          I am not a Title IX lawyer. I'm not a
19 lawyer. I don't know the details of that. But I
20 imagine that as part of any sort of investigation, a
21 report of this nature should be -- the student should
22 at least be contacted for what he says.
23      Q.  So you believe that Duke should have
24 contacted you to advise you that a charge had been made
25 against the fellow student?

Page 89

1      A.  I don't need to know the details of why
2 they need more details, but I can't imagine that what I
3 provided them would be able to have been sufficient.
4 It was sufficient enough to warrant further discussion
5 with me but not sufficient on its own to involve in a
6 separate complaint. Was that clear? I'm sorry.
7      Q.  I mean, it's -- I don't know. It's as
8 clear as you stated it. If you want to further
9 explain, you're welcome to.
10      A.  So the detail that I provided would not --
11 and I don't -- this is outside of my professional
12 field. I don't think would have been enough to involve
13 in a separate complaint or a separate investigation of
14 a separate complaint, but there were enough details
15 that had matched that I should have been asked for
16 further details. At the time I would have had a much
17 fresher recollection, and now we're sitting here six
18 years later when a lot has happened in six years.
19      Q.  The details that matched were what?
20      A.  Were -- and this was why, again, I cannot
21 swear under oath that I identified Brian or Frank, but
22 I believe I did because it was three students and it
23 was the same three. And I had talked about a pattern
24 of events with three students, and it would be hard for
25 me to imagine that there wouldn't have been some push

Page 90

1 to at least identify who those students were in my
2 report from Dean Pesetski as well as having three
3 students and one female in something, whether it was
4 consensual, would be questioned.
5    Q.   Who questioned the consensual nature of the
6 visiting student encounter?
7    A.   I did.
8    Q.   Anyone else?
9    A.   In what capacity?
10    Q.   In terms of a report to Duke.
11    A.   Not that I am aware of.
12    Q.   So if Dean Pesetski had taken every step
13 that you believe she should have in connection with
14 what you told her, even if she had done all of that,
15 those actions by Dean Pesetski in response to your
16 report would not have prevented the incident involving
17 Ariana Qayumi and the timing of those two incidents,
18 correct?
19    A.   I don't think that's for me to speculate.
20 If this incident was afterwards -- you can't go back in
21 time, but that's not for me to speculate.
22         MR. EKSTRAND:  For the record, I'll
23 object to that question as utterly irrelevant actually.
24         MR. JACKSON:  If that's not relevant
25 to any claim that's being asserted as a Title IX, I'm

Page 91

1 happy to stipulate to that.
2         MR. BACHMAN:  Find me that proof.
3 (BY MR. JACKSON)
4    Q.   Mr. Kozin, those are all the questions I
5 have right now.  There may be others around the table.
6 CROSS-EXAMINATION BY
7 MR. BACHMAN:
8    Q.   Mr. Kozin, let me just ask you, have you
9 authorized Christine Pesetski to release the contents
10 of your disciplinary record?
11    A.   I did not.
12    Q.   Have you authorized the release of the
13 contents of any of your academic records to anybody?
14    A.   Far and away, no.
15    Q.   That's all the questions I have.
16         MR. EKSTRAND:  Can we take a
17 five-minute break so I can collect my thoughts and do
18 this quicker than I would otherwise.
19         (Whereupon a break was taken from
20 11:27 a.m. to 11:34 a.m.)
21 RECROSS-EXAMINATION BY
22 MR. EKSTRAND:
23    Q.   For the record, I'm Bob Ekstrand.  I
24 represent Ariana Qayumi in this case.  Eli, I have a
25 few questions I wanted to clarify, if we could.  You

Page 92

1 were asked a number of times in different ways whether
2 or not you accused or charged or -- various forms of a
3 report of sexual events or an assault, and you
4 explained that you didn't know the law of the land and
5 the student policies and all of that.
6         So what I want to do is ask you whether or
7 not you reported some of the things that I think are
8 relevant to that.  So if you actually would look at the
9 affidavit that is marked as Exhibit 21, it says in
10 paragraph 12 on page two, "During my meeting with Dean
11 Pesetski I reported the foregoing to Dean Pesetski."
12 And that refers to paragraphs three through 11
13 essentially?
14    A.   Okay.
15         MR. JACKSON:  Objection.
16 (BY MR. EKSTRAND)
17    Q.   Is three through 11 a fair and accurate
18 description of what you reported to Dean Pesetski?
19    A.   Well, he is the son of Lori Leachman.  I
20 don't know -- I don't recall six years later if that
21 fact was, in fact, part of our conversation.  Paragraph
22 five, she was receiving assistance walking and standing
23 upright from Colby.  I did not see her attempt to do
24 that on her own.  Those are not the words I would have
25 written myself, but I would attest to those.

Page 93

1    Q.   Hang on one second.  Let me take you back
2 to paragraph four.
3    A.   Okay.
4    Q.   The one thing I want to make sure that's
5 true, first of all, is that this young woman was with
6 Colby Leachman who had brought her to your dorm and
7 that at that point her condition had changed
8 dramatically from the time you saw her earlier?
9    A.   Yes, that is true.
10    Q.   In paragraph number five she was clearly
11 impaired?
12    A.   I would attest to that.
13    Q.   She had glassy eyes when you saw her later
14 in the evening with Colby?
15    A.   Yes, that was true.
16    Q.   She was unsteady on her feet?
17    A.   That was true.
18    Q.   And she swayed when she stood?
19    A.   She was -- I remember Colby kind of
20 gripping her.  I don't -- like, I did not see her
21 attempt to walk on her own.
22    Q.   So, in other words, Colby was essentially
23 helping her walk?
24         MR. JACKSON:  Objection.
25         MR. EKSTRAND:  What's the objection?

Page 94

1          MR. JACKSON:  He just said he didn't
2 know if she was trying to walk on her own and you
3 restated -- you re-characterized this --
4          **THE WITNESS:  Colby was assisting her**
5 **walking.  I don't know what the effects were had she**
6 **attempted to walk on her own.**
7          MR. EKSTRAND:  I think he was
8 testifying that she was --
9          MR. JACKSON:  You don't need to
10 explain.  You asked me -- I didn't make a speaking
11 objection.  You asked me to explain the nature of my
12 objection.
13          MR. EKSTRAND:  Right.  And, for the
14 record, I'm clarifying that the basis of your objection
15 was misunderstanding what the witness testified to.
16          MR. JACKSON:  I don't think either of
17 us is testifying here so it doesn't matter what either
18 of us says.  You asked me to clarify my objection and I
19 did.
20          MR. EKSTRAND:  Are you going to do
21 this a lot or are we going to --
22          MR. JACKSON:  If someone asks for the
23 basis for my objection I will explain it to you.
24 Otherwise, I will limit my objections to objection.
25          MR. EKSTRAND:  You're going to need to

Page 95

1 state your basis.
2          MR. JACKSON:  Form.
3 (BY MR. EKSTRAND)
4     Q.   Number six -- paragraph six.  Let me stop
5 right there.  Did you convey those things that we've
6 just described to Dean Pesetski in your meeting?
7     **A.   From what I recall, I did.**
8     Q.   Paragraph six, Leachman indicated to you
9 that he needed the exclusive use of your room for a
10 while and that from your prior experience that meant he
11 intended to have some kind of sexual interaction with
12 the young woman and wanted you to stay out of the room?
13    **A.   That is correct.**
14    Q.   Did you report that to Dean Pesetski?
15    **A.   One way or another.**
16          MR. JACKSON:  Objection.
17          **THE WITNESS:  Yes.  Again, probably**
18 **not in those words.  I may have used "sex tiles."  That**
19 **was a phrase that was common at the time.  You know, a**
20 **text message essentially saying I would like to have**
21 **exclusive use of the room for purposes of sexual**
22 **activity, that is correct, which is not the first time**
23 **that had happened in our room or any dorm room, for**
24 **that matter.**
25    Q.   Paragraph seven, Leachman steered the young

Page 96

1 woman into your room and closed the door and they
2 remained inside.  Is that true?
3    **A.   That is true.**
4    Q.   Did you inform Dean Pesetski of that fact?
5    **A.   I did.**
6    Q.   Roughly 45 minutes later two of Leachman's
7 friends Brian Self and Frank Jones appeared on our hall
8 and entered the room while Leachman and the young woman
9 were still inside.  Is that true?
10   **A.   Roughly 45 minutes.  Yes, that is true.**
11   Q.   And did you report that to Dean Pesetski?
12   **A.   I did.**
13   Q.   Paragraph eight says Self and Jones did not
14 knock before they entered the room.
15   **A.   That is true.**
16   Q.   Did you report that to Dean Pesetski?
17   **A.   I did.  I found that extraordinarily odd at**
18 **the time.  Not odd but suspicious.**
19   Q.   And go ahead and explain why.
20   **A.   It's not often that you see other men**
21 **entering a room where a man and a woman are already**
22 **engaged in a sexual activity.  I stated before it was**
23 **outside the bounds of what was considered normal at the**
24 **time.**
25   Q.   And they closed the door behind them and

Page 97

1 remained in the room.  Is that true?
2    **A.   We went back downstairs.  To the best of my**
3 **knowledge, they remained in the room.  We were upstairs**
4 **for a couple of minutes and all three were being -- we**
5 **could hear the sounds of all three.  I don't know for**
6 **how long they stayed in the room but, yes, they were in**
7 **the room for a period of time.**
8    Q.   And it says not long thereafter the
9 unmistakable sounds of sexual interaction were audible
10 from the hallway outside the door.
11   **A.   That is correct.**
12   Q.   And you heard that yourself?
13   **A.   That is correct.**
14   Q.   And you personally witnessed her condition
15 as they went into the room the first time?
16   **A.   That is correct.**
17   Q.   And her condition was clearly impaired?
18   **A.   I would characterize it that way.**
19   Q.   Now, you've been asked again and again
20 whether or not you had personal knowledge of the young
21 woman giving consent to any of this going on in the
22 room.  Let me ask you a slightly different question.
23 Are you aware that to give consent one has to have the
24 capacity to consent?
25          MR. JACKSON:  Objection.

Page 98

1    THE WITNESS: I'm aware that that is
2 the definition of consent that one has to be capable of
3 giving consent. I am also aware that at the time that
4 wasn't always followed on college campuses --
5 especially that college campus. And that's why my
6 suspicions were not too highly roused when it was
7 simply Colby and the student in the room, just to
8 explain why I didn't do anything.
9 (BY MR. EKSTRAND)
10    Q. Now, do you think that she was in any
11 condition to drive a car?
12    A. Hell, no. Sorry. Pardon my French. She
13 was clearly in no -- I would not -- no.
14    Q. Did you get the sense that she was fully
15 aware of even her surroundings?
16       MR. JACKSON: Objection.
17    THE WITNESS: I'm not sure I would be
18 qualified to make that judgment. Different people may
19 take different levels of acuity through different
20 things.
21 (BY MR. EKSTRAND)
22    Q. Did you have any suspicion or sense that
23 rather than alcohol, her capacity may have been induced
24 by a drug?
25    A. At the time, not a large suspicion. Of

Page 99

1 course, when I had spoken about the rumors on campus,
2 that was always mentioned. But that was the most
3 unsubstantiated part of all the rumors. And even today
4 I don't know, but there's plenty of -- specifically a
5 date rape drug, no, but either plenty of alcohol or
6 some other sort of accelerant. That's honestly --
7 that's not my place to testify to.
8    Q. Sure. All right. You mentioned you had
9 two friends with you at the time you observed the two
10 men going in?
11    A. That's correct.
12    Q. And you all heard sounds of sexual
13 intercourse --
14    A. That's correct.
15    Q. -- involving all four, is that right, or
16 all three of the men?
17    A. Three of the men and -- what's odd is I
18 don't remember hearing the female student or any sort
19 of noise that seemed to have been emitted from a
20 female.
21    Q. At all?
22    A. We were not listening for a very long time,
23 but during the short span we were, I don't not recall
24 having heard any sound attributed to a female.
25    Q. Now, how long after they went into the room

Page 100

1 did you go -- I'm sorry. How long after the two
2 gentlemen went into the room did you go listen or did
3 you begin to hear noises?
4    A. I believe there were two separate
5 incidents. It was right when they first started, we
6 went back downstairs and came back up to see if
7 everything was finished and I could go to bed. It was,
8 again -- I would say, again, roughly 45 minutes later.
9    Q. But the first time did you hear noises
10 immediately after they went into the room or soon after
11 they went into the room?
12    A. Soon after.
13    Q. And you did not hear the young woman saying
14 anything when you listened?
15    A. Not that I recall.
16    Q. Did Dean Pesetski ever ask you any details
17 about whether the woman was heard saying anything?
18    A. She did not.
19    Q. And did she ask you of any details at all
20 about what occurred?
21    A. She asked me very few details.
22    Q. You were asked a number of times whether or
23 not you said the name Colby Leachman, Brian Self, and
24 Frank Jones. Did Ms. Pesetski ever insist that you
25 convey the names of any of those people if you somehow

Page 101

1 were not perfectly clear for your hypothetical?
2    A. I might have had a much better opportunity
3 of recalling the answer to that question in 2011 or
4 2014. In 2017, unfortunately, I cannot recall the
5 answer to that question. I've fought in two wars.
6 It's been six years.
7    Q. Now, did you refer to Mr. Leachman in your
8 conversations with Dean Pesetski as your roommate?
9    A. Yes.
10    Q. Obviously you're talking about somebody
11 going into your room?
12    A. That's correct.
13    Q. How many roommates did you have?
14    A. Just the one.
15    Q. Who was that?
16    A. Colby Leachman.
17    Q. Is that public knowledge on campus?
18    A. I would imagine so.
19    Q. Dean Pesetski, did she --
20    A. She had access to student records. Sorry
21 to talk over you.
22    Q. That's fine.
23    A. And there was a clear -- and, again, I
24 don't recall how we got to the understanding. There
25 was a clear understanding that he was connected to the

Page 102

1 administration -- the personnel. Whether or not I used
2 his name, I don't remember how we got to that
3 understanding, but we had to reach that at some point
4 during our conversation.
5      Q.   All right.  So essentially she knew during
6 the conversation that this was Colby Leachman and that
7 was the provost's son?
8          MR. JACKSON:  Objection.
9 (BY MR. EKSTRAND)
10     Q.   To your understanding.
11     A.   To my understanding, they were discussing
12 the provost's son my roommate.  I don't know if she was
13 aware of his name at the point.  I don't have record of
14 whether the two had met or interacted.
15     Q.   Was it pretty well-known that he was the
16 provost's son amongst folks at Duke at that time?
17         MR. JACKSON:  Objection.
18         THE WITNESS:  Stepson, and at least in
19 the dorm, yes, it was fairly well-known.  There was not
20 anything that was being hidden.  I will say that many
21 of the students in finance banking-related fields,
22 economy, or just taking economics, she was the
23 professor of one of the large economics lectures.  And
24 so other students were aware of the relationship
25 through having his mother as their professor.

Page 103

1      Q.   In that capacity as the professor of
2 economics for students who want to have financial
3 careers, do you think that that would raise any concern
4 with people?
5      A.   It's not for me to say.
6          MR. JACKSON:  Objection.
7 (BY MR. EKSTRAND)
8      Q.   Are you aware of any time that Provost
9 Lange recused himself from any involvement in any of
10 the investigations or any communications about any
11 investigation involving his son?
12     A.   I am unaware.  I was unaware any
13 investigation had even occurred until after the -- from
14 my understanding of the timeline today had even
15 occurred.  I believe I was first made aware of the
16 investigation in 2014 which, I believe, the
17 investigation was closed before that.
18     Q.   Now, you mentioned that there were many,
19 many rumors involving Colby engaging in an activity
20 that sounds like sexual misconduct and that they were
21 pretty widespread.  Did he ever express to you any
22 dismay, disappointment, concern about these rumors
23 about him?
24         MR. JACKSON:  Objection.
25         THE WITNESS:  He did not.  We barely

Page 104

1 spoke.
2 (BY MR. EKSTRAND)
3      Q.   I want to read something to you and just
4 have you tell me if this sounds like what you saw.  In
5 other words, does this sound like the same incident to
6 you.
7      A.   Okay.
8      Q.   "This incident involved an unknown woman
9 who had shown up at South Gate apparently very
10 intoxicated an unaware of her location.  Three men took
11 her to a back area of the dorm and had sex with her.
12 The men were identified as Colby Leachman, Brian Self,
13 and Frank Jones."  Does that sound like what you saw?
14         MR. JACKSON:  Objection.
15         THE WITNESS:  With the difference
16 that, first, she had arrived with Colby and later the
17 two men entered.  And I don't know if that area of the
18 dorm is referring to the fact that it was a U-shaped
19 building.  It was kind of over a courtyard, and this
20 was in a dorm room.
21 (BY MR. EKSTRAND)
22     Q.   So the back area of the dorm is different
23 than what you saw: is that right?
24     A.   They were in a dorm room; that is correct.
25 Unless the back area of the dorm -- I don't know what

Page 105

1 that refers to specifically.
2      Q.   And three men took her to the back area.
3 That's different?
4      A.   That's different as well.
5      Q.   And, in addition, one of the men went down
6 the hallway soliciting other men to have sex with the
7 woman?
8      A.   I don't recall having that occurred in this
9 case.
10     Q.   And there were men who took up the offer?
11     A.   As far as I'm aware, that did not happen in
12 this case.
13     Q.   So essentially does that sound like the
14 same thing that you reported or different?
15         MR. JACKSON:  Objection.
16         THE WITNESS:  It sounds fairly
17 different to me.
18 (BY MR. EKSTRAND)
19     Q.   Did anybody ever ask you -- anybody from
20 Duke ever call you and say, Eli, let me ask you if
21 these things are what you saw?
22     A.   No.
23     Q.   In fact, did anybody from Duke ever contact
24 you after you made your report to Dean Pesetski about
25 your report?

Case 1:16-cv-01038-CCE-JLW   Document 81-3   Filed 02/02/18   Page 27 of 49

1    A.  No.

2    Q.  Did the police ever search your room after

3 you made the report to Dean Pesetski?

4    A.  I'm not aware of having been present for

5 any search.  And I don't recall if this happened before

6 or after.  I do recall at one point a police officer

7 knocking on the door to the room when Colby was not

8 there asking to speak with him.  He was not there.  I

9 said, "Colby is not there."  And the police officer

10 said, "Okay.  We'll get him another time."  I was not

11 present for any searches.

12    Q.  Did they ask you to search the room at that

13 time?

14    A.  They did not.

15    Q.  Do you know if they were Duke police

16 officers?

17    A.  I do not have this information, no.  I was

18 studying or doing whatever at the time.

19    Q.  So that officer did not ask you for consent

20 to search the room?

21    A.  He did not.

22    Q.  And did you ever receive what would be

23 called an inventory of a search pursuant to a --

24    A.  I did not.  Am I allowed to ask a question?

25    Q.  Yeah.

1    A.  Should I have been aware of a search?  Was

2 there a search of the room?

3    Q.  I'm not aware of one.  I'll represent to

4 you I don't --

5        MR. JACKSON:  We don't get to answer

6 questions.

7        THE WITNESS:  I would love to know if

8 my things were pilfered through because I did go

9 missing a camera right around then -- a very expensive

10 camera.

11 (BY MR. EKSTRAND)

12    Q.  Around when?

13    A.  2011.

14    Q.  After these events occurred?

15    A.  Yeah.  I was packing my room at the end of

16 the semester, and my expensive camera was not there.

17    Q.  When was the last time you remember using

18 it?

19    A.  I could go look up the pictures.  Sometime

20 probably February or March of that spring.

21    Q.  Did you have it in your room?  Did you keep

22 it in your room?

23    A.  In my closet.

24    Q.  So it wasn't ever sitting out on a desk or

25 --

1    A.  No, it was always in my closet.

2    Q.  Did any other theft occur in your room

3 other than that, that you're aware of?

4        MR. JACKSON:  Objection.

5        THE WITNESS:  Not that I'm aware of.

6    MR. EKSTRAND:  What's the basis?

7        MR. JACKSON:  The theft.  What any

8 other theft?

9        MR. EKSTRAND:  I'm assuming that it

10 was stolen.

11        MR. JACKSON:  By whom?  I mean, what's

12 the -- the predicate for this is asking whether any

13 search occurred.  He's now suspecting that Duke police

14 took his camera.

15        THE WITNESS:  I'm not suspecting.  I

16 barked up a lot of other trees.

17 (BY MR. EKSTRAND)

18    Q.  I'm not suggesting that the police stole

19 anything.  I'm wondering if anybody else other than

20 your roommate had easy access to your camera?

21    A.  I was always, having originally been from

22 New York, wanted the door to be left locked at all

23 times.  That's always happened.  When I left, Colby

24 didn't always leave the room locked so, theoretically,

25 other people could have access to the room.

1    Q.  Now, the video of the sexual assault of

2 Ariana Qayumi, that was -- do you know whose phone that

3 was on?

4        MR. JACKSON:  Objection.

5        THE WITNESS:  From firsthand, I do

6 not.

7 (BY MR. EKSTRAND)

8    Q.  Were part of the rumors that were

9 circulating about Colby at Duke, did they involve him

10 having videos of these encounters with impaired women?

11    A.  I strongly recall that the rumor of

12 Ariana's encounter was on video.  I don't recall if any

13 other encounters were alleged to be on video.

14    Q.  Did Duke's Title IX coordinator ever

15 contact you?

16    A.  No.

17    Q.  Just for the record, I want to be clear.

18 The two gentlemen that came into the room and the

19 incident that you witnessed -- the two men who came in

20 late -- you knew who they were?

21    A.  That's correct.

22    Q.  And you just don't recall if you said to

23 Dean Pesetski that was --

24    A.  That's correct.

25    Q.  -- Self and Jones?  Do you recall Pesetski

Page 110

1 being confused about who the other two were or asking
2 about who the other two were?
3     A.  I don't recall her being confused about
4 anything.  In fact, I recall her being very unconfused
5 about everything.
6     Q.  Did you ever tell Dean Pesetski, I don't
7 want to reveal the identity of any of these people?
8     A.  No.  I did say I wasn't in the room.  I
9 can't accuse -- you know, I can't come forward, and the
10 woman's name -- I can't accuse any of them.  But this
11 is past the point of me pretending that everything is
12 okay.  This all within the realm of normal behavior.
13     Q.  But you did witness her condition prior to
14 entering the room?
15     A.  That's correct.
16     Q.  And she was clearly impaired when she
17 entered the room?
18     A.  That's correct.
19     Q.  When you listened to the unmistakable
20 sounds of sexual conduct in the room, you did not hear
21 any of her voice?
22     A.  That's correct.
23     Q.  Were any of the three young men involved
24 rumored to have access to or otherwise possess drugs of
25 any kind?

Page 111

1     A.  Of any kind?
2     Q.  Um-hm.
3     A.  I'm aware of that.
4     Q.  What's that?
5     A.  I'm aware that there was marijuana in their
6 possession.
7     Q.  Generally or at the time?
8     A.  In general.
9     Q.  Were any of them --
10     A.  I'm sorry.  Ivy League campus in the year
11 2011.  There was marijuana in their possession.
12     Q.  Fair enough.
13     A.  Not Ivy League, but you get the point.
14     Q.  Just to clarify, did Dean Pesetski ever ask
15 you to help her identify the victim?
16     A.  She did not.
17     Q.  You were with -- the two young men that you
18 were with, did they voice any reaction at the time to
19 what was happening that you recall?
20     A.  They were as appalled as I was.
21     Q.  Do you recall anything that they said in
22 particular at this time?
23     A.  No.
24     Q.  Did they say what specifically they were
25 appalled by?

Page 112

1          MR. JACKSON:  Objection.
2          THE WITNESS:  Not that I recall
3 anything specific.
4 (BY MR. EKSTRAND)
5     Q.  Just what you had all observed?
6     A.  Yes, that's correct.
7     Q.  You mentioned that Ariana had in passing
8 told you something about inappropriate conduct
9 involving Colby, perhaps the other two, in passing; is
10 that right?
11     A.  That's correct.
12     Q.  Could she have been referring to
13 inappropriate touching, verbal harassment, subsequent
14 behaviors that occurred after the --
15     A.  No, she was --
16          MR. JACKSON:  Objection.
17          THE WITNESS:  She was referring to
18 something about an incident that had a lot of rumors
19 and had been videotaped.  And, as far as I knew, there
20 was only one incident with her and these gentlemen
21 involving a videotape and lots of rumors.
22 (BY MR. EKSTRAND)
23     Q.  So those were the points that she had made
24 in passing that --
25     A.  They were in reference to, yes.

Page 113

1     Q.  That makes sense.  All right.  I think
2 that's all I have.
3          MR. JACKSON:  I actually have more.
4 REDIRECT EXAMINATION BY
5 MR. JACKSON:
6     Q.  Mr. Kozin, those are -- there's a statement
7 in paragraph 12 of the draft declaration that was
8 referred to a moment ago.  "I reported the forgoing to
9 Dean Pesetski."  And then there were questions in
10 paragraphs three through 11.  As you sit here today,
11 you're not able to testify that you reported all of the
12 details of paragraphs three through 11 to Dean Pesetski
13 in April of 2011, are you?
14          MR. EKSTRAND:  Objection.  Asked and
15 answered.
16          THE WITNESS:  I mean, there's, again,
17 minor edits I would wish to make, and then I can
18 testify that I did report those things.
19 (BY MR. JACKSON)
20     Q.  You stand by your testimony that when you
21 spoke with Dean Pesetski you discussed the events
22 involving the visiting student in terms of a
23 hypothetical?
24     A.  Most of the conversation I recall has been
25 conducted in the guise of a hypothetical under the

Page 114

1 very, very clear understanding between the two of us
2 that we're talking about actual events. Again, at the
3 time, I did not wish to make any formal accusations
4 against the men. I only wished to protect myself and
5 document one incident and a pattern of behavior. A
6 pattern cannot be established without documentation of
7 separate incidents.
8     Q. And you're not able to say whether you gave
9 the names of Brian Self and Frank Jones to Dean
10 Pesetski in April of 2011?
11     A. As I sit here in 2017, I cannot. I believe
12 if I were to review notes of conversations I had, had
13 in 2014 -- what I remembered obviously in 2014 was not
14 the same as 2011, but it's half as close.
15     Q. Do you have any notes to that effect?
16     A. No. But I believe other members of counsel
17 in this room and Mr. Ginsberg may as well.
18     Q. Have you reviewed any notes of that nature?
19     A. I did not.
20     Q. If Dean Pesetski were to say that in
21 April of 2011, she did not know that Colby Leachman had
22 a family relationship with any professor at Duke, do
23 you have any reason to dispute that?
24     A. I would just laugh. I would find that
25 absurd and just laugh.

Page 115

1     Q. If Dean Pesetski were to say that as of
2 April 2011, she had no reason to believe that Colby
3 Leachman had a family relationship with a professor at
4 Duke, would you have any reason to dispute that?
5     A. I probably did not inform her that Colby
6 was this person and that person and this and that
7 person. I would find it very -- I have no firsthand
8 way of disputing it. I would find it hilarious though
9 if she were to maintain that.
10     Q. If Dean Pesetski were to say that as of
11 April 2011, she didn't know that Colby Leachman had a
12 family relationship with any Duke administrator, would
13 you have any reason -- any basis for disputing that?
14     A. I would say that under my least
15 understanding of what constitutes perjury, that's
16 probably perjury.
17     Q. You would -- if Dean Pesetski were to say
18 that, you would accuse her of perjury?
19     A. I would not accuse her of perjury. I would
20 just find it very hard to believe that she was not
21 aware. And if she was not aware on April 11th, by
22 April 13th or 14th, I would say she was most likely
23 very acutely aware.
24     Q. Why?
25     A. Because that's when I believe that the

Page 116

1 report of Ariana was filed, as I sit here today, was
2 later on that week. And everybody on campus was aware
3 of who these people were.
4     Q. "These people" meaning?
5     A. Meaning Peter, Colby, and Lori.
6     Q. As of April of 2011, you didn't know of any
7 victims being involved in the -- well, strike that. As
8 of April of 2011, you weren't aware of whether an
9 actual sexual assault had occurred on the evening of
10 April 9th into April 10th involving Colby Leachman,
11 Brian Self, and Frank Jones, correct?
12         MR. EKSTRAND: Objection. He just
13 testified that a rape occurred. He can't consent --
14 he's not capable of consent --
15         MR. JACKSON: That was a totally
16 improper objection and, no, he didn't.
17 (BY MR. JACKSON)
18     Q. As of April 2011, when you came to speak
19 with Dean Pesetski, did you know whether a rape had
20 occurred in your dorm room?
21     A. I was not in the room. I did not know what
22 consent was given or not given. I had a strong
23 suspicion based on my years, my eyes, and my logic, my
24 brain, that consent had likely been not given. And
25 even though I could not -- I was not raped. I was not

Page 117

1 in the room. I cannot come forward and say, hey, this
2 happened. I was not there. The best I could do was
3 have my -- what I witnessed reported as a report so
4 that if that woman or any other woman were to come
5 forward or had come forward, I can raise my hand and
6 say I'm aware of the circumstances around these events
7 and what had happened. And what happened is a woman
8 had come forward.
9     Q. And, to your knowledge, did Duke -- setting
10 aside your meeting with Dean Pesetski, did Duke
11 otherwise -- do you know if Duke otherwise learned
12 about this incident involving this visiting student?
13     A. I have no idea.
14     Q. Do you know if Duke investigated the
15 incident involving this visiting student?
16     A. I have no idea.
17     Q. Do you know if this visiting student ever
18 came forward to make a complaint?
19     A. I have no idea.
20     Q. Do you know if this visiting student was
21 ever identified?
22     A. I have no idea.
23     Q. Even if all of the statements in your
24 declaration are taken as true, you would agree with me
25 that you don't know the identity of this visiting

1 student?
2      A.   I do not.
3      Q.   That you never tried to find out?
4      A.   At the time I could have.
5      Q.   That you never tried to find out?
6      A.   Again, my report was not for the purpose of
7 -- it was not my place to come forward with her name.
8 It was not my place to come forward with her name.
9      Q.   You heard sounds from outside the room, but
10 you don't have firsthand knowledge of what happened in
11 the room?
12      A.   It was clearly sexual activity.
13      Q.   There were some references to you not
14 hearing a woman's voice.  How long did you stand
15 outside the room and listen to what was happening in
16 the room?
17      A.   A couple of minutes.
18      Q.   Are you -- did you believe that the woman
19 was unconscious?
20      A.   To the best of my speculation, it would
21 seem like it.
22      Q.   Do you have any basis for that speculation?
23          MR. EKSTRAND:  Objection.
24 (BY MR. JACKSON)
25      Q.   Let me back up.  Do you have any facts that

1 support a thought that the woman was unconscious?
2      A.   She was either unconscious or not making a
3 lot of noise.
4      Q.   And you don't know which?
5      A.   Usually when something like that happens I
6 would imagine at least some noise would be made.
7      Q.   You didn't intervene to stop this all from
8 happening at the time?
9      A.   I did not.
10      Q.   You said the woman was in a changed state.
11 Do you know what she did earlier that evening?
12      A.   I was not with her.
13      Q.   Do you know --
14      A.   I saw the before and the after picture.
15      Q.   Do you know one way or another whether she
16 lacked capacity to give consent?
17      A.   She wasn't speaking very clearly and she
18 wasn't walking very unassisted.
19      Q.   Do you know one way or another whether she
20 lacked capacity to consent?
21      A.   It's not for me to -- it's not my place to
22 say.
23      Q.   Did you try to find out on the evening of
24 the event in question?
25      A.   I'm sorry.  Can you rephrase the question?

1      Q.   Yeah.  Did you take any steps to determine
2 whether this women was capable --
3      A.   I did not breathalyze her, no.
4      Q.   Did you take any other steps to engage her
5 in conversation?
6      A.   No.
7      Q.   Ms. Qayumi's incident, you don't have any
8 firsthand knowledge about that, correct?
9      A.   I do not.
10      Q.   Who's Duke's Title IX coordinator?
11      A.   I have no idea.
12      Q.   You mentioned fighting in two wars since
13 all of this incident.  Are you currently taking any
14 medication that would affect your ability to give clear
15 and honest testimony?
16      A.   I am not.
17      Q.   Those are all the questions I have.
18          (Signature reserved.)
19          (Deposition concluded at 12:11 p.m.)
20
21
22
23
24
25

1 CERTIFICATE OF REPORTER

2 STATE OF NORTH CAROLINA  )

3 COUNTY OF WAKE           )

4

5      I, Leslie Christian, the officer before whom

6 the foregoing deposition was taken, do hereby certify

7 that the witness whose testimony appears in the

8 foregoing deposition was duly sworn by me; that the

9 testimony of said witness was taken by me to the best

10 of my ability and thereafter reduced to typewriting

11 under my direction; that I am neither counsel for,

12 related to, nor employed by any of the parties to the

13 action in which this deposition was taken, and further

14 that I am not a relative or employee of any attorney or

15 counsel employed by the parties thereto, nor

16 financially or otherwise interested in the outcome of

17 the action.

18      This the 29th day of June, 2017.

19

20                    _Leslie Christian_

21          LESLIE CHRISTIAN

22          Notary Public in and for

23          County of Wake

24          State of North Carolina

25          Notary Public No. 201221300088

**Page 123**

```
1              WITNESS'S CERTIFICATE
2
3         I, ELI KOZIN, do hereby certify
4    that I have read and understand the foregoing
5    transcript and believe it to be a true, accurate, and
6    complete transcript of my testimony, subject to
7    the attached list of changes, if any.
8
                    _____
9                      ELI KOZIN
10
11        This deposition was signed in my presence by
12   _____, on the _____ day of
13   _____, 2017.
14
15
                    _____
16                     Notary Public
17
18   My commission expires:
19
20
21
22
23
24
25
```

**Page 124**

```
1    CaseWorks, Inc.
     811 Ninth Street, Suite 260        (Page 1 of 2)
2    Durham, North Carolina 27705
3            E R R A T A   S H E E T
4    Re: Ariana Qayumi v. Duke University
5    Deposition of: ELI KOZIN
6            Please read this transcript with care, and if
     you find any corrections or changes you wish made, list
7    them by page and line number below.   DO NOT WRITE IN
     THE TRANSCRIPT ITSELF.  Return the
8    Certificate and Errata Sheet to this office after
     it is signed.  We would appreciate your prompt
9    attention to this matter.
            To assist you in making any such corrections,
10   please use the form below.  If supplemental or
     additional pages are necessary, please furnish same and
11   attach them to the errata sheet.
12   Page _____ Line _____ should
13   read:_____
14   Page _____ Line _____ should
15   read:_____
16   Page _____ Line _____ should
17   read:_____
18   Page _____ Line _____ should
19   read:_____
20   Page _____ Line _____ should
21   read:_____
22   Page _____ Line _____ should
23   read:_____
24   Page _____ Line _____ should
25   read:_____
```

**Page 125**

```
1    Page _____ Line _____ should        (Page 2 of 2)
2    read:_____
3    Page _____ Line _____ should
4    read:_____
5    Page _____ Line _____ should
6    read:_____
7    Page _____ Line _____ should
8    read:_____
9    Page _____ Line _____ should
10   read:_____
11   Page _____ Line _____ should
12   read:_____
13   Page _____ Line _____ should
14   read:_____
15   Page _____ Line _____ should
16   read:_____
17   Page _____ Line _____ should
18   read:_____
19   Page _____ Line _____ should
20   read:_____
21   Page _____ Line _____ should
22   read:_____
23   Page _____ Line _____ should
24   read:_____
25
```

**1**

100  41:4
**10:47**  65:10
**10:53**  65:10
**10th**  71:3,8,25 72:7 74:15 116:10
**11**  92:12,17 113:10,12
**11:27**  91:20
**11:34**  91:20
**11th**  71:4,9 88:7 115:21
**12**  84:2,8 92:10 113:7
**12:11**  120:19
**13th**  115:22
**1402**  4:7
**14th**  115:22
**15**  86:9,19
**16**  87:11,12
**18**  57:2,4
**19**  4:5 14:9,10

**2**

**20**  12:10 39:2
**2011**  15:8 19:7,13,20 23:14 24:2
26:4 41:17 43:1,10 50:16 71:25
74:12 101:3 107:13 111:11 113:13
114:10,14,21 115:2,11 116:6,8,18
**2014**  9:10 26:16 39:12,14,16,20
40:11 58:18 101:4 103:16 114:13
**2016**  12:19,23 39:10 40:8 57:23 58:8
60:9,12,16 61:20 62:7,8 65:18 66:2,
6
**2017**  4:5 63:18 64:25 101:4 114:11
**21**  65:5 82:13 92:9
**22**  71:16,18,21
**23**  12:10
**2nd**  66:2,6

**3**

**3**  39:10 40:8

**3rd**  57:23 60:9,12 62:7

**4**

**4**  65:18
**45**  25:22 45:4 96:6,10 100:8
**4th**  62:8

**5**

**5**  63:18
**5:56**  71:25

**9**

**9:36**  4:6
**9th**  43:1,10 71:2 74:15 116:10

**A**

**a.m.**  4:6 65:10 91:20
**ability**  120:14
**absurd**  114:25
**academic**  58:14,17 91:13
**accelerant**  23:22 99:6
**access**  108:20,25 110:24
**account**  57:7
**accounts**  8:16
**accurate**  14:21 92:17
**accusation**  83:25 88:13
**accusations**  114:3
**accuse**  73:25 74:1,23 75:1,3 110:9,
10 115:18,19
**accused**  27:5 31:15,17 78:9 79:2,3
81:9 92:2
**accusing**  74:13,22
**acquaintance**  25:11 50:10
**acquaintances**  7:5
**act**  21:13 81:25 82:5
**action**  13:10 46:3 88:5,9
**actions**  76:11 90:15

**activities**  32:8,15 83:19
**activity**  24:4,5,10,11 31:20 32:2
51:10 54:3 55:24 96:22 103:19
118:12
**actual**  76:4,6 82:8 114:2 116:9
**acuity**  98:19
**acutely**  115:23
**addition**  105:5
**additional**  26:1 59:25 88:15
**administration**  102:1
**administrator**  85:13 115:12
**administrators**  27:23 78:12
**advice**  10:9,15
**advise**  88:24
**advised**  60:22
**advisor**  28:13
**affair**  10:2
**affect**  120:14
**affidavit**  11:22 61:3 92:9
**affirm**  11:16
**afford**  64:5,8
**afternoon**  71:9
**agree**  88:3 117:24
**agreed**  46:5
**ahead**  96:19
**alarmed**  51:3
**alcohol**  22:10,16 47:11,17,21 98:23
99:5
**alert**  13:1
**alerted**  13:8
**Alex**  51:18
**allegation**  15:25
**allegations**  15:24 40:19
**allege**  54:19,20
**alleged**  19:6 21:13 28:8 31:14 36:3
55:14 74:2 109:13
**allegedly**  40:14
**alleging**  31:1

**allowed** 106:24

**alluded** 74:3

**alluding** 83:11

**amended** 12:1,5, 14:15,23

**answering** 6:9

**appalled** 111:20,25

**apparently** 104:9

**appeared** 44:10 50:23 51:4 96:7

**appears** 39:9 65:19

**appended** 51:20,22

**Apple** 16:17

**apply** 48:22 49:2

**appointed** 4:4

**approached** 70:18

**April** 39:14,16,19,20 40:11 43:1,10 60:9,12,16 61:20 62:7 71:2,3,4,25 72:7 74:12,15 88:7 113:13 114:10, 21 115:2,11,21,22 116:6,8,10,18

**area** 104:11,17,22,25 105:2

**arena** 41:23

**Ariana** 4:20 6:13 19:3 21:8,12 24:23 25:10 31:4 37:12 42:11 54:1 90:17 91:24 109:2 112:7 116:1

**Ariana's** 109:12

**arising** 82:21

**arm** 70:11

**arrived** 104:16

**articles** 17:23

**asks** 94:22

**assault** 27:6 28:8 36:4 40:14 53:15, 19 54:24 55:1,8,12 75:10 92:3 109:1 116:9

**assaults** 74:2

**asserted** 90:25

**assistance** 92:22

**assisting** 94:4

**associates** 87:21

**assume** 5:23

**assumes** 5:22 31:18

**assuming** 108:9

**assumption** 76:2

**assumptions** 41:6

**assured** 87:18

**attached** 14:16,23 18:8 65:13,20 66:15,25 82:12

**attempt** 68:21 92:23 93:21

**attempted** 94:6

**attempting** 35:8

**attest** 92:25 93:12

**attorney** 10:20,21,23,24

**attributed** 99:24

**audible** 97:9

**August** 12:19

**authorized** 91:9,12

**aware** 19:15 35:8 40:19,23 76:8,17, 19 78:10,13,14,17 79:5 90:11 97:23 98:1,3,15 102:13,24 103:8,15 105:11 106:4 107:1, 108:3,5 111:3,5 115:21,23 116:2,8 117:6

---

## B

**Bachman** 4:6 10:10,11 17:18 37:11 64:14 69:13 74:20 91:2,7

**Bachman's** 64:12,17

**back** 11:14 17:23 21:6 26:13 39:18 44:13 45:6,25 46:7,8,10,11 49:15 51:4 52:13 58:10,18 73:13 90:20 93:1 97:2 100:6 104:11,22,25 105:2 118:25

**banking-related** 102:21

**barely** 43:14 103:25

**barked** 108:16

**based** 24:4,13,16 36:11 76:3,5 81:17 116:23

**basically** 43:17

**basis** 30:10,12 34:15 37:6 40:22 41:3 53:21,22 54:1 55:5,6,11,15 59:14 72:21 74:13,21,22 78:16 94:14,23 95:1 108:6 115:13 118:22

**bed** 44:17,20 45:7 46:12,14,15 73:21 74:6,10 75:24 100:7

**beer** 47:25

**began** 71:2

**begin** 100:3

**beginning** 4:6 11:15

**behalf** 29:16

**behavior** 55:18,20 76:16,18 79:14, 16 84:22 110:12 114:5

**behaviors** 112:14

**belief** 10:18 80:21

**believed** 81:24

**Bianchi** 51:19

**bigger** 79:2,8,19,21

**binding** 11:23

**bit** 20:6 44:15

**Blackshear** 26:19,21,22 27:3,19 28:12 30:13,16 31:5,15,24 38:23

**Blackshear's** 28:2

**Bob** 60:10 91:23

**bounds** 76:13 96:23

**brain** 116:24

**break** 6:6,8 17:5,6 21:5 33:15 57:22 65:9 91:17,19

**breathalyze** 120:3

**Brian** 15:13 24:21 35:5 36:20 38:8 45:11 74:13 85:7,9,12 89:21 96:7 100:23 104:12 114:9 116:11

**Broad** 4:7

**brought** 32:14 93:6

**bubbles** 39:18

**Buben** 51:18

**building** 104:19

**business** 38:10 59:21 63:24

---

## C

**call** 26:10 30:5 64:18 66:7,24 67:2,7 78:25 79:1,13,21 105:20

**called** 27:9 66:5 70:16 71:12 87:20 106:23

**calls** 74:16

**camera** 107:9,10,16 108:14,20

**campus** 19:14 20:3 23:14 24:2,14 25:13 26:17 32:2,8,15,16 67:20 83:16 98:5 99:1 101:17 111:10 116:2

**campuses** 98:4

**capable** 98:2 116:14 120:2

**capacity** 10:24 15:6,13 90:9 97:24 98:23 103:1 119:16,20

**car** 98:11

**care** 18:7 45:23

**careers** 103:3

**Carolina** 4:4,8

**carries** 16:17

**case** 4:19,22 9:25 11:2,24 12:3 13:5 14:9 15:3,16,20,23 16:6 17:13,19,23 29:5 30:15 35:8 38:11 39:1,18 61:14 64:1,3 65:4 69:5 78:24 80:23 81:2,5, 9 82:19 91:24 105:9,12

**casual** 7:5 18:25 25:11 81:17

**category** 38:8

**causing** 39:20

**caveat** 14:22

**Celia** 33:5

**Center** 30:4

**change** 32:8,19 50:12 66:22 87:12

**changed** 93:7 119:10

**characterize** 53:19 54:23 55:7 97:18

**characterizing** 55:11

**charge** 88:24

**charged** 92:2

**charges** 59:9

**check** 8:3,15,18 43:7 50:19

**checked** 8:17

**Chris** 4:18

**Christian** 4:2

**Christine** 70:7 91:9

**circles** 43:25

**circulated** 24:17

**circulating** 109:9

**circumstances** 24:1,2 36:7,10 41:9 53:23 55:17 58:12,15 88:12 117:6

**claim** 90:25

**claims** 59:4,19,25 75:10

**clarification** 84:14

**clarify** 37:23 84:13 91:25 94:18 111:14

**clarifying** 94:14

**classes** 25:4

**classify** 34:19 53:8

**clause** 84:9

**cleaning** 43:16

**clear** 27:13 54:18 55:2 64:15 89:6,8 101:1,23,25 109:17 114:1 120:14

**close** 41:8 43:25 45:14 67:2 75:19 78:22,24 80:23 114:14

**closed** 45:13 96:1,25 103:17

**closet** 107:23 108:1

**coercion** 23:19,23

**Colby** 15:3 24:21 28:1 36:20 38:8 43:12 44:9,10,12,15 46:1 74:13 85:4,23 86:6 92:23 93:6,14,19,22 94:4 98:7 100:23 101:16 102:6 103:19 104:12,16 106:7,9 108:23 112:9 114:21 115:2,5,11 116:5,10

**Colby's** 80:8

**collect** 91:17

**college** 98:4,5

**commenced** 55:24

**commented** 17:25 18:2

**comments** 18:9

**commissioner** 4:4

**committed** 23:15

**committee** 82:18

**common** 45:2 46:10 52:3 95:19

**commonly** 21:20 22:1 68:12,17

**communicate** 62:6

**communicated** 8:20 15:6,13,15 17:11,14

**communication** 14:3 17:15 26:2 29:10 52:22

**communications** 9:7 10:4 15:2 16:5,9,13 17:7,10 18:14,21,22 29:15,21 52:18 54:15 62:12,20 103:10

**complaint** 9:13 12:2,5,11,15,17,19 13:16,20 14:16,23 18:1 19:4 59:15 89:6,13,14 117:18

**complaints** 58:20

**completely** 23:17 34:16 48:15 62:2 69:10

**concern** 73:12 87:6,8 103:3,22

**concerned** 73:10 75:18 77:5,20 83:4

**concluded** 82:22 120:19

**conclusion** 41:14 57:11 74:17

**conclusions** 81:19

**condition** 93:7 97:14,17 98:11 110:13

**conduct** 33:1 69:19 73:20,24 110:20 112:8

**conducted** 75:22 76:2 77:22 113:25

**confused** 37:7 110:1,3

**conjunction** 36:6

**connected** 28:10 30:15 101:25

**connection** 9:11,25 11:2,9,24 12:2 88:6 90:13

**consensual** 23:5,7,9 53:1 90:4,5

**consent** 4:4 23:13 54:2 55:15,17 97:21,23,24 98:2,3 106:19 116:13, 14,22,24 119:16,20

**considered** 69:20 96:23

**consistent** 83:5

**constant** 83:13

**constitutes** 115:15

**consume** 47:20

**contact** 13:10,15 27:5 36:1 39:10 56:24 70:1 105:23 109:15

**contacted** 33:7 64:14 88:16,22,24

**contacting** 56:22

**contending** 36:24 37:4,9,12 38:1,9

**contents** 91:9,13

**continue** 72:25

**continues** 73:7

**conversation** 16:2 18:25 25:7,8 26:4,7,17 27:7,15,16,19,20 28:6,15, 22,25 29:24 30:20 32:5 34:11 64:25 66:10 77:17 80:1,6,17 83:14 88:6 92:21 102:4,6 113:24 120:5

**conversations** 30:13 101:8 114:12

**convey** 95:5 100:25

**cooperative** 84:15

**coordinator** 109:14 120:10

**copy** 12:1 14:21

**cordial** 70:8,17

**corner** 45:10

**correct** 9:2 11:7 15:11 16:10 22:14, 18 25:16 26:24 28:21 29:13 38:21, 24 39:13 40:1,6 41:18,20 42:9,25 47:9,12 48:11 49:9 52:16,23,24 53:1 58:4, 63:5 64:11 66:16 70:22 72:8, 14,15,17 74:15 75:2,7 77:6 80:24 83:18 85:11,15,16 86:19 88:1 90:18 95:13,22 97:11,13,16 99:11,14 101:12 104:24 109:21,24 110:15,18, 22 112:6, 116:11 120:8

**corroborates** 78:25

**cost** 63:24

**counsel** 9:1 26:8,15 27:6,11 28:19 58:4 114:16

**country** 7:16,18

**couple** 5:3 10:14 30:7 60:10 64:21 97:4 118:17

**courses** 41:23

**court** 4:2 5:5,18

**courtyard** 104:19

**cousin** 8:24

**cover** 65:13

**coverage** 12:18 13:5

**covered** 47:6 72:21

**credits** 6:22

**crime** 74:14

**crimes** 74:17 75:1,4

**criminal** 31:20

**critical** 40:19,21,24 41:15 72:23

**CROSS-EXAMINATION** 91:6

**crossed** 25:13

**crude** 20:7

**culture** 24:6

**current** 50:18 84:5

— D —

**date** 14:11 21:21,22 22:2 39:3,16 65:6 68:12,17 71:19 99:5

**dated** 39:9

**dates** 39:15 42:25 43:4

**day** 36:8 46:12,21 63:22 70:24 71:6 72:14 75:10 83:24 86:23

**days** 30:2,7 86:23

**dealing** 43:15

**dean** 26:17,18,19,21,22 27:3,19 28:12 30:13,16 31:5,15,24 35:4,6 38:23 40:13 69:7 70:24 71:2,11 72:3,6, 73:13 74:25 75:5,17, 76:20 77:3,7,19,23 79:17 80:21 81:23 82:3,15,23 84:9,11,20 85:6, 86:10, 14 87:2,13,18 88:4,9 90:2,12,15 92:10,11,18 95:6,14 96:4,11, 100:16 101:8,19 105:24 106:3 109:23 110:6 111:14 113:9,12,21 114:9,20 115:1, 10,17 116:19 117:10

**decide** 9:24

**declaration** 11:1,3,5,22 61:2,6,9, 14,21 62:1,21,25 63:7,9,12,15 65:14,20 66:12,14,18,25 67:5 82:12 83:4 84:3,6 86:9 113:7 117:24

**declarations** 62:24

**declared** 41:21

**deduce** 27:8 30:22 31:4

**defendants** 36:6

**define** 17:14 18:20 21:4 53:11 54:24

**defining** 53:13

**definition** 98:2

**degree** 6:25

**Delta** 49:2,4

**departure** 58:13,16

**depending** 70:25

**deposed** 65:2

**deposition** 4:5,24 11:13,15 14:10 39:2 60:21,23 61:6 65:5 71:18 120:19

**depth** 81:16

**describe** 7:3 70:6

**describing** 30:23

**description** 79:14 92:18

**desk** 107:24

**detail** 34:12 89:10

**details** 25:19 26:2 60:18,23 88:15, 19 89:1,2,14,16,19 100:16,19,21 113:12

**deteriorated** 48:13

**determination** 36:9,11

**determine** 56:16 67:25 68:6 120:1

**deviations** 55:20

**difference** 104:15

**Dillan** 51:14 52:5,8 68:25

**direct** 4:14 41:5

**directly** 25:1 28:18 29:9 73:25 74:1 75:3

**disappointment** 103:22

**disciplinary** 31:7,11 69:12 91:10

**disclose** 60:24

**discovery** 65:3

**discuss** 26:9 40:10,16 56:21 60:5 61:13 63:2 72:11

**discussed** 25:1 40:12,18 41:7 53:5 56:19 59:17,25 61:5 65:1 113:21

**discussing** 27:21,22,23 53:18 63:25 67:9 76:4,6 78:3 79:13 86:3 102:11

**discussion** 19:18 59:11 77:21 89:4

**disheveled** 46:15

**dismay** 103:22

**dispute** 114:23 115:4

**disputing** 115:8,13

**distressing** 73:6,7

**disturbing** 46:17 73:7,8

**DNA** 46:19 73:21 74:9,11 75:24

**document** 12:8,16 14:14,15,19,21 16:11 17:10,12 39:4 43:2 63:7 65:19,20,23 66:4 71:16,24 114:5

**documentation** 114:6

**documents** 12:2 16:12 58:20,23 65:3

**door** 45:12,14,15,22 54:11,12,13 96:1,25 97:10 106:7 108:22

**dorm** 6:14 7:6 19:18,19 20:5 25:12 43:11,22 44:4 46:9 47:8 49:21 50:10,22 51:11 52:14 54:4 67:23 83:15 93:6 95:23 102:19 104:11,18, 20,22,24,25 116:20

**dorms** 46:8

**dots** 28:7,9

**double** 8:18 43:7

**downstairs** 45:2,8 46:7 56:10 97:2 100:6

**draft** 58:19 62:25 66:2,14 67:3 82:11 84:5,13 86:17 113:7

**drafts** 62:23 63:11,15

**dramatically** 93:8

**drank** 48:6

**draw** 20:10

**drink** 47:23

**drinking** 44:10 47:11 48:2,5 49:17 57:6

**drive** 98:11

**drug** 21:21,22 22:1,2 23:22 68:17 98:24 99:5

**drugs** 68:12,16 110:24

**due** 23:9

**Duke** 4:19 6:15,17,23,24 29:16,21 31:6,25 33:6 41:1 48:21 49:8 50:4,6 52:7 53:9 55:18 56:22,24 58:6,9,13, 16 59:5,10,20 60:1,16 67:19 68:3,20 73:19 75:9 82:4 85:14 88:23 90:10 102:16 105:20,23 106:15 108:13 109:9 114:22 115:4,12 117:9,10,11,

14

**Duke's** 24:2 29:21 30:17 31:16 32:21 69:19 81:11 109:14 120:10

**duly** 4:12

**Durham** 4:7

---

**E**

**e-mail** 14:4 46:23 65:13,24 66:2,4, 13,15,25 71:21,24 72:3 82:11

**e-mailed** 72:6

**e-mails** 7:25 16:15 17:16,23 18:5

**ear** 45:15,22

**earlier** 18:21 28:17 44:25 61:4 67:9 68:25 69:9 72:22 85:3 86:12 93:8 119:11

**early** 46:22 70:25 71:7 72:12 79:15

**easier** 5:19

**easily** 86:10,21

**easy** 108:20

**economics** 102:22,23 103:2

**economy** 102:22

**edit** 86:16

**edits** 62:3 63:2,6 66:19,21 113:17

**effect** 21:1 80:22 114:15

**effects** 94:5

**efforts** 67:25

**Eiffel** 20:5

**Ekstrand** 4:21 10:14,20 13:15,19 27:1,2 28:20,23 30:14 31:18 35:22 38:15 39:11 40:8,10,16 42:11,12,17 53:5,12 57:25 58:19 60:10,12,19 62:6,12,15,18 63:19,22 64:9,12,16, 25 65:19,24 66:5,24 67:2 74:16 90:22 91:16,22,23 92:16 93:25 94:7, 13,20,25 95:3 98:9,21 102:9 103:7 104:2,21 105:18 107:11 108:6,9,17 109:7 112:4,22 113:14 116:12 118:23

**Ekstrand's** 17:1 36:4

**elaborate** 25:8

**Eli** 4:5,11 66:6 71:25 91:24 105:20

**emitted** 99:19

**encounter** 16:1 19:6 20:2,8,14 21:3,7 22:10,13,21 23:1 24:24 25:3 36:25 37:4,9,15,19,23 38:1 52:25 53:7,8,17 55:7 56:3 67:10 68:22 73:15 75:7 76:22,25 77:4,8 90:6 109:12

**encounters** 23:17 53:13 109:10,13

**end** 15:7,9 48:24 78:18 80:16,17 107:15

**engage** 24:3,5 120:4

**engaged** 15:25 16:2 24:10,11 53:25 75:6 81:25 96:22

**engaging** 53:24 103:19

**enrolled** 28:14

**ensued** 74:8

**entailed** 74:17

**enter** 46:3

**entered** 45:13 76:15 96:8,14 110:17

**entering** 45:11 52:14 96:21 110:14

**entirety** 62:11

**environment** 24:15

**essay** 82:24

**essentially** 77:24 92:13 93:22 95:20 102:5 105:13

**establish** 73:17,20

**established** 80:7,14,19,20 114:6

**etched** 20:6

**evening** 52:11 55:25 72:7 93:14 116:9 119:11,23

**event** 44:12,13 46:6 47:13,17,21 49:6,13,16,22,24,25 50:22 119:24

**events** 17:25 73:6,8 76:4,6 79:15 84:17,19 85:23 86:3 87:16 89:24 92:3 107:14 113:21 114:2 117:6

**eventually** 41:7

**evidence** 41:5 61:18 83:25

**exact** 20:4 31:3 39:14 51:12

**EXAMINATION** 4:14 113:4

**examined** 4:13

**exchange** 7:25 39:9 40:7 46:24

50:13,14 62:10,23 65:16 69:10,11 71:1,21 78:18 80:17

**exchanged** 8:8,12 14:1 15:2 16:8 17:16 57:24

**exchanges** 62:16

**exclusive** 95:9,21

**excuse** 30:14 66:1

**exert** 33:12 34:1,4,7

**exerted** 33:17,20

**exerting** 34:21,24 35:2

**exhibit** 14:9,10 39:2 65:5,13 71:18, 21 92:9

**exhibits** 14:7,12

**existing** 24:2

**expect** 6:7

**expensive** 107:9,16

**experience** 95:10

**expert** 41:25 42:7

**explain** 11:11 31:5,9,15,24 74:9 79:4,7,17,22 89:9 94:10,11,23 96:19 98:8

**explained** 27:10 92:4

**explanation** 79:10

**explicitly** 79:22 80:2,14 87:13

**express** 61:20 103:21

**extent** 7:12 22:19,23,24 68:23

**extenuating** 55:16

**extraordinarily** 71:13 78:2 96:17

**extraordinary** 43:13

**extremely** 55:16 88:12

**eye** 43:18 48:14

**eyes** 28:3 83:23 93:13 116:23

---

### F

**Facebook** 8:17 16:19,20 17:16

**fact** 24:16 34:4,6,7 41:8 51:3 55:22 57:6 65:1 71:11 72:13 73:14 87:20 92:21 96:4 104:18 105:23 110:4

**facts** 23:3 29:5 74:18 77:23 118:25

**factually** 86:19

**faculty** 85:13

**fair** 5:11,23 6:10 19:22 20:9 29:3 35:22 51:5 52:19 92:17 111:12

**fairly** 44:11 53:25 78:22 102:19 105:16

**familiar** 14:19 39:4

**family** 8:20,22 13:7 17:20 18:11 114:22 115:3,12

**farcical** 70:16,18

**fearful** 75:23 78:4

**February** 107:20

**feel** 5:22 10:23 14:13

**feeling** 73:23

**feet** 93:16

**fellow** 81:24 88:25

**felt** 10:9,19 11:23 16:21 77:8

**female** 21:7,13 44:3,4 82:5 90:3 99:18,20,24

**females** 67:23

**field** 89:12

**fields** 102:21

**fighting** 120:12

**figure** 32:13

**filed** 4:19 12:20 13:16,20 28:3,4,9 30:3,4,7,8 36:5 39:23 40:12 41:16 42:15 59:23 70:9 88:15 116:1

**filing** 12:21,22 59:4 61:18

**final** 6:6 84:9

**Finally** 5:21

**finance** 102:21

**financial** 103:2

**find** 16:20 91:2 114:24 115:7,8,20 118:3,5 119:23

**fine** 44:19 48:20 60:22 65:8 87:18 101:22

**finish** 5:15,17 6:9,25 45:3

**finished** 100:7

**firm** 64:1

**firms** 13:14 63:3,4

**firsthand** 22:3 29:14,17 32:6,21,25 33:4,14,16,19,24 34:20,23 36:21 38:11 55:15 72:24 83:17,20 88:12 109:5 115:7 118:10 120:8

**fist** 70:1

**fit** 55:19

**fitting** 87:22

**five-minute** 91:17

**folks** 43:22 102:16

**follow** 13:12

**force** 23:8,11,20

**forcefully** 70:13

**foregoing** 92:11

**forgoing** 113:8

**form** 11:8 14:3 15:16,19 18:3 19:25 20:1,8 23:19,23 29:9,20 37:4,18 41:6 82:7,8 84:23 86:7 88:17 95:2

**formal** 114:3

**forming** 41:3

**forms** 92:2

**fortuitous** 71:12

**forward** 27:7 28:8 68:9 74:4,5,7 79:12,18 83:24 87:15 110:9 117:1,5, 8,18 118:7,8

**fought** 101:5

**found** 27:16 46:2 69:18 86:10,21 96:17

**framed** 79:14 84:21

**framing** 84:23 86:13

**Frank** 16:4 24:21 36:20,25 37:5,9,19 38:1,3,6,7 45:11 52:22 74:13 85:17, 18,20 89:21 96:7 100:24 104:13 114:9 116:11

**fraternities** 48:22

**fraternity** 48:25 49:3,8,10,22,25

**French** 98:12

**fresher** 89:17

**freshman** 6:14 7:6 15:9 23:14 27:25 41:19 44:5 48:21 52:7 78:4

**friend** 25:10 44:2 52:8 69:2 70:10

**friends**  44:9,14,18,22 45:3,21 46:13
48:15,16,20 50:8 51:13,16 56:20,21
70:4 82:21 96:7 99:9

**front**  18:5 62:11

**full**  22:24 77:2

**fully**  98:14

G

**gain**  22:9

**Gamerut**  51:14 52:5,8 68:25

**gang**  36:13,14,18,19 53:4,10,13
54:23

**Gate**  104:9

**gave**  71:16 114:8

**general**  19:5 23:16 34:11 61:22
111:8

**generally**  34:17 111:7

**gentleman**  64:19 68:24 70:14

**gentlemen**  24:18,19 27:5 32:6 46:3
51:14,23 53:9 74:1 76:15 77:13
100:2 109:18 112:20

**get along**  48:19

**Ginsberg**  9:4,9,16,19 10:10 17:18
27:16 30:14 58:2 60:14,22 63:1,4,
14,25 64:7 114:17

**Ginsberg's**  9:21

**girl**  44:13,22 45:25

**give**  4:22 5:8 11:17 26:10 29:25
34:12 78:25 79:1,10,20 97:23
119:16 120:14

**giving**  11:9 97:21 98:3

**glassy**  93:13

**God**  27:8

**good**  4:16,17 48:10 57:4

**Google**  13:1

**graduate**  6:17

**gravity**  70:19

**gripping**  93:20

**ground**  5:3 47:5

**group**  48:15,16,19

**groups**  43:25

**guess**  83:1

**guise**  113:25

H

**half**  45:4 114:14

**hall**  96:7

**hallway**  44:23 45:10 52:13 97:10
105:6

**hand**  14:5 54:8,9 71:20 117:5

**handed**  14:14 65:12 66:4

**handing**  44:15

**handle**  10:4

**handles**  75:10

**hands**  36:20

**Hang**  93:1

**hanging**  46:1

**happen**  105:11

**happened**  7:16 8:24 20:2 23:17
24:25 32:2,8 46:5 54:25 67:12 71:7
72:12 76:14 78:1 82:9 89:18 95:23
106:5 108:23 117:2,7 118:10

**happening**  24:14 30:25 32:15 55:25
56:3,13 73:2,4 111:19 118:15 119:8

**happenings**  23:16 27:21

**happy**  28:19 57:22 91:1

**harassment**  112:13

**hard**  89:24 115:20

**harsh**  69:24

**head**  5:8

**heading**  51:4

**health**  58:17

**hear**  20:19,25 21:19 22:15 23:6,8
35:6 45:14,22 97:5 100:3,9,13
110:20

**heard**  7:8 19:17,24 20:1,12 22:6
23:4,13 24:8 34:2 35:7 36:15 48:17
76:23,25 77:8,12 83:22 99:12,24
100:17 118:9

**hearing**  21:19 22:12 33:1 35:11,15
42:3 99:18 118:14

**hearsay**  19:15

**heavier**  49:16

**heavy**  48:5

**held**  33:1 76:10

**Hell**  98:12

**helping**  93:23

**hey**  45:7 60:10 117:1

**hidden**  102:20

**high**  44:3

**highly**  98:6

**hilarious**  115:8

**hire**  9:22

**hired**  26:23 57:25

**hiring**  9:19

**hold**  8:23,25

**honest**  120:15

**honestly**  38:9 99:6

**hosted**  48:1 49:20

**hosting**  43:11,20 47:7 50:4 86:22
87:5

**hour**  45:4,5

**hours**  71:1

**house**  20:2,14 22:22

**hypothetical**  82:7 84:24 86:13
101:1 113:23,25

**hypothetically**  75:25 76:1 77:25

**hypotheticals**  75:22,25 77:21 78:3

I

**idea**  117:13,16,19,22 120:11

**identifiable**  85:12

**identification**  14:11 39:3 65:6
71:19

**identified**  85:7,20 87:19 89:21
104:12 117:21

**identify**  14:8 30:19 32:5 85:14,18
86:2,8 90:1 111:15

**identifying**  85:21

**identity** 21:7 31:10 32:1 67:17,19 68:1,7 79:9 80:8,14 110:7 117:25

**Igne** 51:18

**imagine** 19:12 62:17 86:4 88:20 89:2,25 101:18 119:6

**immediately** 78:24 80:23 100:10

**impact** 33:10

**impaired** 21:16 24:9 45:25 51:3 56:16 93:11 97:17 109:10 110:16

**impairment** 21:2,4 23:9

**implicit** 78:2

**important** 5:7,13

**imposed** 34:8 35:9

**improper** 73:24 116:16

**inappropriate** 112:8,13

**incident** 19:3,4,10,21 20:20 24:22 25:15 31:3 32:22 35:24 36:10,17 37:24 41:11 42:12,13,23 54:25 55:3, 11 57:15,18 67:8,15,24 68:18 69:1, 12,16 70:22 71:7,13 72:11,24 82:23 84:21 86:24 87:25 88:1 90:16,20 104:5,8 109:19 112:18,20 114:5 117:12,15 120:7,13

**incidents** 11:9 15:19,23 90:17 100:5 114:7

**include** 17:20

**including** 74:10

**individual** 31:7

**individuals** 17:9 24:3 32:1

**induced** 98:23

**infer** 24:9

**influence** 21:20 22:1,10,16 33:11, 16,20,25 34:5,7,21,24 35:2 68:11,16

**inform** 96:4 115:5

**informal** 28:13

**information** 33:9,11 34:19 59:3 81:20 85:21 87:3 106:17

**informed** 26:8,22 76:19

**initial** 20:20,25 21:15 22:8,19 23:4 40:17

**initiate** 28:22

**Initiated** 25:17

**inside** 96:2,9

**insist** 100:24

**institution** 18:15

**intend** 6:23,25

**intended** 95:11

**interacted** 102:14

**interaction** 45:18 70:7 77:13 95:11 97:9

**interactions** 54:7

**intercourse** 99:13

**interests** 10:6

**internal** 81:12,21

**interpret** 48:18

**interrupt** 45:19 47:5

**intervene** 56:6 68:21 119:7

**intimidation** 23:21

**intoxicated** 104:10

**introduce** 14:6

**inventory** 106:23

**investigate** 33:6

**investigated** 117:14

**investigation** 29:16,22 30:17 32:21 33:5,8,12,17 74:8 81:17 88:20 89:13 103:11,13,16,17

**investigations** 31:11 103:10

**invited** 44:8

**involve** 89:5,12 109:9

**involved** 22:20 27:3 31:7 49:3 56:1 69:5 83:20 104:8 110:23 116:7

**involvement** 38:22 39:19 103:9

**involving** 19:7,11 21:8 53:7 54:25 67:11,24 68:22 69:1,16 73:20 83:6 84:18,19 88:13 90:16 99:15 103:11, 19 112:9,21 113:22 116:10 117:12, 15

**irrelevant** 90:23

**Irvine** 33:5

**Israel** 7:15,20 70:4 82:21

**Ivy** 111:10,13

**IX** 59:11,14 88:18 90:25 109:14 120:10

**J**

**jabbed** 70:10

**Jackson** 4:15,18 10:16 31:21 37:13, 16 65:11 69:15 90:24 91:3 92:15 93:24 94:1,9,16,22 95:2,16 97:25 98:16 102:8,17 103:6,24 104:14 105:15 107:5 108:4,7,11 109:4 112:1,16 113:3,5,19 116:15,17 118:24

**January** 39:10 40:8 57:23

**job** 5:19

**Jonathan** 51:18

**Jones** 16:4,5 36:20,25 37:5,10,19 38:2,3 52:14,22 54:8 57:20 74:14 83:6 84:18,20 85:18, 87:21 96:7,13 100:24 104:13 109:25 114:9 116:11

**judge** 51:8

**judgment** 57:4 98:18

**June** 4:5

**K**

**Kevin** 9:4 13:12 60:25

**kind** 4:20 10:4 28:6 43:15,25 44:15, 23 45:6,8 46:9 48:2 49:5 70:10,15 93:19 95:11 104:19 110:25 111:1

**knew** 7:6 10:1,2 54:20 71:14 78:22 80:17 87:15 102:5 109:20 112:19

**knock** 45:12 96:14

**knocking** 106:7

**knowing** 53:3

**knowledge** 8:21 11:18 18:12 21:23, 25 22:3,4,7,19 29:14,17,20 32:21,25 33:4,16,19,23,24,25 34:20,23 35:1, 25 38:12 40:9,13 49:4,18 68:23 83:17,20 84:17,19 97:3,20 101:17 117:9 118:10 120:8

**Kozin** 4:5,11,16 71:25 91:4,8 113:6

## L

lack  23:13 45:16

lacked  119:16,20

laid  42:18,19

land  92:4

Lange  33:10,11,17,25 35:4 60:5 79:25 80:12,13 103:9

Lange's  85:5

language  42:6

languages  41:3

large  43:23 98:25 102:23

larger  10:2 48:1

Larry  35:4

late  45:7 46:22 60:11 109:20

laugh  114:24,25

law  92:4

laws  75:11

lawsuit  11:10 12:22 18:24

lawyer  4:18 9:15,24 10:8,19 26:23, 25 32:10 57:25 64:10 88:18,19

lawyers  10:3 32:12

lay  42:5

Leachman  15:3,6,24 19:7,11 28:1 32:22 33:2,20 34:18,21 36:20 47:7 48:9 49:3 50:1,11,18,23 51:24 57:14 74:13 83:6 84:18,20 85:4 87:19,21 92:19 93:6 95:8,25 96:8 100:23 101:7,16 102:6 104:12 114:21 115:3,11 116:10

Leachman's  96:6

League  111:10,13

learn  12:21 13:4 19:2,10 26:14 38:22

learned  13:9,13 26:16 117:11

learning  67:24

leave  44:18 108:24

leaving  44:21

lectures  102:23

led  48:12

left  46:9 58:10,11 61:25 76:21 108:22,23

legal  10:9 59:19 74:17

Leslie  4:2

letter  14:24

letting  59:23

level  41:7 46:17

levels  98:19

light  34:8 35:9 86:13

lightly  70:10

limit  94:24

lines  25:1 45:5

list  16:12

listed  17:9

listen  100:2 118:15

listened  100:14 110:19

listening  99:22

lit  28:4

lived  7:5 25:11

living  6:14 44:4

located  4:7

location  104:10

lock  45:14

locked  54:13 108:22,24

log  67:7

logic  116:23

logistics  43:15

long  6:8 27:20 44:8 97:6,8 99:22,25 100:1 118:14

long-term  23:15

longer  25:22 64:3

looked  49:5

Lori  33:20 34:18,21 92:19 116:5

lost  31:23

lot  47:5,22 48:2 75:22,25 89:18 94:21 108:16 112:18 119:3

lots  112:21

love  107:7

## M

made  40:19 46:12,14 59:25 62:4 63:2,6 68:21 69:25 75:24 76:17,19 83:10 86:11 88:24 103:15 105:24 106:3 112:23 119:6

maiden  51:19

maintain  115:9

major  41:21 86:16

make  5:18 11:3 42:25 43:8 44:19 55:2 56:12 60:24 64:15 66:20 67:25 75:16 76:9 77:1 83:25 86:15,16 93:4 94:10 98:18 113:17 114:3 117:18

makes  113:1

making  61:23 119:2

male  22:21 53:18 70:1 82:4

man  96:21

March  19:7,13, 107:20

Marco  20:3

marijuana  111:5,11

marked  14:8,10 39:2 65:5 71:18 92:9

marking  71:20

mass  40:20,21,25 41:15 72:23

matched  89:15,19

materials  59:1

matter  15:3,4,16,19,22 16:6 17:13, 19 18:23 29:22 33:6,13,17 82:21 94:17 95:24

matters  9:12 30:11

meaning  42:6 116:4,5

meant  61:6 70:12 71:14 79:4,6,7,11, 18,22 95:10

media  8:12,15 12:25

medication  120:14

meet  6:12,13 60:12,23 69:7 72:13

meeting  40:17,20 60:1,14,19 61:1, 5,9,20,25 70:4,20,21 71:11 72:10,19 74:23,25 75:21 78:19 80:20 81:24 82:4,16,22 85:6 92:10 95:6 117:10

meetings  60:6

member 13:8

members 8:20,22 18:10 19:18,19 20:5 49:24 114:16

memorialize 73:14

men 54:3 55:22 56:4 75:1,6 96:20 99:10,16,17 104:10,12,17 105:2,5,6, 10 109:19 110:23 111:17 114:4

men's 77:14,17

mention 31:12 79:25

mentioned 30:21 42:10,11 47:6, 59:8,14 64:23 68:25 69:4 72:20 77:21 99:2,8 103:18 112:7 120:12

mentioning 80:3

message 39:9 57:25 58:3 60:13 63:18 65:16 95:20

messages 8:9,13 14:1 16:16,20 17:16,17 38:25 39:8 40:7 50:17 55:23 57:24

messed 72:21

Messenger 8:17 16:19

met 13:22 58:18 69:9 75:13 102:14

meticulously 61:23

mill 19:13 35:3 40:21,25 41:15 83:12

mind 20:6 25:2 60:21 61:5

mine 69:3

minor 66:19,22 71:13 113:17

minutes 45:4 60:11 65:7 96:6,10 97:4 100:8 118:17

misconduct 83:6 103:20

missing 107:9

mistake 83:12

misunderstanding 94:15

moment 113:8

Monday 71:5,9 72:14

monster 28:2

months 83:14

moral 36:3

morning 4:16,17 46:23 47:2 71:1,8 72:12 79:15

mother 17:22 18:1 102:25

mother's 51:19

move 38:14

moved 63:3,4

moving 13:7

multiple 30:25 63:11,15

multiple-party 20:8

---

**N**

named 4:20 35:3,4

names 64:22 77:14,17 78:12 86:6 87:4 100:25 114:9

nap 46:9 52:3

narrative 11:24

narrow 67:22

nature 17:17 23:10 25:4 28:11 29:6 37:24 52:17, 58:21 59:9 62:19 63:21,23 66:9,22 70:6 87:23 88:21 90:5 94:11 114:18

necessarily 41:4

needed 27:9,11 50:12 62:4,22 63:2 95:9

Netta 35:4

news 12:18,25 13:4,7 17:23

nice 48:18

night 43:1,11,21 44:12 45:1 46:22 47:6,15,25 48:3,4,7 49:13,14,16,20 68:13,17,21, 77:25 83:21,22

noise 99:19 119:3,6

noises 100:3,9

non-consensual 37:1 51:10 56:2 57:9 70:1 75:6 81:25 82:5

non-firsthand 35:1

nonconsensual 16:1

normal 46:2,6 53:23 54:3 55:6,18, 20 96:23 110:12

normality 76:13,14

North 4:3,8

Notary 4:3,12

noted 36:2

notes 36:8 114:12,15,18

noticed 46:14

notifications 13:2

notion 61:22

November 62:8 63:17 65:18

number 8:2,6 55:20 92:1 93:10 95:4 100:22

---

**O**

oath 87:20 89:21

object 90:23

objection 31:18 74:16 92:15 93:24, 25 94:11,12,14,18,23,24 95:16 97:25 98:16 102:8,17 103:6,24 104:14 105:15 109:4 112:1,16 113:14 116:12,16 118:23

objections 94:24

obligation 31:6,19,25 36:3

obligations 31:16

observed 52:14 83:5 99:9 112:5

occasion 31:1 38:16,18,19

Occasionally 81:15

occasions 10:14 30:25 31:3

occur 108:2

occurred 19:6,12,16 20:14 31:3 40:14 57:15,18 73:15 74:14 76:6 87:25 100:20 103:13,15 105:8 107:14 108:13 112:14 116:9,13,20

occurring 57:10 73:24

odd 96:17,18 99:17

offer 29:4 105:10

offered 11:8,13,18,19

offering 42:7

office 36:4 62:7,15

officer 106:6,9,19

officers 106:16

offices 4:6

one-on-one 7:11

online 12:20

open 54:11 78:24 80:22

**opened** 81:5,9

**opening** 81:2

**operated** 10:17

**opinion** 42:7

**opportunity** 101:2

**opposed** 5:8

**options** 64:20

**oral** 11:18 16:5 17:7 18:22 29:9

**orally** 18:17,19

**order** 34:8

**original** 12:19,22 13:16,19 63:6

**originally** 108:21

**P**

**p.m.** 71:25 120:19

**packing** 107:15

**panel** 33:1

**paper** 14:17

**paragraph** 83:3 84:2,8,16 86:9,19
87:11,12 92:10,21 93:2,10 95:4,8,25
96:13 113:7

**paragraphs** 12:7,10 92:12 113:10,
12

**Pardon** 98:12

**part** 14:5,7 21:2 23:3 24:6, 40:15
61:17 76:16,18 88:20 92:21 99:3
109:8

**participant** 21:7,13

**participants** 21:2

**participate** 49:7 87:14

**participating** 48:24

**partners** 64:2

**parts** 84:12

**party** 64:1,3

**passing** 25:21 26:4 112:7,9,24

**past** 110:11

**paths** 25:13

**pattern** 73:6,8 76:16,18 79:13,16
83:5 84:22 85:23 86:3 87:16 89:23

114:5,6

**penalty** 11:19 34:8 35:9 84:5 86:1,5

**people** 23:15 24:5 25:6 30:15 36:12
44:1 47:7 54:5 64:22 76:7,8 83:20
87:4 98:18 100:25 103:4 108:25
110:7 116:3,4

**perceive** 41:4

**perceived** 40:22 41:8,12

**percent** 41:4

**perception** 24:14 41:2 42:5

**perfectly** 101:1

**performed** 33:5

**period** 97:7

**perjury** 11:19 84:5 86:2,5 115:15,
16,18,19

**perpetuated** 74:2

**person** 9:7 13:22 17:11 18:15 29:7
48:18 50:8 80:18 115:6,7

**personal** 10:21,23 82:20,21 97:20

**personally** 69:16 97:14

**personnel** 102:1

**persons** 18:23 54:7

**Pesetski** 40:13 42:19 69:8 70:7,24
71:2,12 72:4,6,14 73:13 74:25 75:5,
17,20 76:21 77:3,7,19,23 79:17
80:22 81:23 82:3,15,23 84:9,11,20
85:7, 86:10,15 87:2,14,18 88:5,10
90:2,12,15 91:9 92:11,18 95:6,14
96:4,11, 100:16,24 101:8,19 105:24
106:3 109:23,25 110:6 111:14
113:9,12,21 114:10,20 115:1,10,17
116:19 117:10

**Peter** 33:10,11,16,25 60:5 79:25
80:12,13 116:5

**phase** 20:20,25 22:8,19 23:4

**Phi** 49:11,12,15

**phone** 8:2,5,6,10 13:24 16:16,18
40:5 50:18,20 62:15,18 109:2

**phones** 50:12

**phrase** 19:5 20:4 40:24 54:22 95:19

**phraseology** 19:5

**physical** 23:20

**physically** 54:10

**pick** 47:1

**picked** 29:23

**picture** 20:11 119:14

**pictures** 107:19

**pilfered** 107:8

**place** 35:21 46:16,18 51:8 53:11
63:24 68:8,14,19 74:5 86:22 118:7,8
119:21

**places** 76:7,8

**play** 57:7 58:25

**pleadings** 58:20

**plenty** 10:3 99:4,5

**PLLC** 4:7

**point** 5:21 6:7 7:2 13:13 21:6 24:19
25:9 27:2 28:10,12 40:23 41:13,14,
21 43:14,19 44:18 45:13,24 46:4
50:2 51:7,9,12 52:2,10 56:8 58:1
59:17 61:11 65:2,3 73:1 77:17 78:2
79:5 82:18 83:14 86:4 88:14 93:7
102:3,13 106:6 110:11 111:13

**points** 112:23

**police** 30:5 56:22,24 106:2,6,9,15
108:13,18

**policies** 81:12 92:5

**policy** 69:19,21

**portion** 76:22 77:4,8

**portions** 76:25

**posed** 6:10

**possess** 110:24

**possession** 111:6,11

**possibility** 10:1 19:15

**Possibly** 87:9

**potential** 40:23 59:4,16

**predicate** 108:12

**prefer** 20:10

**pregame** 43:11,20 44:2,9 46:13
47:8,14,24 49:21 50:22

**premise** 32:16

**present** 58:25 60:14 75:10 77:22
106:4,11

Case 1:16-cv-01038-CCE-JLW   Document 81-3   Filed 02/02/18   Page 43 of 49

**presented** 36:5 86:12,14

**preserve** 31:6,16,25

**pressed** 45:15,20,22

**pretend** 73:9

**pretending** 72:25 110:11

**pretty** 41:12 48:14 102:15 103:21

**prevent** 57:11

**prevented** 90:16

**previous** 30:5 48:6

**previously** 9:3 43:5 66:1

**prior** 9:15,18 63:7 95:10 110:13

**privacy** 31:6,17,25

**private** 51:5

**privately** 7:14

**problems** 79:2,8,19,21

**proceedings** 31:7

**process** 10:10 14:6 30:9 33:21 34:1,21,24 35:2 63:12 73:20

**produced** 38:25

**product** 30:11 36:15

**professional** 89:11

**professor** 102:23,25 103:1 114:22 115:3

**prompt** 13:9

**proof** 74:18 91:2

**proper** 75:15

**proposal** 61:10

**proposed** 58:20 61:8

**proposition** 31:19

**protect** 74:8 114:4

**provide** 26:1 29:6 64:16,20 72:16 78:5 86:25

**provided** 64:12 78:8,11 84:14,23 86:25 89:3,10

**provost** 27:24 35:3 80:4,6,11,12 103:8

**provost's** 20:2,14 22:22 85:5 102:7, 12,16

**public** 4:3,12 101:17

**purpose** 61:2,13,16,17 72:9,18 73:10 118:6

**purposes** 95:21

**pursuant** 106:23

**pursue** 29:2 59:19

**pursued** 59:22

**push** 89:25

**pushing** 27:6 59:9

**put** 28:7 62:3

---

**Q**

**Qayumi** 4:20 6:13 7:4,22 16:1 19:3, 7,11 21:12,16 22:9,16,20 24:9,23 25:10 26:6,14,23 28:18 29:1,12 30:18 35:23 36:19,24 37:3,8,12,18, 25 40:15,17 42:11 53:7 55:2,13 59:4,25 67:11,25 68:16 90:17 91:24 109:2

**Qayumi's** 8:20 9:12 17:7 29:15,21 32:22 87:25 120:7

**quad** 7:12 24:24 25:4

**qualified** 10:22 37:21 98:18

**qualify** 33:24 34:20 36:13

**question** 5:15,18,21,25 6:9 16:4 22:11 31:13,22 32:7,9,14,15,17 33:14 34:18 35:13 36:16 37:7,22 49:13 55:9 57:20 65:15 67:1 68:13 77:2 90:23 97:22 101:3,5 119:24,25

**questioned** 90:4,5

**questions** 6:2 35:14 37:20 47:1 56:15,17 84:3,9,10,11 91:4,15,25 107:6 113:9 120:17

**quick** 44:19 65:15

**quicker** 91:18

---

**R**

**RA** 56:12

**rabbi** 9:23 18:14 27:9,15,17 36:2 38:19 39:25 40:5

**raise** 103:3 117:5

**range** 39:16

**rape** 21:21,22 22:2 36:13,14,18,19

53:4,10,13 54:23 68:12,17 99:5 116:13,19

**raped** 116:25

**re-characterized** 94:3

**reach** 26:6,11 41:14 68:3 81:18 102:3

**reached** 28:18 38:15 40:21,25 41:15 73:1

**reaches** 25:2

**reaching** 57:11

**reaction** 111:18

**read** 13:7 86:18 104:3

**reads** 83:4 84:16

**ready** 62:4

**reality** 41:2,3 42:5

**realized** 70:19

**realm** 110:12

**reason** 5:2,7,13 30:22 38:6 40:3 69:5 114:23 115:2,4,13

**recall** 7:19,24 8:1 12:3 13:6 19:17 23:22 24:24 25:2,24 27:20 28:6 30:20 41:13 44:6,7 47:15 50:7 52:12 58:22,24 59:2,21 60:3,7,18 62:2,14, 19 66:9 77:15,16,18 78:8 80:2,5,10, 16,18 81:1 82:10,24,25 83:2 84:25 85:3,8,19,22 86:20,22,24 87:2 92:20 95:7 99:23 100:15 101:4,24 105:8 106:5,6 109:11,12,22,25 110:3,4 111:19,21 112:2 113:24

**recalling** 86:6 101:3

**receive** 10:15 63:11 66:12 106:22

**received** 12:1,19 14:22 16:11 57:24 63:14 67:3

**receiving** 12:3,15 66:24 92:22

**recognize** 71:21

**recollection** 23:16 25:14 80:21,25 89:17

**recommendations** 64:10

**recommended** 9:23

**record** 4:5 27:14 65:12 90:22 91:10, 23 94:14 102:13 109:17

**recorded** 23:1

**recordings** 58:25

**records** 14:7 91:13 101:20

**recount** 42:22

**RECROSS-EXAMINATION** 91:21

**recused** 103:9

**REDIRECT** 113:4

**reentered** 72:20

**refer** 45:16 53:6 101:7

**reference** 20:8 25:14 67:4,5 84:8 112:25

**referenced** 12:8,9 55:1

**references** 118:13

**referred** 64:4,7 68:12,17 80:3,4,6 113:8

**referring** 19:3 24:20 25:3 36:17 43:2,4 55:12 78:15 104:18 112:12, 17

**refers** 58:4 74:6 92:12 105:1

**regular** 54:1

**relating** 82:19

**relation** 40:17 42:13 69:11 73:12

**relationship** 7:3 9:18 23:15 28:11 43:12 48:10,13 78:11 85:13,23 102:24 114:22 115:3,12

**relative** 39:11

**relay** 77:3,7

**relayed** 76:20

**release** 91:9,12

**relevant** 43:6 90:24 92:8

**religious** 18:15

**remained** 96:2 97:1,3

**remember** 19:24 20:4 35:10,15 39:22 44:16 46:11,14 47:24 49:23 59:7,11,13,16 61:10 64:22,24 69:20 78:11 80:7,13 84:10 86:25 93:19 99:18 102:2 107:17

**remembered** 114:13

**remind** 5:2

**removed** 71:6 76:14

**repeat** 22:11 37:2

**repeating** 37:20

**rephrase** 5:24 6:4 35:13 36:16 55:9 119:25

**report** 28:3,4,9 30:3,4,7,8 32:22 36:5 39:23 40:12 41:16 42:14 54:19 56:12 59:23 69:22,25 70:9 84:18 88:11,14,21 90:2,10,16 92:3 95:14 96:11,16 105:24,25 106:3 113:18 116:1 117:3 118:6

**reported** 75:12 84:17 92:7,11,18 105:14 113:8,11 117:3

**reporter** 4:2 5:5,18

**reporting** 81:12

**reports** 83:5,9,11 84:17,19

**represent** 4:19 14:14 64:4 91:24 107:3

**representation** 64:4,6

**representative** 35:23

**representatives** 17:8

**represented** 4:21 8:25 9:3,8 26:14

**representing** 10:5 64:1,2

**request** 16:21

**requested** 16:12

**requesting** 72:10

**requests** 16:14

**required** 82:25 84:13

**requirements** 75:13

**resembled** 63:10

**reservations** 61:20

**reserved** 120:18

**respect** 31:20

**responded** 60:9

**response** 28:2 79:1 90:15

**responses** 5:8,10 76:3,5

**responsible** 69:18 76:10

**responsive** 16:13,21

**restate** 67:1

**restated** 94:3

**retain** 9:9,24 64:10

**retained** 9:15 10:7 33:6 58:2

**return** 6:23

**returned** 51:2

**returning** 33:23

**reveal** 18:13 31:8,10 110:7

**review** 12:5,20 14:13 39:6 66:11 114:12

**reviewed** 12:12,16 114:18

**rise** 11:9

**role** 9:11,25

**room** 7:14 43:11,17,20,21 44:14,17, 21,22,24 45:2,11,13 46:1,3,4,10,11 47:8,11 49:21 50:12 51:2,4,11,24,25 52:3,15 53:2 54:4,8,11,20 55:23 56:4,9 72:20 73:4,15,25 76:15,21 77:13 83:21 95:9,12,21,23 96:1,8, 14,21 97:1,3,6,7,15,22 98:7 99:25 100:2,10, 101:11 104:20,24 106:2,7, 12,20 107:2,15,21,22 108:2,24,25 109:18 110:8,14,17,20 114:17 116:20,21 117:1 118:9,11,15,16

**roommate** 27:25 101:8 102:12 108:20

**roommates** 43:15 101:13

**roommates'** 76:11

**rooms** 43:22

**roughly** 45:5 70:23 96:6,10 100:8

**roused** 98:6

**rules** 5:3

**rumor** 20:13,20 22:8,20,24 23:4 29:23 34:17 35:3,11,15 40:21,25 41:10,15 83:12 85:25 109:11

**rumored** 110:24

**rumors** 19:25 21:1,11 22:6 23:18,23 24:8,17 30:11,24 34:2,3,4,10,13, 36:15 48:17 72:23 99:1,3 103:19,22 109:8 112:18,21

**run** 7:13

**running** 60:10

**rush** 48:22 49:2,5

---

**S**

**sake** 14:16

**sat**  36:7

**Saturday**  43:1,10 46:22 47:6 48:2 77:25

**saved**  8:11

**saving**  14:16

**scenario**  86:12

**school**  6:20 44:3 50:5 78:12

**search**  16:23 106:2,5,12,20,23 107:1,2 108:13

**searched**  16:15

**searches**  106:11

**secondhand**  22:4 23:25 30:24 40:13

**seconds**  25:22 49:5

**Self's**  85:10

**semester**  107:16

**sense**  98:14,22 113:1

**sentence**  87:17

**separate**  89:6,13,14 100:4 114:7

**separately**  43:12

**September**  66:2,6

**served**  47:18 61:14

**service**  63:24

**set**  13:2 24:1 53:23 55:16 77:23 88:12

**setting**  7:11 117:9

**sex**  54:5 95:18 104:11 105:6

**sexual**  16:1 19:6 20:2,8 22:21 23:17 24:3, 27:5,6 36:25 37:4,9,15,19,23 38:1 45:18 51:10 55:24 56:2 57:9 73:15 75:7,10 77:13 81:25 82:5 83:6,19 92:3 95:11,21 96:22 97:9 99:12 103:20 109:1 110:20 116:9 118:12

**shaking**  5:8

**shape**  86:7 88:16

**share**  58:19 59:3 61:8 87:15

**sheets**  46:15 72:20

**shocked**  70:9

**short**  17:5 70:20 99:23

**shortly**  19:12 60:11

**show**  58:23

**shown**  104:9

**side**  43:21,23

**Sig**  49:2,4

**Sigma**  49:11,12,15

**sign**  62:4

**signature**  120:18

**signed**  11:1,6,21 66:18 84:4

**signing**  61:21,22,25

**similar**  36:6,7,10 72:24 84:17,19 88:12

**simply**  98:7

**sir**  4:23 5:1,6,12,20 6:5 12:24 19:9, 23 65:17

**sit**  20:16 21:24 25:25 35:18 37:17,24 53:7,16 63:1 66:17 67:13,14,16 68:10,15 87:24 88:2,4 113:10 114:11 116:1

**sitting**  89:17 107:24

**situation**  27:10 36:7 57:12 72:22

**situations**  73:5

**sketch**  61:11

**sleep**  46:18 73:21

**slight**  62:3

**slightly**  97:22

**small**  43:20

**sober**  23:17

**social**  8:12,15

**sociolinguistic**  41:2

**sociolinguistics**  41:1,24 42:1,4

**soliciting**  105:6

**son**  92:19 102:7,12,16 103:11

**sort**  10:5 11:1,13,18 22:1 23:21 25:8 31:3,23 34:17 37:21 61:11 70:19 88:20 99:6,18

**sound**  99:24 104:5, 105:13

**sounds**  45:17 77:13 97:5,9 99:12 103:20 104:4 105:16 110:20 118:9

**source**  22:5 34:9 83:14

**South**  104:9

**span**  99:23

**speak**  8:24 18:2,6,7 27:11 28:20 29:1 42:12 57:14,17 71:14 73:13,19 82:22 106:8 116:18

**speaking**  5:16 35:10 36:2 53:10 60:7 62:14 64:21 77:1 94:10 119:17

**specific**  31:12,14 60:18 73:12 76:7 112:3

**specifically**  19:24 20:22 21:8 38:4 40:16 46:12, 62:14 64:19,23 76:20 99:4 105:1 111:24

**speculate**  21:17 35:21 68:14, 90:19,21

**speculation**  29:23 118:20,22

**spend**  52:10

**spending**  51:13,16

**spoke**  7:22 24:1 35:23 38:19 39:25 40:5,11 42:10 43:14 53:12 62:17 104:1 113:21

**spoken**  7:8 10:13 13:19,24 15:18 16:5 18:14 24:22 29:8 68:24 72:22 82:15 99:1

**spring**  15:7 107:20

**stage**  21:15

**stairs**  45:9

**stand**  113:20 118:14

**standard**  55:20

**standing**  92:22

**start**  5:15,17 17:15 18:21 40:15

**started**  100:5

**state**  4:3 38:11 95:1 119:10

**stated**  73:4 89:8 96:22

**statement**  11:19 36:14 42:4 67:3 79:23 86:14,15 113:6

**statements**  117:23

**stay**  95:12

**stayed**  45:8 52:2 97:6

**steered**  95:25

**step**  90:12

**steps** 68:6 120:1,4

**stepson** 80:12,13 85:5 102:18

**Steven** 35:4

**stick** 55:10

**stipulate** 91:1

**stole** 108:18

**stolen** 108:10

**stood** 93:18

**stop** 46:25 57:12 95:4 119:7

**stopped** 27:24

**story** 46:25 77:24

**Street** 4:7 20:3

**strike** 6:22 15:1 33:10 61:19 63:17 73:11 77:20 88:3 116:7

**strong** 46:20 70:13 73:23 116:22

**strongly** 109:11

**struck** 69:22,24

**structure** 61:12

**student** 6:15,19 28:14 33:1 44:3, 50:4,23 51:1 53:9,17,23 55:1,3,7,12 56:1 58:6,9 60:16 67:8,17,20 68:1,3, 4,7,11,21,22 69:1,19,23 70:2,22 71:2 75:7 78:9,10,15 82:1 86:22,23 87:5 88:1,21,25 90:6 92:5 98:7 99:18 101:20 113:22 117:12,15,17, 20 118:1

**student's** 50:6 81:9 86:21

**students** 31:10,17 53:18,24 55:18 78:14 79:3 81:24 82:4 83:15 86:3 88:14 89:22,24 90:1,3 102:21,24 103:2

**studying** 41:1 106:18

**subject** 15:3,4,16,19,22 16:6,9 17:13,19 18:23 22:5 30:17 31:11 32:15 35:11 81:14

**subjected** 36:19 82:4

**subjective** 10:18

**submitted** 61:17 63:10 82:25

**subpoena** 12:8,16 14:15,22 16:11 17:10,13

**subpoenaed** 12:2

**subsequent** 112:13

**substance** 9:6

**substantiate** 36:21

**substantiative** 87:10

**substantive** 66:23

**Sue** 35:4,6

**sufficient** 89:3,4,5

**suggesting** 108:18

**Sunday** 46:22,23 71:7,8 72:7,12 79:15

**support** 29:7 119:1

**surprised** 70:11

**surroundings** 98:15

**suspect** 51:9 56:2

**suspected** 51:2 53:25 54:2 75:8,18 82:6

**suspecting** 74:22 108:13,15

**suspicion** 46:20 76:12 98:22,25 116:23

**suspicions** 48:17 98:6

**suspicious** 96:18

**Swanson** 4:7

**swayed** 93:18

**swear** 11:16 86:1,5,7 87:20,22 89:21

**switched** 13:14

**sworn** 4:12,22 11:8 84:4

**synopsis** 29:25

---

**T**

**table** 91:5

**taking** 102:22 120:13

**talk** 27:14 101:21

**talked** 60:25 89:23

**talking** 7:13 29:5 44:1 55:3 78:13 80:18 101:10 114:2

**telling** 42:3 78:22

**ten** 49:5 83:3

**term** 47:8 53:4,6 69:24

**terms** 16:4 21:18 77:21 86:12 90:10 113:22

**terribly** 6:7

**testified** 4:13 94:15 116:13

**testify** 41:25 99:7 113:11,18

**testifying** 94:8,17

**testimony** 4:22 11:9,16 113:20 120:15

**text** 8:8 14:1 16:15 17:16 38:25 39:8, 9,11 40:7 46:10 50:13,14,17 55:23 57:24 58:3 60:13 62:10,11,16 63:18 65:15,18 95:20

**texted** 44:15,16 50:11 60:10

**theft** 108:2,7,8

**theoretically** 75:12 108:24

**theories** 59:17,18,19

**thing** 6:6 35:7 42:19 82:8 93:4 105:14

**things** 16:17 22:12 27:7 29:23 43:16 46:21 47:4 53:11 62:22 73:3 83:22 84:1 92:7 95:5 98:20 105:21 107:8 113:18

**thinking** 83:13

**thought** 70:15 119:1

**thoughts** 91:17

**threshold** 75:13

**thrown** 46:16

**tiles** 95:18

**time** 7:10 12:12 14:13 15:5,12,14 19:16 22:8 24:17 28:14 38:7 39:17 41:19 44:24 45:21 48:10 50:9 51:13, 17,24 52:10 55:19 56:2 57:3 58:7,9 63:1,8 67:2,3,6,12 69:3 70:14 72:17 73:5 75:9,23 76:17 78:4 79:10 81:21 82:22 84:15 86:11,21 87:6,8 89:16 90:21 93:8 95:19,22 96:18,24 97:7, 15 98:3,25 99:9,22 100:9 102:16 103:8 106:10,13,18 107:17 111:7, 18,22 114:3 118:4 119:8

**timeframe** 39:21

**timeline** 103:14

**times** 13:18 20:5 69:3 76:7,8 92:1 100:22 108:23

**timing** 90:17

**Title** 59:11,14 88:18 90:25 109:14 120:10

**today** 4:22 5:5 9:1 20:16 21:24 26:1 35:18 37:17,24 53:8,16 57:5 66:7,17 67:13,14,16 68:10,15 69:4 87:24 88:2,4 99:3 103:14 113:10 116:1

**told** 26:3 27:4 42:14 55:5 75:17 77:12,19,24 81:1 82:6,8 86:10,20 87:13 90:14 112:8

**top** 65:14 70:10 71:24

**totally** 116:15

**touching** 112:13

**tout** 20:6

**town** 43:16

**trained** 10:19

**trees** 108:16

**triple** 50:19

**trudging** 57:23

**true** 11:17 35:19 41:4,12 61:24 93:5, 9,15,17 96:2,3,9,10,15 97:1 117:24

**turn** 71:23

**turned** 45:10

**Twenty-one** 71:17

**twofold** 72:19

**type** 24:10,11

---

**U**

**U-shaped** 104:18

**uh-huh** 5:9

**uh-uh** 5:9

**ultimately** 48:24 61:19

**Um-hm** 111:2

**unannounced** 54:4,6

**unassisted** 119:18

**unaware** 38:6 75:9,11 103:12 104:10

**unconfused** 110:4

**unconscious** 118:19 119:1,2

**underlying** 9:12 15:20,23 18:1 19:4 25:15

**understand** 4:21 5:3,4,22 6:3 10:18 11:12 15:23 19:5 22:25 31:22 43:8 47:4,10 53:6 75:16

**understanding** 20:13,15,17 21:16 22:9 24:4,8 30:1,2 36:18,22,23 37:18,25 38:14 67:9,14 81:4,8,11,18 84:3 87:25 101:24,25 102:3,10,11 103:14 114:1 115:15

**understood** 8:19 20:7 21:12 54:22 71:10 76:3,9 79:11

**undue** 34:24

**universities** 44:6

**university** 4:19 7:1 27:22,23 44:7 59:20

**unknown** 8:22 104:8

**unlocked** 54:12

**unmistakable** 45:17 97:9 110:19

**unrelated** 69:10,11

**unsteady** 93:16

**unsubstantiated** 34:16 99:3

**unwanted** 27:5

**updates** 62:21

**upright** 92:23

**upstairs** 45:6 97:3

**upwards** 7:23

**utterly** 90:23

---

**V**

**vaguely** 59:12 87:9

**venture** 83:1

**verbal** 5:8,10 112:13

**verbatim** 28:6 78:21

**verified** 43:5

**version** 63:7 65:23

**versus** 23:9 32:16

**victim** 31:14 36:3 72:16 78:5,6 81:5 88:13 111:15

**victims** 116:7

**video** 20:3,23 23:1 30:21 109:1,12, 13

**videos** 109:10

**videotape** 112:21

**view** 42:5

**violation** 69:19,21

**Virginia** 44:6

**visiting** 44:5,7 50:5 51:1 53:9,17 55:1,3,7,12 56:1 67:8,17,20 68:1,4, 7,11,22 69:1 70:21 71:1 75:7 81:25 86:23 88:1 90:6 113:22 117:12,15, 17,20,25

**visually** 77:4

**voice** 110:21 111:18 118:14

**voicemail** 63:21,23

**voicemails** 16:23,25

---

**W**

**wait** 5:15,16

**walk** 54:4 93:21,23 94:2,6

**walked** 49:5,6 54:10,12 55:23 56:4

**walking** 25:6 44:23 92:22 94:5 119:18

**wanted** 8:18 10:3 26:11 29:2 43:7 66:19 73:13,19 75:14 84:13 91:25 95:12 108:22

**wanting** 76:9 87:20

**warrant** 89:4

**wars** 101:5 120:12

**ways** 92:1

**week** 30:8 69:9 70:23 71:13 116:2

**weekend** 74:14

**weeks** 19:21

**well-known** 102:15,19

**whatsoever** 69:6 70:20

**whereabouts** 74:9

**widespread** 103:21

**willingness** 86:25

**wished** 86:16 114:4

**witnessed** 31:1 42:14,16 75:25
76:1,22 87:5 97:14 109:19 117:3

**woman** 4:20 27:8 30:23 50:5 52:18,
22 54:2 56:8,16 74:7 79:18 93:5
95:12 96:1,8, 97:21 100:13,17 104:8
105:7 117:4,7 118:18 119:1,10

**woman's** 110:10 118:14

**women** 27:4 28:8 44:2 74:4 79:11
109:10 120:2

**Women's** 30:4

**wondering** 108:19

**word** 53:14

**worded** 61:24

**words** 45:16 75:20 80:22 92:24
93:22 95:18 104:5

**working** 10:20,23 29:15

**world** 41:2,6

**written** 15:2,16 16:8 17:15 18:3,22
29:9 92:25

**wrong** 73:3

**wrote** 72:1

_____
Y
_____

**year** 6:14 7:6 15:10 23:14 27:25
48:21 52:7 111:10

**years** 7:9,23 39:22 40:20 87:19
89:18 92:20 101:6 116:23

**York** 27:15 39:25 40:2 108:22

**young** 4:20 50:4 52:18,22 56:8 93:5
95:12,25 96:8 97:20 100:13 110:23
111:17