IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| ARIANA QAYUMI, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:16-CV-1038 |
| | ) | |
| DUKE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

The plaintiff, Arianna Qayumi, has sued Duke University for violating Title IX of the Education Amendments of 1972. She contends that Duke's response to her March 6, 2011, rape by two other students was clearly unreasonable and created a hostile educational environment, depriving her of access to educational opportunities and forcing her to transfer to another school. The evidence viewed in the light most favorable to Ms. Qayumi shows that Duke's response was not clearly unreasonable, and therefore Duke's motion for summary judgment will be granted.

## THE EVIDENCE

Ms. Qayumi began attending Duke in the fall of 2010.[1] Doc. 81-6 at ¶ 2. According to Ms. Qayumi's evidence, on March 6, 2011, a fellow student, Colby

---

[1] At summary judgment, the Court views the evidence in the light most favorable to Ms. Qayumi, the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Therefore, the Court will not recite conflicting evidence supporting Duke's view of the case. The Court has included Duke's evidence that Ms. Qayumi has not contradicted.

Leachman, drugged her and then raped her. *Id.* at ¶¶ 3-10. Mr. Leachman was the son of a Duke professor and the stepson of the Duke provost, and the rape occurred in the provost's home. *Id.* at ¶¶ 6, 10. He also invited another student, Brian Self, to rape Ms. Qayumi while she was drugged. *See id.* at ¶ 10. This rape occurred later that night in Mr. Self's dorm room. *Id.* Mr. Leachman recorded a short video of Ms. Qayumi's rape by Mr. Self. Doc. 71-3 at 3, 4-5. After the event, Mr. Leachman showed the video "to a few people, but not [his] entire fraternity." *Id.*

Ms. Qayumi awoke the next day with bruises and indicators of sexual activity but no memory of any sexual encounters. Doc. 83-2 at 6. She visited the Student Health Center on March 6, but she left without seeing anyone. Doc. 71-16 at 37-38. She left anonymous notes to Resident Advisors reporting that someone had engaged in sexual conduct with her, that she was bruised, and that she didn't remember the event. Doc. 83-2 at 6-7. She did not provide the names of anyone involved, including her own. *Id.*

A little more than a month later, the Duke University Police Department heard about two incidents of possible sexual misconduct. Doc. 71-7 at ¶¶ 3-4. Officers Dyson and Stotsenberg investigated the rumors by interviewing numerous students to identify persons with firsthand knowledge or information. *Id.* at ¶¶ 4-11. They eventually identified Mr. Leachman and Mr. Self as two of the men involved in the two incidents. *Id.* at ¶¶ 3, 11. During interviews by law enforcement, Mr. Leachman and Mr. Self each said the sexual activity was consensual in both incidents. *Id.* at ¶ 11; Doc. 71-3.

As to the incident not involving Ms. Qayumi, several other witnesses reported that the woman involved had told them at or around the time of the event that it was

2

consensual. Doc. 71-7 at ¶ 12. Mr. Leachman and Mr. Self as well as the other witnesses denied knowing the woman's name, and Officer Stotsenberg was unable to identify the woman involved. *Id.* at ¶¶ 11-12.

As to the incident involving Ms. Qayumi, Mr. Leachman initially lied to Officer Stotsenberg, denying he had videotaped a sexual encounter. *Id.* at ¶ 14. When Officer Stotsenberg examined Mr. Leachman's phone and located the video, Mr. Leachman again lied and identified the woman as his previous girlfriend. *Id.* Eventually, Mr. Leachman admitted that the people in the video were Mr. Self and Ms. Qayumi. *Id.* He continued to say the sexual encounter was consensual. *Id.* at ¶ 11. On the video, Ms. Qayumi clearly and audibly objected to the videotaping, but she cannot be heard either explicitly consenting or objecting to the sexual activity. *See* Doc. 71-3 at 5.

Officers Stotsenberg and Dyson then interviewed Ms. Qayumi. Doc. 71-7 at ¶ 15. She told the officers she did not remember having sexual contact with anyone on the night of March 6 and that she had not consented to any sexual activity with anyone. Doc. 83-2 at 5. Ms. Qayumi asked the officers to continue investigating and asked them to talk with her further after finals were over. *Id.* at 6, 8. She also asked the officers not to disclose her name at that point. *Id.* at 8.

At some point around this time, Mr. Self and Mr. Leachman told Ms. Qayumi that they could be expelled and urged her not to "get them in trouble." Doc. 71-4. Ms. Qayumi reported this to the Duke Police. *Id.*

In June 2011, Stephen Bryan, Duke's Associate Dean of Students, began an investigation into the incidents involving Mr. Leachman and Mr. Self. Doc. 71-10 at ¶ 5.

3

Among other things, Dean Bryan wrote both men that he was considering whether to initiate disciplinary proceedings for alcohol policy violations, disorderly conduct, and unauthorized photography against Mr. Leachman, Doc. 71-11, and for alcohol policy violations and disorderly conduct against Mr. Self. Doc 71-12. He did not indicate he was investigating claims of sexual misconduct or rape. Lieutenant Stotensberg told Ms. Qayumi about this investigation, reminded her that "as I promised you, I have not revealed your name to [the student conduct] office," and he asked her to tell him if she still wanted to remain anonymous. Doc. 65-25 at 5.

On July 13, 2011, Ms. Qayumi told her academic dean, Dr. Baishakhi Taylor, that she believed she was a victim of sexual misconduct in March 2011. Doc. 65-27 at 3. Ms. Qayumi told Dr. Taylor she wanted to maintain privacy for the time being so she could "decide what to do." *Id*. Dr. Taylor reported the incident to several Duke administrators, including Dean Bryan. *Id.*

Duke administrators thereafter contacted Ms. Qayumi on several occasions, informing her that her cooperation was needed to go forward with university disciplinary processes against Mr. Leachman and Mr. Self for sexual misconduct and providing information about Duke's resources for sexual assault victims. *E.g.,* Doc. 68-2; Doc. 68-3. In September 2011, Ms. Qayumi told Dean Bryan she did not want to be involved in a disciplinary case and she did not want to talk about the incident. Doc. 68-4 at 3.

In November 2011, Dean Bryan issued a formal warning and written reprimand to Mr. Leachman for violating two aspects of Duke's alcohol policy. Doc. 71-13 at 3. He also said that Duke was dropping the sexual misconduct investigation because the victim

4

decided "not to engage," but noted Mr. Leachman's "very concerning" behavior. *Id.* In January 2012, Dean Bryan gave Mr. Self a formal warning and written reprimand for violating Duke's alcohol policy. Doc. 71-14 at 3. Dean Bryan's letter to Mr. Self did not mention any investigation into sexual misconduct. *Id.*

Ms. Qayumi took a leave of absence from Duke in the spring of 2012. Doc. 83-2 at 23. That spring, she sent Officer Dyson several emails indicating she was ready to talk and wanted to "file an official police report about what happened to me." Doc. 65-25 at 2-4. In May 2012, she spoke with Officer Dyson by phone. Doc. 71-16. Officer Dyson told her he had discussed the case with a Durham County prosecutor, who told Officer Dyson that Ms. Qayumi would need to testify if charges were brought. Doc. 71-6 at 4. Ms. Qayumi told Duke police officers that she was ready to testify, but officers told her the prosecution would not be successful. Doc. 83-2 at 20-22.

Later that summer, Ms. Qayumi told Dean Bryan that she wanted to initiate a disciplinary case, but she did not follow through on the next steps when she returned to school in the fall of 2012. Doc. 71-10 at ¶¶ 12-13. Eventually, in March 2013, she submitted a written statement accusing Mr. Leachman and Mr. Self of non-consensual sexual activity and unauthorized recording. *Id.* at ¶ 14; Doc. 68-1. Near the end of the month, Dean Bryan sent a no-contact order to both men, directing them not to have any contact with Ms. Qayumi. Doc. 71-10 at ¶ 16. The Office of Student Conduct also initiated disciplinary procedures against both men. *Id.* at ¶¶ 15-16.

Officer Stotsenberg then re-interviewed Ms. Qayumi in March 2013. Doc. 71-7 at ¶ 19. Duke Police officers again discussed the case with the Durham County District

Attorney, who declined prosecution. *Id.* Duke police officers did not independently initiate any criminal charges against either Mr. Leachman or Mr. Self and no criminal charges were ever brought against either man.

After Ms. Qayumi's written charge in March 2013, Duke hired Celia Irvine, a clinical psychologist, to further investigate, and Dr. Irvine prepared a detailed report that was submitted to the disciplinary panel. Doc. 71-18 at ¶¶ 3, 6-10; Doc. 71-19. The Panel conducted a hearing, at which Ms. Qayumi, Mr. Leachman, Mr. Self, Dr. Irvine, Officer Dyson, and Officer Stotsenberg testified. Doc. 71-20 at ¶¶ 3-5. The Panel noted the lack of evidence from independent witnesses, the evidence from the video tending to indicate Ms. Qayumi was not impaired, and the discrepancies between the various accounts over time of the events of March 5. Doc. 71-15 at 9-10.[2] The Panel unanimously found that there was not a preponderance of evidence that Mr. Leachman and Mr. Self had violated Duke's sexual misconduct or harassment policies. *Id.* at 10. The Panel accepted Mr. Leachman's plea of responsible to the charge that he had violated Duke's Unauthorized Surveillance/Photography policy and placed him on probation for his remaining time at Duke. *Id.*

After the hearing, Ms. Qayumi asked Duke's Office of Institutional Equity to investigate the handling of her case. Doc. 65-39 at ¶ 4. That office concluded that there was insufficient evidence that she was denied any rights under Title IX or otherwise subjected to a hostile educational environment. *Id.* at ¶¶ 5-6.

---

[2] Record cites to the Panel's report will use that document's internal pagination.

This lawsuit followed. Ms. Qayumi asserts that Duke violated Title IX by its deliberate indifference to her sexual assault. Doc. 16 at ¶¶ 56-63. She further asserts that Duke was negligent in the way it responded to her sexual assault. *Id.* at ¶¶ 75-79.

## ANALYSIS

I.  **THE TITLE IX CLAIM**

Title IX of the Education Amendments of 1972 provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has recognized an implied private right of action under Title IX, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 709 (1979), and money damages are available in such suits. *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 76 (1992).

A plaintiff bringing a Title IX hostile educational environment claim must show that: (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution. *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 695 (4th Cir. 2007).

"If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference ... cause[s] [the victim] to undergo harassment or make[s] [her] liable or vulnerable to it." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 644-45 (1999) (internal citations omitted). An institution is

7

deliberately indifferent to third-party harassment "only where [its] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648. Title IX liability is appropriate only if the school "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Id.* at 645. Deliberate indifference is a high bar. *E.g., Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011) (observing that deliberate indifference "is a high bar, and neither negligence nor mere unreasonableness is enough").

As the evidence recited above shows, many facts are undisputed. Before Ms. Qayumi made any report of the rape, Duke police officers investigated rumors that two women had been sexually assaulted and those officers uncovered a video of one of the sexual encounters. Doc. 71-7 at ¶¶ 3-14. The officers identified many potential witnesses including the perpetrators and, once they had identified Ms. Qayumi as a potential victim, they interviewed her. *Id.* at ¶¶ 8-11, 13-15. Duke police officers contacted a Durham County prosecutor to discuss criminal charges and stayed in touch with Ms. Qayumi and her mother. *Id.* at ¶¶ 17, 19; Doc. 71-2 at ¶¶ 8-13. When Ms. Qayumi decided to go forward with disciplinary proceedings in 2013, the Duke Police re-interviewed Ms. Qayumi and took the case to the Durham County District Attorney who declined to prosecute. Doc. 71-7 at 19.

Dean Bryan began a disciplinary investigation into Mr. Leachman's and Mr. Self's conduct in June 2011, before Ms. Qayumi reported the matter to any Duke administrator. Doc. 71-10 at ¶ 5; Doc. 71-11; Doc. 71-12. After Ms. Qayumi reported the incident to

8

her academic dean, Dr. Taylor submitted a report to Duke's conduct office within five days. Doc. 65-27. Within a month, Dean Bryan told Ms. Qayumi that she could initiate student disciplinary proceedings and advised her of available resources for support and treatment. Doc. 68-2 (August 2011 letter). Before Ms. Qayumi was willing to participate in disciplinary proceedings, Duke imposed sanctions on Mr. Self and Mr. Leachman for violating Duke's alcohol policy, but not for sexual misconduct. Doc. 71-13; Doc. 71-14.

It is also undisputed that when Ms. Qayumi filed a conduct charge—approximately two years after the incident—Duke promptly issued a no-contact order, charged the two students with sexual misconduct, and hired an outside investigator to interview witnesses and issue a report. Doc. 71-10 at ¶¶ 14-16, 18-19. The disciplinary process included an adversarial hearing that resulted in sanctions against one of the students. *Id.* at ¶¶ 20-21; Doc. 71-15 at 10. After the hearing, Duke's Office of Institutional Equity conducted a Title IX compliance review. Doc. 65-39 at ¶¶ 4-6.

The cases finding sufficient evidence to support a hostile educational environment and a "clearly unreasonable" response are much more egregious than what is present here. Most involve facts where the victim complained, the defendant did little to nothing, and the harassment continued. *See, e.g., Davis*, 526 U.S. at 641-43; *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669-70 (2d Cir. 2012); *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000).

For example, in *Jennings v. Univ. of N. Carolina*, a university administrator responded to a student's detailed complaint about her soccer coach's extensive and pervasive sexual harassment by telling the student that the coach was a "'great guy'" and

9

that she should "work out her problems directly with him." 482 F.3d at 700. The administrator took no action and the harassment continued afterward. *Id.* This response is obviously a far cry from Duke's response here. Moreover, Ms. Qayumi has not identified any case in which a court found that a university's response similar to Duke's here was clearly unreasonable.

Ms. Qayumi contends that Duke's response was clearly unreasonable because Duke did not initiate student disciplinary proceedings against Mr. Leachman and Mr. Self for sexual misconduct for over two years after the incident occurred. Doc. 83-1 at 14-15. However, given Ms. Qayumi's clear statements in 2011 to Duke administrators that she did not want to participate in any disciplinary proceedings and recurring statements of hesitation thereafter, no rational jury could find that Duke's response was clearly unreasonable. It is not clearly unreasonable to honor a sexual assault victim's request for privacy and to refuse to initiate a disciplinary proceeding for sexual assault when the proceeding would be dependent on the testimony of the unwilling witness-victim.

Ms. Qayumi also contends that Duke police officers failed to initiate criminal proceedings after a Durham prosecutor said that a charge was appropriate as to Mr. Leachman. Doc. 83-1 at 15. While there are some disputed facts as to when Ms. Qayumi told the officers she was willing to testify in criminal proceedings, *compare* Doc. 71-6 at 4 *with* Doc. 83-2 at 22, it is undisputed that the Duke Police interviewed Ms. Qayumi multiple times, *e.g.*, Doc. 71-7 at ¶ 19; Doc. 71-2 at ¶¶ 7-13; interviewed Mr. Leachman and retrieved the video from his cell-phone, Doc. 71-2 at ¶¶ 5-6; and presented Ms. Qayumi's case to the Durham DA on two separate occasions. Doc. 71-7 at ¶ 19; Doc. 71-

2 at ¶ 11.  Given the undisputed evidence of Ms. Qayumi's hesitation to go forward with criminal charges for over a year after the incident, her admitted memory issues and confusion concerning the underlying events, and the consistent assertions by Mr. Leachman and Mr. Self that the sexual activity was consensual, the behavior of the officers was not clearly unreasonable.

Ms. Qayumi contends in her brief that Officer Dyson falsely told prosecutors that she refused to cooperate, Doc. 83-1 at 15, 24-25, and that Officer Dyson misled her into believing that "the prosecutor refused to prosecute any of the charges." *Id.* at 15. However, she did not direct the Court to any evidence supporting her contentions that Officer Dyson told falsehoods.[3]  Similarly, Ms. Qayumi contends in her brief that she repeatedly told Dean Bryan that she wanted Duke to investigate the assault against her. *Id.* at 24.  But she did not direct the Court to any evidence to support this, nor did she point to any evidence contradicting the contemporaneous documentary evidence showing that she wanted to maintain her privacy and not participate in any disciplinary proceedings.[4]  *E.g.*, Doc. 68-4 at 3 (telling Dean Bryan that "waiting to file a case if I need[] to be involved" was better for her and that she did not want to talk about the

---

[3] The Court reviewed the evidence referenced in the parties' briefs, but it did not scour the record to locate support for factual assertions in the briefs that are not accompanied by a citation to evidence.  *See Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001); *see also Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.,* 33 F.3d 390, 395-96 (4th Cir. 1994) (noting that the district court is "well within its discretion in refusing to ferret out the facts that counsel had not bothered to excavate").

[4] Statements in a brief by counsel are not evidence, much less evidence sufficient to raise a disputed question of fact. *See, e.g., Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) ("An attorney's unsworn statements in a brief are not evidence.").

11

incident); Doc. 83-2 at 18 (acknowledging that Bryan said he would pause "anything [ ] regarding the student conduct process and that he would wait to hear from me"); Doc. 71-16 at 9 (telling Dyson on May 3, 2012, that during an earlier exchange, "I wasn't able to contact [Bryan] yet . . . I guess emotionally I wasn't ready too").

Ms. Qayumi also contends that Dr. Irvine's report was rife with errors and that Duke knew Dr. Irvine was not licensed by the N.C. Private Services Protective Board to conduct investigations. Doc. 83-1 at 18-19; Doc. 16 at ¶¶ 35-41. The evidence is undisputed that Dr. Irvine interviewed Mr. Leachman, Mr. Self, Ms. Qayumi, and numerous other witnesses; reviewed the Duke Police reports; and produced a detailed report highlighting consistencies, inconsistencies, and unresolved questions. Doc. 71-18 at ¶¶ 7-9; Doc. 71-19 at 66-68.[5] Further, Duke permitted Ms. Qayumi to submit a critique of Dr. Irvine's report and additional materials to the Panel. Doc. 71-10 at ¶ 19. That Dr. Irvine's report could have been better does not render Duke's response clearly unreasonable. *See Doe v. Bd. of Educ. of Prince George's Cty.*, 605 F. App'x 159, 167-168 (4th Cir. 2015) (per curiam) (affirming district court's grant of summary judgment on Title IX claim relating to faulty investigation, which would require court "to speculate what the [defendant] might have known had school employees more thoroughly investigated"). Nor does Ms. Qayumi show that Duke made a "decision to remain idle." *See Davis*, 526 U.S. at 641. To the contrary, Duke promptly contracted with Dr. Irvine to conduct an independent investigation. Doc. 71-10 at ¶ 18.

---

[5] Because the page numbers appended by CM-ECF to Dr. Irvine's report are not legible, the Court cites to the UCB Hearing Packet's page numbers.

12

Ms. Qayumi also contends that Duke was deliberately indifferent by concealing evidence of other assaults by Mr. Leachman and Mr. Self. Doc. 83-1 at 16. This contention focuses on another student's report of an April 9 incident involving Mr. Self and Mr. Leachman and an alleged third assault by Mr. Self and Mr. Leachman. *Id.* at 4-8. However, the undisputed evidence establishes that the Duke Police interviewed multiple students who confirmed that the April 9 incident was consensual. Doc. 71-7 at ¶¶ 7-11. As to the alleged third incident, Duke Police concluded that this incident was not a separate occurrence. Doc. 71-8; Doc. 71-7 at ¶¶ 3, 5-12. Nor has she established that the police had any legal duty to disclose their investigation of another incident to her. In sum, Duke's failure to disclose an incident that it concluded did not occur and a report concerning an incident that Duke Police determined was consensual was not clearly unreasonable.

Finally, Ms. Qayumi contends that the investigation and hearing process were tainted because the process was overseen by Mr. Leachman's parents. Doc. 83-1 at 20. However, the evidence cited in support of this contention is limited to a total of four emails from Mr. Leachman's mother. One was to a Duke administrator in March 2013 soon after the disciplinary process began asking a procedural question. Doc. 83-4 at 71. The other three emails were to Dean Bryan shortly before the hearing. *Id.* at 30, 32. In those emails, Mr. Leachman's mother complained about and objected to evidence submitted by Ms. Qayumi in the hearing packet, but there is nothing to indicate that her complaints caused Dean Bryan to remove any of the materials. In fact, he consistently

13

told her that the evidence would be evaluated by the disciplinary panel. *Id.* These emails are insufficient to support Ms. Qayumi's contention.

On summary judgment, a court is entitled to decide that the educational entity's response was "not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649; *see Doe,* 605 F. App'x at 167. The undisputed evidence establishes that Duke's response was not clearly unreasonable.

## II. THE NEGLIGENCE CLAIM

Ms. Qayumi also contends that Duke was negligent by contracting with Dr. Irvine to investigate and report on Ms. Qayumi's rape to the disciplinary panel. Specifically, she contends that in undertaking to investigate her March 2013 report of sexual misconduct, Duke had an affirmative duty to exercise due care and comply with applicable statutes, and that Duke breached these duties by hiring an investigator who lacked the "training, education, or experience" required to investigate the case, Doc. 16 at ¶ 34, and who was not licensed under the North Carolina Private Protective Services Act. *Id.* at ¶ 77. She contends that she was harmed by this breach because the report was allegedly full of falsehoods, omissions, and errors. *Id.* at ¶¶ 39-41.

Ms. Qayumi has produced evidence that Dr. Irvine was not licensed by the North Carolina Private Protective Services Board as a private detective or private investigator in 2015. Doc. 81-16. It further appears that the investigation she was hired to undertake falls within the provisions of North Carolina law requiring a license. *See* N.C. Gen. Stat. Ann. § 74C-3(a)(8)(e) (defining "private detective or private investigator" as "[a]ny person who . . . accepts employment to furnish, agrees to make, or makes inquiries or

14

investigations concerning . . . [s]ecuring evidence to be used before any court, board, officer, or investigative committee."). However, Ms. Qayumi does not point the Court to any provision of this statute which imposes any duty on Duke; rather, the statute imposes duties on the investigator. *See Stein v. Asheville City Bd. of Educ.*, 360 N.C. 321, 326, 626 S.E.2d 263, 266 (2006) (holding that a negligence per se claim arises from the violation of a public safety statute "imposing upon the defendant a specific duty for the protection of others."). In the absence of a duty imposed on Duke, her negligence per se claim against Duke fails.

Nor has Ms. Qayumi produced any evidence that Dr. Irvine was in fact unqualified in 2013 to investigate the facts surrounding the March 5 events, or that Dr. Irvine did not meet the standard of care applicable to investigators in 2013 when she conducted this investigation. *See Associated Indus. Contractors, Inc. v. Fleming Eng'g, Inc.*, 162 N.C. App. 405, 410, 590 S.E.2d 866, 870 (2004), *aff'd,* 359 N.C. 296, 608 S.E.2d 757 (2005) (describing standard of care for professionals). And she has proffered no evidence that Duke was aware of any such lack of qualifications or failure to meet the standard of care. In other words, assuming that Duke had or assumed a duty to hire a qualified investigator, Ms. Qayumi has not shown that Duke breached that duty.

Finally, and in the alternative, Ms. Qayumi has not established that any breach of duty by Duke in hiring Dr. Irvine was the proximate cause of harm to her. She claims in her brief that Duke's breach "exacerbated the trauma she suffered as a result of the drug-facilitated rapes and ultimately caused Ms. Qayumi to leave Duke," as well as causing economic losses. Doc. 83-1 at 30. It is not clear whether she is contending that Dr.

15

Irvine's report led to an acquittal during the disciplinary process or whether she is contending Dr. Irvine's report made the disciplinary process more difficult for her. If the former, her contention is speculative and unsupported by any evidence.[6] If the latter, she has not directed the Court's attention to any specific evidence supporting causation.[7]

## CONCLUSION

While reasonable people might well think that more serious consequences would have been appropriate for two students who participated in the non-consensual videotaping of a sex act with another student and thereafter showed the video to other people, who lied to the police about the video, and who even under their own version of the facts behaved horribly to Ms. Qayumi and at least one other woman, this Court does not review Duke's disciplinary decisions de novo. And while one can second-guess certain aspects of Duke's failures to act in 2011, the Court does not evaluate Duke's conduct with the benefit of hindsight or in a vacuum.

The undisputed evidence shows that Duke offered Ms. Qayumi resources to assist her in dealing with the sexual assault and respected her desire for privacy and anonymity until she was ready to proceed, that Duke law enforcement began investigating rumors of

---

[6] While the Court has stated the evidence in the light most favorable to Ms. Qayumi, the disciplinary panel was under no such obligation and indeed had a duty to weigh the evidence. While Ms. Qayumi disagreed with aspects of Dr. Irvine's report, those disagreements are not sufficient to establish that Dr. Irvine was incompetent or that the outcome of the hearing would have been different had her report been different.

[7] Ms. Qayumi cites as support eighty pages of the deposition of her psychiatrist and forty-five pages of her own deposition. *See* Doc. 83-1 at 30. However, she does not direct the Court's attention to specific testimony within these scores of pages, and the Court has no duty to take on work counsel declined to undertake. *See*, *supra*, note 3. She also cites an economic loss report, but that report assumes causation. *See* Doc. 39-2.

16

Case 1:16-cv-01038-CCE-JLW Document 97 Filed 04/18/18 Page 16 of 17

sexual assault even before Ms. Qayumi reported the matter, and that upon receiving her written charge Duke initiated disciplinary proceedings against the perpetrators and gave Ms. Qayumi a full opportunity to present her testimony to the Panel. This response was not so clearly unreasonable that Duke's actions deprived Ms. Qayumi of access to educational opportunities. Nor is there any evidence Duke breached any duty of care to Ms. Qayumi in hiring Dr. Irvine. Summary judgment for Duke is appropriate.

It is **ORDERED** that the defendant's motion for summary judgment, Doc. 65, is **GRANTED**.

This the 18th day of April, 2018.

_____
UNITED STATES DISTRICT JUDGE